## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

WESKAN GRAIN LLC; COLORADO
PACIFIC RAILROAD, L.L.C.; D&L FARMS,
GP; E&D FARMS, GP; D&C FARMS, GP;
L&E FARMS, GP; NORTH FOUR FARMS,
GP; MARIENTHAL GRAIN LLC; D&A
FARMS, GP; HINEMAN LAND & CATTLE,
INC.; HINEMAN RANCH, L.L.C.; CIRCLE C
FARMS, INC.; STEVEN COMPTON;  MARK
SANDERS; and JLD PARTNERSHIP;

              Plaintiffs,

      v.

KANSAS & OKLAHOMA RAILROAD, LLC,
and UNION PACIFIC RAILROAD COMPANY

           Defendants.

Civil Action No. _____

**JURY TRIAL DEMANDED**

## <u>COMPLAINT</u>

      Plaintiffs Weskan Grain LLC ("Weskan"); Colorado Pacific Railroad, L.L.C. ("CXR");

D&L Farms, GP; E&D Farms, GP; D&C Farms, GP; L&E Farms, GP; North Four Farms, GP;

Marienthal Grain, LLC; D&A Farms, GP; Hineman Land & Cattle, Inc.; Hineman Ranch, L.L.C.;

Circle C Farms, Inc.; Steven Compton;  Mark Sanders; and JLD Partnership;[1] and, bring this action

against Defendants Kansas & Oklahoma Railroad, LLC ("K&O") and Union Pacific Railroad

Company ("UP") (collectively, "Defendants") for violations of federal, Kansas, and Colorado

antitrust laws stemming from Defendants anticompetitive business practices that have harmed

---

[1] D&L Farms, GP; E&D Farms, GP; D&C Farms, GP; L&E Farms, GP; North Four Farms, GP;
Marienthal Grain, LLC; D&A Farms, GP; Hineman Land & Cattle, Inc.; Hineman Ranch, L.L.C.;
Circle C Farms, Inc.; Steven Compton;  Mark Sanders; and JLD Partnership shall be collectively
referred to as "Farmer Plaintiffs."

grain farmers in western Kansas and eastern Colorado and prevented the development of other rail lines in the region.  For their Complaint, Plaintiffs allege as follows:

## INTRODUCTION

1.    This is a case about a multibillion-dollar behemoth in the railroad industry (UP) secretly agreeing and conspiring with a short-line railroad owner-operator (K&O) to stifle competition from a newly rehabilitated rail line and preserve control over westward shipments of grain from Lane, Scott, Wichita, and Greeley Counties in Kansas and in Kiowa County, Colorado (the "Relevant Market"). Through their secret agreement – including a "paper barrier" – and related misconduct, Defendants have (i) fixed, raised, and/or stabilized transportation prices for the westward shipment of grain in the Relevant Market; (ii) allocated markets between themselves; (iii) harmed Plaintiffs through higher prices and lost profits; and (iv) eliminated competition in the Relevant Market. As a result, Defendants violated Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1-2), and Kansas and Colorado state competition laws.

2.    Grain farmers and shippers in the Relevant Market must access West Coast markets to remain competitive, as these markets contain several of the largest mills and ports. These farmers and shippers must use nearby trains to transport their grain to West Coast markets, as trucks and distant rail lines are too expensive.

3.    According to Defendants, Kansas rail represents the "nucleus for all rail transportation in America."[2] Defendants own and/or operate much of this "nucleus," including a common carrier railroad line running through the middle of the Relevant Market (the "UP Lease Track"). UP owns the UP Lease Track and leases it to K&O pursuant to a 1997 lease agreement

---

[2] Union Pacific in Kansas, pdf_kansas_usguide.pdf (last checked January 27, 2026).

(the "1997 Lease").[3] As the diagram below demonstrates, the UP Lease Track connects to the K&O-owned Great Bend Line to the east and the CXR-owned Towner Line to the west.[4] Accordingly, absent artificial and anticompetitive barriers, freight rail traffic can physically travel west from the UP Lease Track along the Towner Line.



4.     Between roughly 1996 and 2018, parties could not transport grain west on the Towner Line due to its condition. This meant that the UP Lease Track did not connect to an active rail line to its west, so all westbound grain shipments using the UP Lease Line had to first travel east to the K&O-owned Great Bend Line and then farther east on a K&O-owned line to Hutchinson, Kansas. Only then could the freight begin traveling west. This was an inefficient and costly process for westbound rail freight. It also ensured that Defendants controlled all such freight because it traveled over Defendant-owned lines until at least Hutchinson, Kansas.

---

[3] UP originally leased the UP Lease Track to Central Kansas Railway, LLC ("CKR"). K&O inherited the lease in 2001 when it acquired the assets of CKR.
[4] The Great Bend Line runs from Scott City, Kansas to Great Bend, Kansas.

5.      CXR attempted to give shippers and farmers in the Relevant Market an alternative and more direct route west by purchasing the Towner Line in early 2018 and rehabilitating it. The line reopened for freight service in 2019.

6.      As the diagram above demonstrates, the Towner Line connects to the western terminus of the UP Lease Track, providing a direct line for westbound freight from the Relevant Market. *See also* **Ex. A** (maps showing (1) railroad ownership in western Kansas and eastern Colorado and (2) a close-up of the UP Lease Track operated by K&O). The Towner Line continues west for approximately 122 rail miles to NA Junction, at which point it connects to a line over which both BNSF Railway Company ("BNSF") and UP have trackage rights, meaning BNSF and UP must compete for rail traffic continuing west from NA Junction. *Id.* Therefore, by rehabilitating the Towner Line, CXR transformed the westbound shipment of grain from a market completely controlled by Defendants to one in which Defendants and others had to compete at multiple stages. But for Defendants' misconduct, this increase in competition for rail traffic would have benefitted Plaintiffs and other market participants.

7.      Rather than accept this new reality and compete for rail traffic on the merits, Defendants agreed and conspired to eliminate the Towner Line as an option for westbound shipments of commodities altogether. Shortly after CXR acquired the Towner Line in 2018, Defendants secretly and unlawfully amended the 1997 Lease by failing to either disclose the agreement to the Surface Transportation Board ("STB") or receive permission from the STB for the amendments as required by law.[5] They did so again shortly after the Towner Line became operational in 2019. As part of the 2019 amendment, Defendants agreed to impose a significant

---

[5] *See* 49 U.S.C. § 11323 (granting the STB authority to approve transactions like leases, mergers, etc.); 49 CFR Part 1180 (Railroad Acquisition, Control, Merger, Consolidation Project, Trackage Rights, and Lease Procedures).

interchange fee on any railcar that originated or terminated on the UP Lease Track and interchanged with the Towner Line (the "Interchange Fee").

8.      The Interchange Fee is exorbitant and clearly designed to prevent the westward flow of rail traffic from the UP Lease Track onto the Towner Line. Based on information and belief, the Interchange Fee exceeds $500 per railcar, making it cost-prohibitive for parties shipping grain west from the Relevant Market to use the Towner Line. In fact, no westbound railcar carrying any commodity has shipped from the Relevant Market and travelled over the Towner Line in the more than six years since the Interchange Fee was adopted. Defendants, therefore, have used the Interchange Fee to unlawfully maintain their dominance over westbound shipments from the Relevant Market.

9.      Defendants hid the fact they amended the 1997 Lease because, presumably, they understood the amendments were unlawful and anticompetitive. Defendants were required to obtain STB approval for the amendments, which would have required disclosure of the Interchange Fee. Defendants failed to even request (let alone obtain) approval from the STB.

10.      Likewise, multiple parties requested information concerning the amendments from K&O, including Plaintiffs Weskan and CXR. K&O refused to provide this information in every instance. Defendants did not even confirm the existence of the lease amendments until forced to do so after Weskan initiated proceedings with the STB seeking such information. Even then, Defendants refused (and continue to refuse) to disclose the actual amount of the Interchange Fee.

11.      As a direct result of their secret agreements and Interchange Fee, Defendants have (i) fixed, raised, and/or stabilized transportation prices for the westward shipment of grain in the Relevant Market (ii) allocated the market for the shipment of westbound grain from the Relevant Market between themselves; and (iii) preserved their monopoly over such shipping. In addition,

by increasing the cost of shipping grain west from the Relevant Market and preventing use of the Towner Line, Defendants have (i) decreased the amount Farmer Plaintiffs receive for their grain, (ii) increased the amount Weskan pays to transport grain west from the Relevant Market, and (iii) significantly reduced the amount of revenue that CXR generates from the Towner Line. Defendants have thereby caused antitrust injury to Plaintiffs in their respective businesses or properties in interstate commerce.

## PARTIES

12.    Plaintiff Weskan Grain LLC is a Delaware limited liability company with its principal place of business in Sheridan Lake, Colorado. Weskan is an indirect affiliate of CXR. It owns grain storage facilities along both the UP Lease Track in western Kansas and the Towner Line in eastern Colorado, including a state-of-the-art grain elevator complex near Sheridan Lake, Colorado, approximately eight miles west of Towner, Colorado at the Colorado-Kansas state line. Weskan works with grain farmers in western Kansas and eastern Colorado, including Farmer Plaintiffs, to store, sell, and ship grain. The Farmer Plaintiffs are customers of Weskan's grain storage facilities. Weskan ships grain via K&O and UP.

13.    Plaintiff Colorado Pacific Railroad, L.L.C. ("CXR") is a Delaware limited liability company and an indirect affiliate of Weskan with its principal place of business in Alamosa, Colorado. CXR is the owner-operator of the Towner Line.

14.    Plaintiff D&L Farms, GP ("D&L Farms") is a general partnership with its principal place of business in Scott City, Kansas. D&L Farms grows and stores grain in western Kansas and indirectly purchased rail transportation for grain from Defendants.

15.    Plaintiff E&D Farms, GP ("E&D Farms") is a general partnership with its principal place of business in Marienthal, Kansas. E&D Farms grows and stores grain in western Kansas and indirectly purchased rail transportation for grain from Defendants.

16.     Plaintiff D&C Farms, GP ("D&C Farms") is a general partnership with its principal place of business in Marienthal, Kansas. D&C Farms grows and stores grain in western Kansas and indirectly purchased rail transportation for grain from Defendants.

17.     Plaintiff L&E Farms, GP ("L&E Farms") is a general partnership with its principal place of business in Leoti, Kansas. L&E Farms grows and stores grain in western Kansas and indirectly purchased rail transportation for grain from Defendants.

18.     Plaintiff North Four Farms, GP ("North Four Farms") is a general partnership with its principal place of business in Marienthal, Kansas. North Four Farms grows and stores grain in western Kansas and indirectly purchased rail transportation for grain from Defendants.

19.     Plaintiff Marienthal Grain LLC ("Marienthal Grain") is a Kansas limited liability company with its principal place of business in Marienthal, Kansas. Marienthal Grain is an affiliate of Plaintiffs D&L Farms, E&D Farms, D&C Farms, L&E Farms, and North Four Farms who markets and sells grain grown by those five farms.  It indirectly purchased rail transportation for grain from Defendants.

20.     Plaintiff D&A Farms, GP ("D&A Farms") is a general partnership with its principal place of business in Dighton, Kansas. D&A Farms grows and stores grain in western Kansas and indirectly purchased rail transportation for grain from Defendants.

21.     Plaintiff Hineman Land & Cattle, Inc. ("Hineman Land & Cattle") is a Kansas corporation with its principal place of business in Dighton, Kansas. Hineman Land & Cattle grows and stores grain in western Kansas and indirectly purchased rail transportation for grain from Defendants.

22.     Plaintiff Hineman Ranch, L.L.C. ("Hineman Ranch") is a Kansas limited liability company with its principal place of business in Dighton, Kansas. Hineman Ranch grows and stores grain in western Kansas and indirectly purchased rail transportation for grain from Defendants.

23.     Plaintiff Circle C Farms, Inc. ("Circle C Farms") is a Kansas corporation with its principal place of business in Scott City, Kansas. Circle C Farms grows and stores grain in western Kansas and indirectly purchased rail transportation for grain from Defendants.

24.     Plaintiff Steven Compton ("Compton") is an individual and a resident of Scott City, Kansas. He is a grain farmer who grows and stores grain in western Kansas and who indirectly purchased rail transportation for grain from Defendants.

25.     Plaintiff Mark Sanders ("Sanders") is an individual and resident of Towner, Colorado. He is a grain farmer who grows and stores grain in eastern Colorado and, until approximately 2023, stored grain in western Kansas and who indirectly purchased rail transportation for grain from Defendants.

26.     Plaintiff JLD Partnership ("JLD") is a general partnership with its principal place of business in Eads, Colorado. JLD grows and stores grain in eastern Colorado. Until approximately 2023, grain harvested and sold by JLD frequently had to be transported through western Kansas. JLD indirectly purchased rail transportation for grain from Defendants.

27.     Defendant Kansas & Oklahoma Railroad, LLC ("K&O") is a Kansas limited liability company with its principal place of business in Pittsburg, Kansas. It is a Class III freight railroad company and a railroad common carrier.

28.     Defendant Union Pacific Railroad Company ("UP") is the operating company of Union Pacific Corporation, a Utah corporation, with its principal place of business in Omaha, Nebraska. UP is a Class I freight railroad and is the largest railroad in the world based on market

capitalization. UP owns and operates thousands of miles of rail lines in the central and western parts of the United States, including Kansas and Colorado, and is a railroad common carrier.

29.    The acts alleged to have been done by Defendants were authorized, ordered, or performed by their respective directors, officers, managers, agents, employees, or representatives in the course of their employment and while actively engaged in the management of Defendants' affairs.

30.    Each Defendant, through its subsidiaries, divisions, affiliates and agents, operated as a single unified entity with each acting as the agent or joint venturer of or for the others with respect to the acts, violations, and common course of conduct alleged herein and under the authority and apparent authority of parent entities, principals and controlling parties.

31.    Various other persons not named as Defendants have participated as co-conspirators or joint venturers with Defendants and have made contracts, performed acts, and made statements in furtherance of Defendants' unlawful acts and conspiracy. The Defendants are jointly and severally liable for the acts of such persons or entities and Plaintiffs are informed and believe, and on that basis allege, that each such entity is responsible in some manner for the occurrences herein alleged, or was acting in concert with, and with the permission, approval, and authorization of, the specifically named Defendants. Plaintiffs will seek leave of the Court to amend this pleading to set forth the true names and capacities of such parties when the same are ascertained.

## JURISDICTION AND VENUE

32.    The claims in this action arise under the federal antitrust laws, 15 U.S.C. §§ 1, 2, and 15, and Kansas and Colorado law and affect interstate commerce.

33.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 15. With respect to Kansas and Colorado state-law claims, this Court has supplemental jurisdiction under 28 U.S.C. § 1367.

34.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 and 15 U.S.C. § 15 because Defendants do business in this District, have significant operations here, and otherwise reside, are found, or have an agent here.

## FACTUAL BACKGROUND

I.    **Background of Operations in the Relevant Market**

35.    Farmer Plaintiffs are grain farmers in the Relevant Market. Much of their grain is transported to locations west of the Relevant Market, including port cities on the West Coast. Farmer Plaintiffs must transport grain west because (i) several of the largest mills are located on the West Coast, including several in California; and (ii) much of their grain is exported from ports located on the West Coast.

36.    Weskan purchases, stores, sells, and ships grain for Farmer Plaintiffs. It owns multiple grain storage facilities along the UP Lease Track and a state-of-the-art grain elevator complex along the Towner Line, approximately eight miles west of Towner, Colorado (the "Stockton Facility"). No other Weskan facility is located west of the Towner Line/UP Lease Track interchange.

37.    The Stockton Facility was completed in 2023. Because it is located on the Towner Line (i.e., west of the Towner Line/UP Lease Track interchange), Weskan can ship grain west from this facility without interchanging with the UP Lease Track and, therefore, incurring the Interchange Fee. However, this is immaterial for most farmers in the Relevant Market because they are located a significant distance from the Stockton Facility, making it cost-prohibitive for them to ship their grain by truck to the Stockton Facility to bypass the Interchange Fee. While a small number of farmers in the westernmost part of the Relevant Market can ship their grain by truck to the Stockton Facility or alternative rail lines to bypass the Interchange Fee, they still incur higher transportation costs than would exist but for the Interchange Fee. If the Interchange Fee

were eliminated, then even these farmers would ship much of their westbound grain from the Relevant Market and over the Towner Line.

38.     In a typical transaction between Weskan and Farmer Plaintiffs, Weskan purchases the grain from Farmer Plaintiffs and coordinates and pays for transportation of the grain. This includes paying any transportation costs to railroad owners and/or operators like Defendants.

39.     The price that Weskan pays to Farmer Plaintiffs for the grain is based, in significant part, on the cost of transporting the grain to its ultimate destination via rail. Therefore, when forced to pay the Interchange Fee or incur additional rail transportation costs to avoid the Interchange Fee, Weskan is forced to pay higher transportation costs and Farmer Plaintiffs receive a lower price for their grain.

40.     Farmer Plaintiffs and Weskan must use trains to transport grain any significant distance. Trucks are not a viable alternative. Shipping via trucks is significantly more expensive and, therefore, cost-prohibitive except for short-haul shipments. Trucks are also much less reliable because their supply in the Relevant Market fluctuates, particularly during harvest season. Therefore, by increasing the cost to ship grain by train in the Relevant Market, Defendants' conduct forced Weskan to pay higher prices to transport the grain and Farmer Plaintiffs to accept lower prices for their grain.

41.     Defendant UP owns the UP Lease Track and leases it to K&O pursuant to a 1997 Lease.[6] The UP Lease Track runs uninterrupted from Towner, Colorado, to Scott City, Kansas, and then to Healy, Kansas. *See* **Ex. A**. At its western terminus, it connects to the Towner Line and, at Scott City, Kansas, it connects to the K&O-owned Great Bend Line. *Id*.

_____

[6] The 1997 Lease was originally between UP and the Central Kansas Railroad, Inc. ("CKR"). K&O became the leaseholder when it purchased assets of CKR in 2001.

42.    Prior to the reopening of the Towner Line, all westbound freight shipped from the UP Lease Track had to first travel east to Hutchinson, Kansas on Defendant-owned lines. Only then could the freight begin moving west. This route was, therefore, inefficient, costly, and ensured all westbound freight originating in the Relevant Market used Defendant-owned lines.

43.    CXR acquired the Towner Line in 2018 and reopened it in 2019. The Towner Line provides a direct route west for freight from the Relevant Market. It runs for approximately 122 miles from Towner, Colorado, to NA Junction, Colorado. In NA Junction, the Towner Line connects to a line to which BNSF and UP have tracking rights. Therefore, BNSF and UP must compete to ship this freight farther west.

44.    The Towner Line significantly reduces the distance that westward rail freight in the Relevant Market must travel. As a result, upon information and belief, using the Towner Line to ship grain west reduces shipping costs by at least $500 per rail car.

45.    Pursuant to an Operating Agreement with CXR, K&O was the exclusive operator of the Towner Line from 2019 through 2021. Therefore, absent its collusion with UP and associated anticompetitive conduct, it was in K&O's independent economic interest to increase the flow of rail traffic over the Towner Line during that period. Notwithstanding, K&O did not transport a single railcar from the Relevant Market (i.e., originating on the UP Lease Track) over the Towner Line in the three years in which it had exclusive operating rights. It also secretly amended the 1997 Lease and adopted the Interchange Fee during this time. Due to the lack of rail traffic developed by K&O, the parties agreed to allow the operating agreement to expire on its own terms at the end of 2021.

II.    **Defendants Agreed and Conspired to Unreasonably Restrain Trade in the Relevant Market and Maintain their Monopoly**

46.    Again, from 1996 to 2018, parties that wanted to ship grain west from the Relevant Market had to use Defendants' rail lines. This should have changed in or after 2019 when CXR reopened the Towner Line, which gave those parties an alternative and more direct westward route for shipping grain. For the first time in decades, Defendants faced the prospect of competition for the westbound shipment of grain from the Relevant Market.

47.    Defendants responded to this competitive pressure by secretly amending the 1997 Lease in 2018 and 2019. As part of the 2019 amendment, Defendants adopted the Interchange Fee. An interchange commitment is generally defined as "a provision or agreement that may limit future interchange with a third-party connecting carrier, whether by outright prohibition, per-car penalty, adjustment in the purchase price or rental, positive economic inducement, or other means." 49 C.F.R. § 1180.4(g)(3)(i). Interchange commitments are referred to as "paper barriers" because they effectively erect barriers that prevent interchange with competing railroads, either explicitly or through fees that make it cost-prohibitive to do so (as here).

48.    Prior to the secret amendments, the interchange commitment in the 1997 Lease was a rent-based cost that was significantly less punitive than the current Interchange Fee and did not apply to rail freight traveling over the Towner Line. The prior interchange commitment, therefore, would not have prevented the westward flow of traffic from the UP Lease Track once the Towner Line became operational. When amended in 2019, the Interchange Fee became an "asset use fee" that requires payment for every railcar that originates or terminates on the UP Lease Track and interchanges with the Towner Line. Therefore, the fee applies to every railcar that transports grain or any other commodity west from the Relevant Market over the Towner Line.

49.    Defendants were required to obtain STB approval for both the 2018 and 2019 amendments to the 1997 Lease and to disclose the existence of the interchange commitment. Yet, in each instance, Defendants kept the amendments secret and did not disclose them to the STB or other market participants.

50.    Defendants fraudulently concealed the amendments despite K&O serving as operator of the Towner Line when both amendments were executed. K&O also repeatedly refused requests from CXR and Weskan for information concerning the amendments even though CXR and Weskan needed this information to effectively operate their respective business and were negotiating various arrangements with K&O to increase rail traffic over K&O-owned and/or operated lines.

51.    Due to K&O's repeated refusal to provide information concerning the amendments and Interchange Fee, Weskan instituted proceedings with the STB against K&O in 2024, seeking disclosure of the lease amendments and Interchange Fee. Only then did Defendants confirm the amendments existed. However, Defendants continue to refuse to provide the specific lease amendments, including the amount(s) of the Interchange Fee.

52.    While the precise amount of the Interchange Fee is unknown, on information and belief Defendants set it high enough to make the westward shipment of grain from the Relevant Market over the Towner Line cost prohibitive. According to calculations based on publicly available data, parties shipping grain west from the Relevant Market would save at least $500 per railcar by using the Towner Line because it provides a direct line west and significantly reduces rail travel distances compared to shipping west along Defendants' lines. Despite these potential savings, in the more than six years since the Towner Line reopened, all shippers have been required to use Defendants' lines and incur the additional transportation costs due to the Interchange Fee.

53.    Because the Interchange Fee effectively precludes parties from transporting grain west from the UP Lease Track to the Towner Line, participants in the Relevant Market must choose between the following costly options: (1) ship the grain along Defendants' lines and incur the additional costs and risks associated with the inefficient route, or (2) use trucks to transport the grain to a loading facility located on an alternative railroad not subject to the Interchange Fee, none of which are located in the Relevant Market. The second option is cost-prohibitive for most grain grown in the Relevant Market because it is not located close enough to an alternative railroad.

54.    As discussed in more detail below, both options significantly increase transportation costs for shipping grain west from the Relevant Market. This, in turn, reduces the amount of profit that Farmer Plaintiffs receive for their grain and increases the amount Weskan must pay to transport the grain west and deprives CXR of potential revenues.

III.    **The Relevant Market**

55.    The Relevant Market is the market for the westward shipment of grain by train from Lane, Scott, Wichita, and Greeley Counties in Kansas and in Kiowa County, Colorado.

A.    **Relevant Product Market**

56.    The relevant product market is the market for the westbound shipment of grain by train. This market includes all reasonable substitutes that parties could turn to if faced with a small but significant non-transitory increase in price ("SSNIP").

57.    There is no alternative mode of transportation that parties would turn to if faced with a SSNIP. Again, trucks can physically transport the grain west but are significantly more expensive and less reliable than shipping via train and, therefore, are not a reasonable substitute for shipping grain any distance over 200 miles.

58.    Parties would also not use an alternative railroad if faced with a SSNIP. The UP Lease Track is the only railroad in the Relevant Market. Therefore, to access an alternative railroad,

parties must ship their grain long distances by truck to the alternative railroad, which, again, is both costly and unpredictable. While a small number of parties in the Relevant Market have used trucks to ship grain to an alternative railroad to avoid the Interchange Fee, these parties did so in response to the Interchange Fee – a punitive fee that far exceeds a SSNIP.

**B.  Relevant Geographic Market**

59.     The geographic market conforms to the economic realities of the grain shipping market. Defendants' challenged conduct impacts the farmers and shippers residing in the counties that comprise the Relevant Market, as the UP Lease Track runs through the middle of these counties. Most farmers and shippers in the Relevant Market cannot turn to alternative rail lines located outside of the Relevant Market because it is too costly to ship their grain to those other rail lines. And none would turn to alternative rail lines if faced with a SSNIP.

**C.  Market Power**

60.     Defendants have market power in the Relevant Market. UP owns the UP Lease Track, which is the only rail line in the Relevant Market that parties can use to ship grain. K&O leases and operates the UP Lease Track. UP and K&O also own or operate all rail lines that connect to the UP Lease Track except for the Towner Line. Therefore, before the Towner Line was operational, Defendants controlled all westbound rail shipments of grain from the Relevant Market. Defendants continue to control all such shipments even after the reopening of the Towner Line because the Interchange Fee prevents the flow of any rail traffic from the Relevant Market over the Towner Line.

61.     Further demonstrating Defendants' market power in the Relevant Market, upon information and belief, the Interchange Fee increases the price to ship grain west from the Relevant Market by at least $500 per railcar. Despite this sizeable increase in price, Defendants have not lost significant market share or control of westbound grain shipments from the Relevant Market.

62.     The Relevant Market has significant barriers to entry and expansion. It would take a company several years and tens of millions or hundreds of millions of dollars to obtain approval for and construct a competing railroad.

## IV.     Defendants' Anticompetitive Conduct Injures Plaintiffs and Competition

63.     As explained above, by agreeing to the secret and unauthorized Interchange Fee, Defendants eliminated the Towner Line as a competitive option for the westward shipment of grain from the Relevant Market. In doing so, Defendants also harmed competition between UP and BNSF for shipment of grain west from NA Junction – the western terminus of the Towner Line. **Ex. A**. Therefore, the Interchange Fee turned the westward shipment of grain from the Relevant Market from a market in which parties potentially compete at multiple stages into one in which Defendants operate without competitive restraints.

64.     Defendants have injured Farmer Plaintiffs and Weskan by adopting the Interchange Fee. Again, the amount Farmer Plaintiffs receive for their grain is based, in part, on the cost to transport the grain. And Weskan pays Defendants to transport the grain. Therefore, by increasing the cost to transport grain west from the Relevant Market through the Interchange Fee, Defendants have harmed Farmer Plaintiffs by reducing profits they receive for their grain and have harmed Weskan by artificially increasing the prices it pays for transportation.

65.     Demonstrating this, during the week of December 1, 2025, Weskan sold wheat from the Stockton Facility (not subject to the Interchange Fee) and the Scott City Facility (subject to the Interchange Fee) for shipment to Tolleson, Arizona. The wheat was the same type and quality, and the price of wheat did not materially fluctuate between the sales. Therefore, the price paid for the wheat should have been roughly the same.

66.     Yet, the farmers received 41 cents more per bushel for the wheat from the Stockton Facility than the wheat from Scott City Facility. Assuming typical profit margins on wheat, farmers

shipping from Scott City earned 66% less profit than those shipping from the Stockton Facility. This difference in price-per-bushel was due to the difference in transportation costs caused by the Interchange Fee. The grain from Stockton Facility was not subject to the Interchange Fee and was shipped directly west along the Towner Line. The grain from the Scott City Facility was subject to the Interchange Fee and, therefore, was shipped on Defendant-owned lines to avoid the fee, which increased the length of the trip and cost of transportation.

67.    Likewise, the following diagram shows the per-bushel amount received by farmers for wheat delivered to Los Angeles (referred to as "DLVD LA" in the title of the chart) from Scott City using Defendants' lines and from comparable locations in Kansas using non-Defendant lines. The Y-axis in the diagram represents the amount per bushel that farmers receive for their grain. The diagram demonstrates that farmers shipping from the Relevant Market receive significantly less for each bushel of wheat than those shipping from comparable markets on other railroads. This is entirely or almost entirely due to the Interchange Fee and increases in transportation costs caused therefrom.



68.     Defendants have also reduced the supply of westbound grain from the Relevant Market by adopting the Interchange Fee. By artificially increasing transportation costs, Defendants restrict the number of western markets to which Farmer Plaintiffs and Weskan can profitably ship. As a result, less grain is shipped westward from the Relevant Market.

69.     Finally, by adopting the Interchange Fee and eliminating the flow of rail traffic from the Relevant Market over the Towner Line, Defendants have significantly reduced the revenue CXR generates from operating the Towner Line.

## V.     Fraudulent Concealment Tolls any Statute of Limitations

70.     Plaintiffs did not discover, and could not have discovered through reasonable diligence, Defendants' illegal conduct until 2024 when Defendants admitted they amended the 1997 Lease and the interchange commitment contained therein in 2018 and 2019. Even now, Defendants refuse to disclose the actual Interchange Fee, meaning the full extent of Plaintiffs' injuries remain unknown.

71.     Defendants intentionally concealed the unlawful conduct alleged herein in a manner designed to prevent detection. As described above, Defendants were required to seek approval of the amendments to the 1997 Lease from the STB and disclose the existence of the interchange commitment. Defendants knew this and chose to ignore their legal obligation to keep the amendments secret.

72.     In addition, Plaintiffs CXR, Weskan, and others have requested information from Defendants concerning the amendments to the 1997 Lease on several occasions. Defendants have refused to provide this information in every instance outside of litigation.

73.     Accordingly, to the extent that tolling is necessary to advance some or all of the claims alleged by Plaintiffs, the statutes of limitations governing claims under the Sherman Act

and state competition laws were tolled at least until 2024 pursuant to the injury-discovery rule and/or the doctrine of fraudulent concealment.

## CLAIMS FOR RELIEF

### COUNT I

### Violation of Section 1 of the Sherman Act for Unlawful Price Fixing
**(Against All Defendants)**
**(Injunctive Relief for all Plaintiffs; Damages for Weskan and CXR)**

74.    Plaintiffs incorporate and reallege every allegation set forth in the preceding paragraphs of this Complaint as though fully set forth herein.

75.    Beginning no later than December 2019, Defendants have engaged in an ongoing agreement, contract, combination, or conspiracy to unreasonably restrain interstate trade and commerce in violation of Section 1 of the Sherman Act.

76.    Defendants' agreement, contract, and/or combination has had the effect of fixing, raising, and/or stabilizing prices for the westward shipment of grain by train from the Relevant Market.

77.    Defendants' combination or conspiracy has harmed competition in the Relevant Market and caused anticompetitive effects. These include: (i) causing Plaintiffs to pay super-competitive prices for the transportation of grain west from the Relevant Market; (ii) losing competition at multiple locations for grain traveling west from the Relevant Market; (iii) reducing the supply of grain shipped to western markets from the Relevant Market; and (iv) reducing the total number of western markets to which grain shipped from the Relevant Market can be cost-effectively delivered.

78.    As a direct and proximate result of Defendants' unlawful agreement and conspiracy, Plaintiffs have been injured and will continue to be injured. Specifically, Farmer Plaintiffs have received less for their grain due to Defendants' misconduct; Weskan has overpaid for transportation

services due to Defendants' misconduct; and CXR has lost significant revenue from the elimination of traffic over the Towner Line caused by Defendants' misconduct. Such economic harm suffered by Plaintiffs constitutes antitrust injury.

79.    Plaintiffs CXR and Weskan are entitled to treble damages for their overpayments and lost profits caused by Defendants' unlawful agreement, combination, and/or conspiracy. All Plaintiffs are entitled to attorneys' fees and costs, and injunctive relief.

**COUNT II**

**<u>Violation of Section 1 of the Sherman Act for Unlawful Market Allocation</u>**
**(Against All Defendants)**
**(Injunctive Relief for all Plaintiffs; Damages for Weskan and CXR)**

80.    Plaintiffs incorporate and reallege every allegation set forth in the preceding paragraphs of this Complaint as though fully set forth herein.

81.    At least since December 2019, Defendants have engaged in an ongoing agreement, contract, combination, or conspiracy to unreasonably restrain interstate trade and commerce in violation of Section 1 of the Sherman Act.

82.    Defendants' agreement, contract, and/or combination has had the effect of allocating the market for the westward shipment of grain from the Relevant Market between themselves and excluding competition.

83.    Defendants' combination or conspiracy has harmed competition in the Relevant Market and caused anticompetitive effects. These include: (i) causing Plaintiffs to pay super-competitive prices for the transportation of grain west from the Relevant Market; (ii) losing competition at multiple locations for grain traveling west from the Relevant Market; (iii) reducing the supply of grain shipped to western markets from the Relevant Market; and (iv) reducing the total number of western markets to which grain shipped from the Relevant Market can be cost-effectively delivered.

84. As a direct and proximate result of Defendants' unlawful agreement and conspiracy, Plaintiffs have been injured and will continue to be injured. Specifically, Farmer Plaintiffs have received less for their grain due to Defendants' agreement; Weskan has overpaid for transportation services due to Defendants' agreement; and CXR has lost significant revenue from the elimination of traffic over the Towner Line caused by Defendants' agreement. Such economic harm suffered by Plaintiffs constitutes antitrust injury.

85. Plaintiffs CXR and Weskan are entitled to treble damages for their overpayments and lost profits caused by Defendants' unlawful agreement, combination, and/or conspiracy. All Plaintiffs are entitled to attorneys' fees and costs, and injunctive relief.

**COUNT III**

**<u>Unlawful Monopoly Maintenance in Violation of Section 2 of the Sherman Act</u>**
**(Against Defendant UP)**
**(Injunctive Relief for all Plaintiffs; Damages for Weskan and CXR)**

86. Plaintiffs incorporate and reallege every allegation set forth in the preceding paragraphs of this Complaint as though fully set forth herein.

87. Defendant UP has monopoly power in the Relevant Market. It owns the only railroad in the Relevant Market that can ship grain west – the UP Lease Track.

88. UP unlawfully maintained monopoly power in the Relevant Market by adopting the Interchange Fee, which eliminated the Towner Line as a competitive threat and preserved Defendants' monopoly power over westbound shipments of grain from the Relevant Market.

89. As a direct and proximate result of UP's conduct, Plaintiffs have been injured and will continue to be injured. Specifically, Farmer Plaintiffs have received less for their grain, Weskan has overpaid for transportation services, and CXR has lost significant revenue from the elimination of traffic over the Towner Line due to Defendants' misconduct. Such economic harm suffered by Plaintiffs constitutes antitrust injury.

90.     Plaintiffs CXR and Weskan are entitled to treble damages for their overpayments and lost profits caused by UP's misconduct. All Plaintiffs are entitled to attorneys' fees and costs, and injunctive relief.

## COUNT IV

### Conspiracy to Monopolize in Violation of Section 2 of the Sherman Act
**(Against All Defendants)**
**(Injunctive Relief for all Plaintiffs; Damages for Weskan and CXR)**

91.     Plaintiffs incorporate and reallege every allegation set forth in the preceding paragraphs of this Complaint as though fully set forth herein. Plaintiffs seek equitable and injunctive relief on behalf as described herein.

92.     For purposes of the conspiracy, Defendant UP, on the one hand, and Defendant K&O, on the other hand, have combined, conspired, and agreed among themselves to monopolize the Relevant Market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

93.     Defendants conspired to monopolize the Relevant Market by secretly agreeing to implement the Interchange Fee.

94.     Defendants intended to monopolize the Relevant Market through their adoption of the Interchange Fee, as they set it high enough to eliminate the Towner Line as a competitive threat and did so shortly after the Towner Line became operational.

95.     Defendants maintained monopoly power through its adoption of the Interchange Fee, as this eliminated the Towner Line and other lines as a competitive threat and ensured Defendants maintained complete control over the westward shipment of grain from the Relevant Market.

96.     As a direct and proximate result of Defendants' conduct, Plaintiffs have been injured and will continue to be injured. Specifically, Farmer Plaintiffs have received less for their grain, Weskan has overpaid for transportation services, and CXR has lost significant revenue from

the elimination of traffic over the Towner Line. Such economic harm suffered by Plaintiffs constitutes antitrust injury.

97.     Plaintiffs CXR and Weskan are entitled to treble damages for their overpayments and lost profits caused by UP's misconduct. All Plaintiffs are entitled to attorneys' fees and costs, and injunctive relief.

**COUNT V**

**<u>Conspiring to Monopolize a Line of Business in Violation of the</u>**
**<u>Kansas Restraint of Trade Act</u>**
**<u>(K.S.A. 50-101, *et seq.*)</u>**
**(Against All Defendants)**

98.     Plaintiffs incorporate and reallege every allegation set forth in the preceding paragraphs of this Complaint as though fully set forth herein.

99.     The Kansas Restraint of Trade Act ("KRTA") aims to prohibit practices that, among other things, "create or carry out restrictions in trade or commerce, or to carry out restrictions in the full and free pursuit of any business authorized or permitted by the laws of this state" and "prevent competition in the…transportation of…commodities." K.S.A. 50-101.

100.    The KRTA forbids anyone doing business within the state of Kansas from conspiring or combining "with any other persons, within or without the state for the purpose of monopolizing any line of business . . . ." K.S.A 50-132.

101.    Defendants conspired and combined when secretly amending the 1997 Lease, including adopting the Interchange Fee. Defendants entered into their agreement for the purpose of monopolizing the westward shipment of grain from the Relevant Market and restricting and preventing competition in the transport of grain, as it precluded competition from the Towner Line and other rail lines by making it prohibitively expensive to use them.

102.     Through their agreement, Defendants achieved and/or maintained monopoly power in the Relevant Market.

103.     But for Defendants' conduct set forth, Farmer Plaintiffs would have received more for their grain, Weskan would have paid less to transport the grain, and CXR would have received additional profits from the use of the Towner Line, in an amount to be determined at trial.

104.     As a direct result of Defendants' conduct, Plaintiffs suffered significant and continuing damages, including overpayment, lost profits, increased operating costs, and attorneys' fees.

105.     Under the KRTA, indirect purchasers or persons injured indirectly, have standing to maintain an action for damages based on the facts alleged in this Complaint. K.S.A. 50-161(b).

106.     Plaintiffs are entitled to treble damages caused by Defendants' misconduct. Plaintiffs are also entitled to attorneys' fees and costs, and injunctive relief.

## COUNT VI

### <u>Conspiring to Restrain Trade in Violation of the Kansas Restraint of Trade Act</u> <u>(K.S.A. 50-101, *et seq.*)</u>
### (Against All Defendants)

107.     The KRTA prohibits "all arrangements, contracts, agreements, trusts, or combinations between persons made with a view or which tend to prevent full and free competition in the importation, transportation or sale of articles imported into this state, or in the product, manufacture or sale of articles of domestic growth . . . , and all arrangements, contracts, agreements, trusts or combinations between persons, designed or which tend to advance, reduce or control the price or the cost to the producer or to the consumer of any such products or articles . . . ." K.S.A. 50-112.

108.     Plaintiffs harvested and sold grain within the State of Kansas, were involved in the importation, transportation or sale of goods imported into Kansas, were involved in the sales of

articles of domestic growth, and/or were harmed by Defendants' price fixing concerning the transportation of grain west over rail from the Relevant Market.

109.    Through the actions discussed above, Defendants contracted, conspired, and/or combined to prevent the full and free competition for the westward shipment of grain from the Relevant Market and sought to control prices associated with such transportation in violation of K.S.A. 50-101 *et seq*.

110.    But for Defendants' anticompetitive conduct, the price Farmer Plaintiffs received for their grain would have been higher, the amount Weskan paid to transport that grain would have been lower, and the revenue received by CXR from the operation of the Towner Line would have been higher.

111.    As a direct result of Defendants' conduct, Plaintiffs suffered significant and continuing damages, including overpayment, lost profits, increased operating costs, and attorneys' fees.

112.    Under the KRTA, indirect purchasers or persons injured indirectly have standing to maintain an action based on the facts alleged in this Complaint. K.S.A. 50-161(b).

113.    Plaintiffs are entitled to treble damages caused by Defendants' misconduct. Plaintiffs are also entitled to attorneys' fees and costs, and injunctive relief.

### COUNT VII

**Conspiracy to Restrain Trade in Violation of the Colorado Antitrust Act**
**(Colo. Rev. Stat. Ann. § 6-4-101, *et seq.*)**
**(Against All Defendants)**

114.    Plaintiffs incorporate and reallege every allegation set forth in the preceding paragraphs of this Complaint as though fully set forth herein.

115. Plaintiffs Sanders, JLD, and Weskan harvested and sold grain within Colorado. Plaintiff CXR owned and operated the Towner Line, which is a rail line capable of transporting grain.

116. Defendants contracted, combined or conspired to act in restraint of trade within Colorado in violation of C.R.S. § 6-4-101, *et seq*.

117. But for Defendants' conduct set forth, the profits Plaintiffs received for their grain would have been higher, in an amount to be determined at trial.

118. The Colorado State Antitrust Act of 2023 specifically allows a private act of recovery for "[a]ny person injured, either directly or indirectly" from violations of the Colorado antitrust law. *See* C.R.S. § 6-4-115 (emphasis added).

119. Plaintiffs were injured with respect to the sale of their grain and are entitled to all forms of relief, including actual damages, treble damages, as well as interest and reasonable attorneys' fees and costs. C.R.S. § 6-4-115.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request judgment against Defendants and the following relief:

A. A finding that Defendants violated Sections 1 of the Sherman Act by engaging in the contract, combination and conspiracy alleged herein;

B. A finding that Defendant UP violated Section 2 of the Sherman Act by unlawfully maintaining its monopoly in the Relevant Market through the actions alleged herein;

C. A finding that Defendants violated Section 2 of the Sherman Act by conspiring to maintain their monopoly in the Relevant Market through the actions alleged herein;

D. A finding that Defendants violated § 50-101, *et seq*., of the Kansas Restraint of Trade Act through the actions alleged herein;

E.      A finding that Defendants violated § 6-4-101, *et seq*., of the Colorado Antitrust Act through the actions alleged herein;

F.      An award of damages to Plaintiffs, including statutory treble damages, compensatory damages, punitive damages, and pre- and post-judgment interest to the extent permitted by law;

G.      An Order enjoining Defendants from engaging in the anticompetitive practices alleged herein; and

H.      An Order awarding Plaintiffs attorneys' fees, expenses, and taxable costs to the extent permitted by law.

## JURY DEMAND

Plaintiffs demand trial by jury of all issues so triable as of right.

Dated: January 27, 2026.                    Respectfully submitted,

                                            */s/ Rex A. Sharp*
                                            Rex A. Sharp, KS #12350
                                            Isaac L. Diel, KS #14376
                                            Hammons P. Hepner, KS #29138
                                            SHARP LAW LLP
                                            4820 W. 75th Street
                                            Prairie Village, KS  66208
                                            Telephone:  (913) 901-0505
                                            rsharp@midwest-law.com
                                            idiel@midwest-law.com
                                            hhepner@midwest-law.com

                                            --and--

                                            Thomas R. Ajamie*
                                            John S. "Jack" Edwards, Jr.*
                                            Courtney D. Scobie*
                                            AJAMIE LLP
                                            Pennzoil Place - South Tower
                                            711 Louisiana, Suite 1600
                                            Houston, TX  77002
                                            Telephone: (713) 860-1600
                                            Facsimile: (713) 860-1699
                                            tajamie@ajamie.com
                                            jedwards@ajamie.com
                                            cscobie@ajamie.com

                                            *Counsel for Plaintiffs*

                                            **Pro hac vice* motions forthcoming