**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| WESKAN GRAIN LLC; COLORADO | ) | |
| PACIFIC RAILROAD, L.L.C.; D&L FARMS, | ) | |
| GP; E&D FARMS, GP; D&C FARMS, GP; | ) | |
| L&E FARMS, GP; NORTH FOUR FARMS, | ) | |
| GP; MARIENTHAL GRAIN LLC; D&A | ) | |
| FARMS, GP; HINEMAN LAND & CATTLE, | ) | |
| INC.; HINEMAN RANCH, L.L.C.; CIRCLE C | ) | |
| FARMS, INC.; STEVEN COMPTON; MARK | ) | Case No. 2:26-cv-02053 |
| SANDERS; and JLD PARTNERSHIP; | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| KANSAS & OKLAHOMA RAILROAD, LLC, | ) | |
| and UNION PACIFIC RAILROAD COMPANY, | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANT KANSAS & OKLAHOMA RAILROAD, LLC'S
## MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS

Defendant Kansas & Oklahoma Railroad, LLC submits this memorandum in support of its

Motion to Dismiss Plaintiffs' Complaint under Fed. R. Civ. P. 12(b)(6).

# TABLE OF CONTENTS

**Page**

NATURE OF THE MATTER ................................................................................................1

BACKGROUND ...............................................................................................................4

I.    Factual Background ............................................................................................ 4

    A.    K&O Railroad leases railroad track from Union Pacific in western Kansas .......... 4

    B.    The grain market in western Kansas ................................................................ 7

II.   Procedural History ............................................................................................. 8

LEGAL STANDARD .......................................................................................................9

ARGUMENT ................................................................................................................10

I.    Plaintiffs cannot use federal and state antitrust laws to circumvent Congress's exclusive regulatory scheme ............................................................................. 10

    A.    Implied antitrust immunity precludes Plaintiffs' Sherman Act claims (Counts I–II & IV) ................................................................................... 10

    B.    The ICCTA preempts Plaintiffs' state-law antitrust claims (Counts V–VII) ........ 14

II.   Plaintiffs fail to state claims under the Sherman Act § 1, the Colorado Antitrust Act (C.R.S. §§ 6-4-101 *et seq*.), and the Kansas Restraint of Trade Act (K.S.A. § 50-112) (Counts I–II & VI–VII) ...................................................................... 16

    A.    The rule of reason applies to Plaintiffs' price-fixing claim ................................. 17

    B.    Plaintiffs fail to allege a legally sufficient relevant market ................................. 18

    C.    Plaintiffs fail to allege that K&O has market power in the relevant market......... 25

    D.    Plaintiffs fail to plausibly allege price-fixing and market allocation claims ........ 26

        1.    Plaintiffs do not plausibly allege a price-fixing claim (Counts I & VI–VII) ................................................................................... 26

        2.    Plaintiffs do not plausibly allege a market allocation claim (Count II)............................................................................................... 31

III.  Plaintiffs fail to plausibly allege a conspiracy-to-monopolize claim under the Sherman Act § 2 and the KRTA (K.S.A. § 50-132) (Counts IV–V)................................. 32

IV.   Injunctive relief against common carriers is barred for federal antitrust violations......... 36

CONCLUSION.............................................................................................................36

## TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Abraham v. Intermountain Health Care Inc.*, 461 F.3d 1249 (10th Cir. 2006)............................ 26

*Acad. of Allergy & Asthma in Primary Care v. Quest Diagnostics, Inc.*,
2022 WL 980791 (W.D. Tex. Mar. 31, 2022) ........................................................... 33

*Adaptive Power Sols., LLC v. Hughes Missile Sys. Co.*, 141 F.3d 947 (9th Cir. 1998) ............... 27

*Arapahoe Surgery Ctr., LLC v. Cigna Healthcare, Inc.*,
80 F. Supp. 3d 1257 (D. Colo. 2015) ..................................................................... 16

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ........................................................... 9, 26, 29

*Ass'n of Surgical Assistants v. Nat'l Bd. of Surgical Tech. & Surgical Assisting*,
127 F.4th 178 (10th Cir. 2025)............................................................... passim

*Auraria Student Hous. at the Regency, LLC v. Campus Vill. Apartments, LLC*,
843 F.3d 1225 (10th Cir. 2016)................................................................ 19, 32, 34

*Bakay v. Apple Inc.*, 2024 WL 3381034 (N.D. Cal. July 11, 2024) ........................................... 33

*Bledsoe v. Carreno*, 53 F.4th 589 (10th Cir. 2022) ........................................................ 9

*BNSF Ry. v. Cal. Dep't of Tax & Fee Admin.*, 904 F.3d 755 (9th Cir. 2018) ............................... 15

*BNSF Ry. v. Hiett*, 22 F.4th 1190 (10th Cir. 2022)................................................. 14, 15

*Buccaneer Energy (USA) Inc. v. Gunnison Energy Corp.*,
846 F.3d 1297 (10th Cir. 2017)............................................................... passim

*Campfield v. State Farm Mut. Auto. Ins.*, 532 F.3d 1111 (10th Cir. 2008)............................ passim

*Cates v. Crystal Clear Techs., LLC*, 2016 WL 4379220 (M.D. Tenn. Aug. 17, 2016) ................. 31

*Cavlovic v. J.C. Penney Corp.*, 2018 WL 2926433 (D. Kan. June 7, 2018)................................ 30

*Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582 (2011) ............................................... 14

*Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073 (10th Cir. 2006) ........................... 26

*Chi. & N.W. Transp. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311 (1981).................................... 10

*City of New York v. Grp. Health Inc.*, 649 F.3d 151 (2d Cir. 2011) ........................................... 25

*Clinton v. Sec. Benefit Life Ins.*, 63 F.4th 1264 (10th Cir. 2023) .................................................. 4

*Cont'l TV, Inc. v. GTE Sylvania Inc.*, 433 U.S. 36 (1977) ............................................................. 17

*Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752 (1984) ..................................................... 27

*Credit Suisse Sec. (USA) LLC v. Billing*, 551 U.S. 264 (2007)............................................... passim

*CSX Transp., Inc. v. Norfolk S. Ry.*, 2023 WL 2552343 (E.D. Va. Jan. 27, 2023) ........................ 36

*DHX, Inc. v. Surface Transp. Bd.*, 501 F.3d 1080 (9th Cir. 2007) ................................................ 10

*Doe v. Woodard*, 912 F.3d 1278 (10th Cir. 2019) ........................................................................ 25

*EagleMed LLC v. Cox*, 868 F.3d 893 (10th Cir. 2017) ................................................................. 14

*Emerson v. Kan. City S. Ry.*, 503 F.3d 1126 (10th Cir. 2007) ....................................................... 14

*Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946 (9th Cir. 2023) ...................................................... 23

*Fayus Enters. v. BNSF Ry.*, 602 F.3d 444 (D.C. Cir. 2010) ..................................................... 15, 16

*Four Corners Nephrology Assocs. v. Mercy Med. Ctr. of Durango*,
    582 F.3d 1216 (10th Cir. 2009).............................................................................................. 16

*Full Draw Prods. v. Easton Sports, Inc.*, 182 F.3d 745 (10th Cir. 1999).................................... 26

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88 (1992) ...................................................... 14

*Garnica v. HomeTeam Pest Def., Inc.*,230 F. Supp. 3d 1155 (N.D. Cal. 2017) ........................... 23

*In re German Auto. Manufacturers Antitrust Litig.*, 497 F. Supp. 3d 745 (N.D. Cal. 2020) ........ 23

*In re Overstock Sec. Litig.*, 119 F.4th 787 (10th Cir. 2024) ......................................................... 30

*In re Rail Freight Fuel Surcharge Antitrust Litig.*, 593 F. Supp. 2d 29 (D.D.C. 2008) ................ 16

*In re Treasury Sec. Auction Antitrust Litig.*, 595 F. Supp. 3d 22 (S.D.N.Y. 2022) ....................... 35

*In re Vehicle Carrier Servs. Antitrust Litig.*, 846 F.3d 71 (3d Cir. 2017).................................... 16

*In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337 (S.D.N.Y. 2016) ........................................... 33, 34

*Kansas Penn Gaming, LLC v. Collins*, 656 F.3d 1210 (10th Cir. 2011) ......................................... 9

*Lantec, Inc. v. Novell, Inc.*, 306 F.3d 1003 (10th Cir. 2002).......................................................... 23

*Lavigne v. Great Salt Bay Cmty. Sch. Bd.*, 146 F.4th 115 (1st Cir. 2025).................................... 24

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877 (2007)............................... 17, 18

*Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 847 F.3d 1221 (10th Cir. 2017)................. 34

*Llacua v. W. Range Ass'n*, 930 F.3d 1161 (10th Cir. 2019)............................................................ 27

*Loren Data Corp. v. GXS, Inc.*, 501 F. App'x 275 (4th Cir. 2012) ................................................. 27

*Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*,
709 F.3d 129 (2d Cir. 2013) ........................................................................... 30

*Midwest Underground Storage, Inc. v. Porter*, 717 F.2d 493 (10th Cir. 1983) ....................... 31, 32

*Nat'l Gerimedical Hosp. & Gerontology Ctr. v. Blue Cross of Kansas City*,
452 U.S. 378 (1981)...................................................................................... 12

*Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679 (1978)............................................ 26

*Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284 (1985) ............ 17

*O'Toole v. Northrop Grumman Corp.*, 499 F.3d 1218 (10th Cir. 2007) ................................... 4, 28

*Ohio v. Am. Express Co.*, 585 U.S. 529 (2018)...................................................................... 18, 22

*Oksanen v. Page Mem'l Hosp.*, 945 F.2d 696 (4th Cir. 1991) .................................................... 25

*Ottawa N. R.R. v. City of Baldwin*, 2023 WL 7923152 (D. Kan. Nov. 16, 2023)......................... 10

*Oxbow Carbon & Mins. LLC v. Union Pac. R.R. Co.*, 926 F. Supp. 2d 36 (D.D.C. 2013) .......... 32

*Pahls v. Thomas*, 718 F.3d 1210 (10th Cir. 2013)..................................................................... 20

*PCS Phosphate Co. v. Norfolk S. Corp.*, 559 F.3d 212 (4th Cir. 2009) ....................................... 16

*Perington Wholesale, Inc. v. Burger King Corp.*, 631 F.2d 1369 (10th Cir. 1979)...................... 34

*Reorganized FLI, Inc. v. Williams Companies, Inc.*,
410 F. Supp. 3d 1213 (D. Kan. 2019) ......................................................... 16, 32

*SCFC ILC, Inc. v. Visa USA, Inc.*, 36 F.3d 958 (10th Cir. 1994) ................................................. 26

*Schoenhofer v. McClaskey*, 861 F.3d 1170 (10th Cir. 2017)....................................................... 17

*Smith v. Philip Morris Companies, Inc.*, 50 Kan. App. 2d 535, 335 P.3d 644 (2014) .................. 16

*Suture Express, Inc. v. Cardinal Health 200, LLC*,
963 F. Supp. 2d 1212 (D. Kan. 2013) .............................................. 27, 29, 33, 34

*Tal v. Hogan*, 453 F.3d 1244 (10th Cir. 2006)....................................................................... 3, 23

*Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059 (9th Cir. 2001) ......................................................... 25

*Telecor Commc'ns, Inc. v. Sw. Bell Tel. Co.*, 305 F.3d 1124 (10th Cir. 2002) ............................. 19

*Times-Picayune Pub. Co. v. United States*, 345 U.S. 594 (1953) ................................................ 35

*Total Renal Care, Inc. v. W. Nephrology & Metabolic Bone Disease, P.C.*,
    2009 WL 2596493 (D. Colo. Aug. 21, 2009)................................................................... 34, 35

*Truck-Rail Handling Inc. v. BNSF Ry.*, 2005 WL 8178364 (N.D. Cal. Mar. 8, 2005).................. 36

*TV Commc'n Network, Inc. v. Turner Network TV, Inc.*, 964 F.2d 1022 (10th Cir. 1992)............ 35

*United States v. Orozco-Rivas*, 810 F. App'x 660 (10th Cir. 2020) ............................................. 20

*United States v. Topco Assocs., Inc.*, 405 U.S. 596 (1972) ........................................................... 31

*VDARE Found. v. City of Colorado Springs*, 11 F.4th 1151 (10th Cir. 2021) ................................ 9

*Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004)................. 10, 12

*Winzler v. Toyota Motor Sales U.S., Inc.*, 681 F.3d 1208 (10th Cir. 2012) ............................. 20, 35

**Administrative Decisions:**

*CSX Transp., Inc.—Petition for Declaratory Order*,
    STB No. FD 34662, 2005 WL 584026 (STB served Mar. 14, 2005) ..................................... 15

*CSX Transp., Inc.—Petition for Declaratory Order*,
    STB No. FD 34662, 2005 WL 1024490 (STB served May 3, 2005) ..................................... 15

*Cent. Kansas Ry.—Lease Exemption—Union Pac. R.R.*,
    STB No. FD 33470, 1997 WL 619212 (STB served Oct. 9, 1997) ........................................ 4

*Kan. & Okla. R.R.—Acquisition Exemption—Cent. Kansas Ry., LLC*,
    STB No. FD 34030, 2001 WL 648941 (STB served June 12, 2001) ...................................... 4

*Kan. & Okla. R.R.—Acquisition Exemption—Cent. Kansas Ry., LLC*,
    STB No. FD 34030, 2025 WL 627747 (STB served Feb. 25, 2025)....................................... 8

*Kan. & Okla. R.R.—Acquisition Exemption—Cent. Kansas Ry., LLC*,
    STB No. FD 34030, 2026 WL 795881 (STB served Mar. 20, 2026) .................................8, 11

*Kan. & Okla. R.R.—Lease and Operation Exemption with Interchange
Commitment—Union Pac. R.R.*,
    STB No. FD 36849, 2025 WL 1769306 (STB served June 25, 2025) ................... 6, 28, 30, 35

*Mkt. Dominance Streamlined Approach*,
    STB No. EP 756, 2019 WL 4383954 (STB served Sept. 11, 2019) ..................................... 29

*Mkt. Dominance Streamlined Approach*,
    STB No. EP 756, 2020 WL 4492435 (STB served July 31, 2020)................................... 21, 24

*Rev. of Rail Access & Competition Issues*,
　STB Ex Parte No. 575, 2007 WL 3170981 (STB served Oct. 29, 2007) ........................ passim

*Wichita, Tillman & Jackson Ry. Co.— Renewal of Lease Agreement*..............................................
　*Containing Interchange Commitment—Union Pac. R.R.*,
　STB No. FD 36903, 2026 WL 248709 (STB served Jan. 28, 2026) .......................................11

**Statutes:**

15 U.S.C.
　§ 1..................................................................................................................... passim
　§ 2..................................................................................................................... passim
　§ 26....................................................................................................................... 36

49 U.S.C.
　§ 10101.......................................................................................................8, 11, 12, 16
　§ 10101(1)............................................................................................................. 13
　§ 10101(4)–(6) .......................................................................................................13
　§ 10102..................................................................................................................11
　§ 10501(b).......................................................................................2, 10, 11, 13, 14
　§ 10501(b)(2).........................................................................................................16
　§ 10502..................................................................................................................13
　§ 10502(a) ............................................................................................................. 8
　§ 10701................................................................................................................. 29
　§ 10701(b)............................................................................................................. 21
　§ 10701(c) ............................................................................................................. 21
　§ 10703................................................................................................................. 13
　§ 10705................................................................................................................. 13
　§ 10742................................................................................................................. 13
　§ 10707(a) .............................................................................................................21
　§ 11101(a) .............................................................................................................13
　§ 11701................................................................................................................. 13
　§ 11704(b) ............................................................................................................ 13
　§ 722(c) ................................................................................................................ 13

Colo. Rev. Stat.
　§ 6-4-101............................................................................................................ 9, 16
　§ 6-4-119 ............................................................................................................. 16

Interstate Commerce Commission Termination Act,
　Pub. L. 104–88, 109 Stat. 803 (1995).................................................................. 10

Kan. Stat. Ann.
　§ 50-101 ................................................................................................................ 9
　§ 50-112 ............................................................................................................... 16
　§ 50-132............................................................................................................ 32, 34
　§ 50-163(b)........................................................................................................ 16, 32

§ 50-163(c)...............................................................................................................16

U.S. Const. art. VI...................................................................................................14

**Rules:**

Fed. R. Evid. 201(b)...................................................................................................4

**Regulations:**

49 C.F.R.
    § 1111.12(a).........................................................................................................21
    § 1114.30(d) ....................................................................................................6, 28
    § 1150.43(h) .........................................................................................................12
    § 1150, subpt. D ....................................................................................................4

**Other Authorities:**

Ass'n of Am. R.R., Freight Rail: Economic Regulation,
    available at bit.ly/4qSZAuA (last visited March 30, 2026) .....................................21

H.R. Rep. No. 104-311 (1995)................................................................................10, 14

Gretchen Kuck, A Look at Current U.S. Grain Storage Capacity,
    Nat'l Corn Growers Ass'n, http://bit.ly/3ZR7vOj (Aug. 14, 2025)..........................22

Kansas & Oklahoma Railroad (KO), Watco, bit.ly/4sabvWc (last visited Mar. 30, 2026) .............4

Michelle Rook, Port of South Louisiana Top Export Port for U.S. Grain Even with
    Historic Drought, AgWeb, bit.ly/4saZ50d (Nov. 23, 2023).....................................22

OSHA, DeBruce Grain Elevator Explosion Report, ch. 2,
    available at bit.ly/4812wPk (last visited Mar. 30, 2026) .........................................22

Press Release, The Soloviev Group, Local Farmers, Weskan Grain, and Colorado Pacific
    Railroad File Antitrust Lawsuit Against Union Pacific Railroad and Kansas &
    Oklahoma Railroad, PR Newswire (January 28, 2026), bit.ly/4s1FjUY................................28

The Competitive Advantage, Weskan Grain,
    https://weskangrain.com/advantage/ (last visited Mar. 30, 2026)...................................20, 30

Weskan Grain, https://weskangrain.com/ (last visited Mar. 30, 2026) .....................................7, 22

## NATURE OF THE MATTER

Kansas & Oklahoma Railroad is a Class III - or short line - railroad operating in western Kansas that leases some of its track from Union Pacific, one of the largest railroads in the United States. Since 1997, that lease has contained an interchange commitment—a common lease term in the railroad industry that induces a short line railroad such as K&O to interchange freight traffic with its lessor, usually a Class I railroad like Union Pacific, rather than with another rail carrier.

Since 2019, Plaintiff Colorado Pacific Railroad ("CXR") has operated the Towner Line, which provides a westbound route connecting K&O's leased track to the broader national rail network. Plaintiff Weskan Grain, an affiliate of CXR, alleges that it buys grain from the Farmer Plaintiffs in western Kansas and uses rail service to reach West Coast mills and ports. Plaintiffs allege that K&O and Union Pacific secretly amended the interchange commitment in 2019, replacing a "rent-based" cost with an "asset use fee" of at least $500 per rail car for any car interchanging with a third-party carrier, such as CXR. They contend that this fee was intended to stifle competition from CXR's Towner Line by making westbound traffic on K&O's leased track cost prohibitive.

Yet the Complaint buries a critical fact: Weskan has never paid this asset-use fee. Under the lease terms, K&O, the *lessee*, must pay the asset-use fee to Union Pacific for rail cars that interchange with third-party carriers from K&O's leased track. What Weskan really complains about are the rates that K&O charges to move traffic to the interchange with CXR at the Towner Line. These rates are allegedly not economical for Weskan because K&O must account for its contractually bound costs when setting rates, including the asset-use fee owed to Union Pacific. But Weskan never paid these rates either—Weskan admits that no traffic has interchanged from K&O's leased track with CXR at the Towner Line since it reopened, meaning that K&O has made no revenue from the alleged westbound grain market. Still, Plaintiffs allege that K&O conspired with Union Pacific to preserve control over the westward shipments of grain from western Kansas.

1

At the outset, the Court need not reach the merits: K&O has implied antitrust immunity under the ICC Termination Act's comprehensive regulatory scheme. Federal railroad regulation traces back more than 100 years. The Surface Transportation Board now holds this regulatory authority and actively exercises it to regulate interchange commitments—activity squarely within the heartland of the ICCTA's regulatory regime. There is thus a serious risk that antitrust courts will produce results inconsistent with the STB's case-by-case review of interchange commitments. *See Credit Suisse Sec. (USA) LLC v. Billing*, 551 U.S. 264, 285 (2007). Applying the antitrust laws to interchange commitments is therefore "clearly incompatible" with the ICCTA and precludes Plaintiffs' federal antitrust claims. *Id*.

The ICCTA also preempts Plaintiffs' state-law antitrust claims. The ICCTA established an exclusive federal scheme of economic regulation for railroads and expressly "preempt[s] the remedies provided under . . . State law." 49 U.S.C. § 10501(b). Permitting states to conduct their own case-by-case analysis of interchange commitments under varying antitrust laws would create the very patchwork of railroad regulation that the ICCTA sought to preempt.

Even if the Court were to address the merits, pleading deficiencies doom each of Plaintiffs' claims. To begin, Plaintiffs' claims fail at the start: Plaintiffs do not plead a legally sufficient relevant market. Plaintiffs exclude trucks from the product market even though the Complaint admits (and the STB has determined) that trucks compete with railroads for short-distance hauls. And Plaintiffs likewise plead no facts to explain why they *must* ship grain west when the dominant flow of western Kansas grain is east. These failures also undermine the proposed geographic market, which is artificially drawn around the leased track's footprint and ignores that farmers can easily truck grain to alternative rail lines in adjacent counties.

2

Besides these dispositive threshold issues, Plaintiffs fail to plausibly allege antitrust violations. First, Plaintiffs' price-fixing theory makes no economic sense as to K&O. Put simply, Plaintiffs do not plausibly allege that K&O and Union Pacific shared a unity of purpose or a conscious commitment to a common scheme to restrain trade. K&O would *benefit* from increased westbound traffic, but the interchange commitment—in Weskan's words—makes it economically infeasible for K&O to do so. This obvious alternative explanation for the lack of traffic interchanging at the Towner Line overwhelms any plausible inference of liability against K&O.

Plaintiffs' Section 1 market allocation claim also makes no sense here because K&O and Union Pacific are not competitors operating at the same market level, nor have they agreed to divide anything between themselves to the exclusion of the other. And Plaintiffs' Section 2 conspiracy-to-monopolize claim is riddled with flaws too: It depends on a deficient relevant market, advances an impermissible "shared monopoly" theory, and lacks facts to infer that K&O shared a unity of purpose with Union Pacific or specific intent to monopolize.

In the end, this is a textbook case for heeding the Tenth Circuit's warning that in antitrust cases, courts should "insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed." *Ass'n of Surgical Assistants v. Nat'l Bd. of Surgical Tech. & Surgical Assisting*, 127 F.4th 178, 186 (10th Cir. 2025). Stripped of the conclusory, unadorned allegations, the Complaint amounts to nothing more than "antitrust buzz-words and parroting of general antitrust theories" insufficient to support plausible antitrust claims. *Tal v. Hogan*, 453 F.3d 1244, 1261 (10th Cir. 2006). The Court should dismiss the Complaint in its entirety.

3

## BACKGROUND

I.    **Factual Background.**

A.    **K&O leases railroad track from Union Pacific in western Kansas.**

K&O is a Class III or short line railroad operating roughly 936 miles of railroad in Kansas and Colorado. ECF Doc. 1 ("Compl.") ¶ 27; *see Kansas & Oklahoma Railroad (KO)*, Watco, bit.ly/4sabvWc (last visited Mar. 30, 2026).[1] A short line railroad is a small or mid-sized, typically independent rail company that serves as a critical first- and last-mile connection between local shippers and the national railroad network. Union Pacific Railroad Company is a Class I railroad, operating "thousands of miles" of rail lines in the western and central United States. Compl. ¶ 28. In Plaintiffs' words, Union Pacific is a "multibillion-dollar behemoth in the railroad industry" and "the largest railroad in the world based on market capitalization." *Id.* ¶¶ 1, 28.

Union Pacific owned about 256 miles of rail line in western Kansas that it leased to Central Kansas Railway ("CKR") in 1997 ("Lease"). *Id.* ¶ 41 n.6. The lease transaction was authorized by the STB under the class "exemption" procedures at 49 C.F.R. § 1150, subpt. D. *See Cent. Kansas Ry.—Lease Exemption—Union Pac. R.R.*, STB No. FD 33470, 1997 WL 619212 (STB served Oct. 9, 1997). K&O assumed the Lease when it acquired CKR's assets in 2001 in a transaction that was likewise approved by the STB. Compl. ¶¶ 3, 41 n.6; *see Kan. & Okla. R.R.—Acquisition Exemption—Cent. Kansas Ry., LLC*, STB No. FD 34030, 2001 WL 648941 (STB served June 12, 2001).

---

[1] In reviewing a complaint, the Court may consider "matters of which a court may take judicial notice." *Clinton v. Sec. Benefit Life Ins.*, 63 F.4th 1264, 1275 (10th Cir. 2023) (citation modified). This includes "public information that is not reasonably subject to dispute." *Surgical Assistants*, 127 F.4th at 183–84; *see, e.g.*, *O'Toole v. Northrop Grumman Corp.*, 499 F.3d 1218, 1225 (10th Cir. 2007) (taking judicial notice of information on defendant's website and noting that "[i]t is not uncommon for courts to take judicial notice of factual information found on the world wide web"); *see generally* Fed. R. Evid. 201(b).

4

Union Pacific's leased rail line now consists of two segments, from Geneseo, Kansas to McCracken, Kansas, and from Healy, Kansas to Towner, Colorado just over the Kansas-Colorado border as depicted in red in this map ("Lease Track"):



ECF Doc. 1-1 at 1;[2] *see* Compl. ¶¶ 3, 41.

The western part of the Lease Track connects in the east at Scott City with a track that K&O owns (depicted in black) and in the west with the Towner Line (depicted in green). ECF Doc. 1-1 at 1; Compl. ¶¶ 3, 41. Between 1996 and 2018, the Towner Line was not operational. Compl. ¶ 4. CXR bought the Towner Line in 2018 and reopened it in 2019. *Id.* ¶¶ 5, 43. The Towner Line extends to NA Junction in the west, where CXR connects to a rail line owned and operated by BNSF Railway Company and over which Union Pacific has trackage rights between NA Junction and Pueblo. *Id.* ¶ 43; *see* ECF Doc. 1-1 at 1.

---

[2] K&O references Exhibit A to the Complaint for demonstrative purposes only and does not concede its accuracy.

Since 1997, the Lease has included an interchange commitment, sometimes known as a "paper barrier". Compl. ¶¶ 47–48. An "interchange commitment" is a provision in a "sale or lease agreement that serve[s] to induce a party to the agreement to interchange traffic with another party to the agreement, rather than with a third-party connecting carrier, whether by outright prohibition, per-car penalty, adjustment in the purchase price or rental, positive economic inducement, or other means." 49 C.F.R. § 1114.30(d); *see also Rev. of Rail Access & Competition Issues*, STB Ex Parte No. 575, 2007 WL 3170981, at *1, *3 (STB served Oct. 29, 2007) ("*Ex Parte No. 575*") (defining interchange commitment similarly); Compl. ¶ 47.

Plaintiffs allege that K&O and Union Pacific "secretly and unlawfully" amended the interchange commitment in 2019 to "stifle competition from" CXR's Towner Line and to "preserve control over westward shipments of grain." Compl. ¶¶ 1, 7, 47. They allege that the interchange commitment went from a "rent-based" cost that "would not have prevented the westward flow of traffic" to an "asset use fee" of at least $500 per rail car.[3] *Id.* ¶¶ 8, 48. This fee, Plaintiffs allege, was "clearly designed to prevent the westward flow of rail traffic from the UP Lease Track onto the Towner Line" and makes it "cost-prohibitive" to route traffic westward. *Id.* ¶ 8.

---

[3] The Complaint obscures who pays the "asset-use fee" and to whom it is paid. *See, e.g.*, Compl. ¶ 39 (alleging that Weskan Grain must pay higher transportation costs "when forced to pay the Interchange Fee"); *id.* ¶¶ 37, 48. Plaintiffs know, however, that an interchange commitment is a contract term that "induce[s] a *party to the agreement* to interchange traffic with another party to the agreement" and thus imposes obligations on the lessee—here, K&O—not third parties. 49 C.F.R. § 1114.30(d) (emphasis added); *see Kan. & Okla. R.R.—Lease and Operation Exemption with Interchange Commitment—Union Pac. R.R.*, STB No. FD 36849, 2025 WL 1769306, at *1 (STB served June 25, 2025) ("*Kan. & Okla. R.R.*") (explaining that "Weskan contends that the proposed interchange commitment . . . mak[es] it economically infeasible *for K&O* to transport agricultural products . . . to points west of the CXR interchange at Towner" (emphasis added; citation modified)). In other words, K&O is obligated under the Lease to pay the asset-use fee to Union Pacific.

### B.      The grain market in western Kansas.

Plaintiffs allege that D&L Farms, GP; E&D Farms, GP; D&C Farms, GP; L&E Farms, GP; North Four Farms, GP; D&A Farms, GP; Hineman Land & Cattle, Inc.; Hineman Ranch, LLC; Circle C Farms, Inc.; Steven Compton; Mark Sanders; and JLD Partnership grow and store grain in western Kansas ("Farmer Plaintiffs").[4] Compl. ¶¶ 14–18, 21–26. Weskan Grain is an agricultural company that "works with grain farmers in western Kansas and eastern Colorado, including Farmer Plaintiffs, to store, sell, and ship grain." *Id.* ¶ 36. Weskan and CXR are both owned by the Soloviev Group. *See* Compl. ¶ 12 ("Weskan is an indirect affiliate of CXR."); Weskan Grain, https://weskangrain.com/ (last visited Mar. 30, 2026). Weskan owns several grain storage facilities in western Kansas, and in 2023, completed the Stockton Facility—"a state-of-the-art grain elevator complex" along the Towner Line just west of the connection between the Towner Line and the Lease Track. Compl. ¶¶ 36–37; *see* ECF Doc. 1-1 at 1. In a "typical transaction," Weskan buys the Farmer Plaintiffs' grain and coordinates and pays for transporting the grain. Compl. ¶ 38.

The Farmer Plaintiffs allege that they "must transport grain west" to access West Coast grain mills and ports. *Id.* ¶ 35. The Towner Line provides a "direct route west for freight" from western Kansas but Plaintiffs allege that no rail cars have been interchanged between K&O and CXR at Towner since the Towner Line reopened because the interchange commitment makes it "cost prohibitive." *Id.* ¶¶ 43–44, 52. Weskan alleges that it is therefore "forced to pay higher transportation costs" to use alternative transportation, which it allegedly passes on to the Farmer Plaintiffs. *Id.* ¶¶ 39, 53–54.

---

[4] Marienthal Grain LLC is not a farmer but "an affiliate of Plaintiffs D&L Farms, E&D Farms, D&C Farms, L&E Farms, and North Four Farms who markets and sells grain grown by those five farms." Compl. ¶ 19.

## II.      Procedural History.

On November 27, 2024, Weskan filed a petition in the STB to reopen and partially revoke K&O's 2001 acquisition exemption to acquire the Lease from CKR. Weskan Petition, *Kan. & Okla. R.R.—Acquisition Exemption—Cent. Kansas Ry., LLC*, STB No. FD 34030 (Nov. 27, 2024), Doc. ID 308948. The STB denied the petition and directed K&O "to file a petition for exemption or application to obtain after-the-fact authority to renew the Lease and implement any amendments." *Kan. & Okla. R.R.—Acquisition Exemption—Cent. Kansas Ry., LLC*, STB No. FD 34030, 2025 WL 627747, at *5 (STB served Feb. 25, 2025).

Under the STB's direction, K&O filed a petition for exemption seeking after-the-fact authority to renew and amend the Lease. K&O Petition, *Kan. & Okla. R.R.—Lease and Operation Exemption with Interchange Commitment—Union Pac. R.R.*, STB No. FD 36849 (Mar. 27, 2025), Doc. ID 309401. Weskan opposed the petition, and the matter was vigorously litigated. On March 20, 2026, the STB denied K&O's petition without prejudice, concluding that the evidentiary record was "insufficient . . . to permit the Board to find that regulation is not necessary to carry out" the rail transportation policy goals under 49 U.S.C. § 10101. *Kan. & Okla. R.R.—Acquisition Exemption—Cent. Kansas Ry., LLC*, STB No. FD 34030, 2026 WL 795881, at *7 (STB served Mar. 20, 2026). Because K&O must still obtain after-the-fact authorization for the prior lease renewal and amendment, the STB directed K&O to file a fully supported petition or application to renew the Lease by May 4, 2026. *See Kan. & Okla. R.R.*, 2026 WL 795881, at *10. The Board ordered that any new proceeding implicating a lease agreement with an interchange commitment must include evidence justifying the provision under the Board's regulatory standards. *See id.*

Amid this ongoing STB regulatory mandate to address the Lease's competitive impacts, Plaintiffs filed this lawsuit against Union Pacific and K&O on January 27, 2026. They assert seven claims under federal and state antitrust law: (I–II) price-fixing and unlawful market allocation

8

under the Sherman Act § 1; (III–IV) monopolization (against Union Pacific only) and conspiracy to monopolize under the Sherman Act § 2; (V–VI) conspiracy to monopolize a line of business and to restrain trade under the Kansas Restraint of Trade Act (K.S.A. § 50-101 *et seq*.); and (VII) conspiracy to restrain trade under the Colorado Antitrust Act (C.R.S. § 6-4-101 *et seq*.). *See* Compl. ¶¶ 74–119. Plaintiffs seek damages and injunctive relief. *See, e.g.*, *id.* ¶¶ 79, 104. Weskan seeks damages for overpaying for transportation services, CXR seeks damages for lost revenue from traffic over the Towner Line, and the Farmer Plaintiffs seek damages for lost profits on their grain. *See, e.g.*, *id*. ¶¶ 78, 103.

## **LEGAL STANDARD**

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation modified). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In analyzing the complaint, "the court first eliminates conclusory allegations, mere labels and conclusions, and any formulaic recitation of the elements of a cause of action." *Bledsoe v. Carreno*, 53 F.4th 589, 606 (10th Cir. 2022) (citation modified). The court then accepts the remaining well-pled factual allegations as true and considers "whether they plausibly give rise to an entitlement to relief." *VDARE Found. v. City of Colorado Springs*, 11 F.4th 1151, 1159 (10th Cir. 2021). When the well-pleaded facts "do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679.

Above all, the plausibility requirement serves "to avoid ginning up the costly machinery associated with our civil discovery regime on the basis of a largely groundless claim." *Kansas Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1215 (10th Cir. 2011) (citation modified).

9

**ARGUMENT**

**I.     Plaintiffs cannot use federal and state antitrust laws to circumvent Congress's exclusive regulatory scheme.**

**A.     Implied antitrust immunity precludes Plaintiffs' Sherman Act claims (Counts I–II & IV).**

Railroads have long been subject to one of "the most pervasive and comprehensive of federal regulatory schemes." *Chi. & N.W. Transp. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 318 (1981). The ICC Termination Act of 1995, Pub. L. 104-88, 109 Stat. 803, "abolished the Interstate Commerce Commission, revised the Interstate Commerce Act, and transferred regulatory functions under that Act to the Surface Transportation Board." *Ottawa N. R.R. v. City of Baldwin*, 2023 WL 7923152, at *6 (D. Kan. Nov. 16, 2023) (citing *DHX, Inc. v. Surface Transp. Bd.*, 501 F.3d 1080, 1082 (9th Cir. 2007)) (citation modified). The ICCTA grants the STB "exclusive" jurisdiction over "transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers." § 10501(b). This "scheme of economic regulation and deregulation is intended to address and encompass all such regulation and to be completely exclusive." H.R. Rep. No. 104-311, at 95–96 (1995).

Plaintiffs cannot use the Sherman Act to end-run Congress's exclusive railroad regulatory scheme. A "detailed regulatory scheme" raises the question whether regulated entities are "shielded from antitrust scrutiny . . . by the doctrine of implied immunity." *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 406 (2004). Implied immunity arises when a regulatory scheme clashes with the antitrust laws, creating a "clear repugnancy" or "clear incompatibility" between the two. *Credit Suisse*, 551 U.S. at 275. A four-part test governs the implied immunity doctrine: (1) "the existence of regulatory authority . . . to supervise the activities in question"; (2) "active and ongoing" exercise of that authority (3) "a resulting risk" that the antitrust laws and

10

those governing the challenged activity "would produce conflicting guidance, requirements, duties, privileges, or standards of conduct"; and (4) whether the questioned activity lies "squarely within the heartland" of the regulated area. *Id.* at 275–76, 285.

All four factors are met here. The STB has "clear and adequate" authority to regulate interchange commitments. *Id.* at 285. The ICCTA gives the STB "exclusive" jurisdiction over "transportation by rail carriers, and the remedies provided in this part with respect to . . . rules []including . . . *interchange* . . . ." § 10501(b) (emphasis added); *see* 49 U.S.C. § 10102 (defining "transportation" as "services related to [railroad] movement," including "interchange of passengers and property"). The STB's exercise of its authority over interchange commitments is "active and ongoing," *Credit Suisse*, 551 U.S. at 285, including over the interchange commitment at issue here, *see Kan. & Okla. R.R.*, 2026 WL 795881, at *8; *see also, e.g.*, *Wichita, Tillman & Jackson Ry. Co.— Renewal of Lease Agreement Containing Interchange Commitment—Union Pac. R.R.*, STB No. FD 36903, 2026 WL 248709, at *1–2 (STB served Jan. 28, 2026) (regulating interchange commitment in lease agreement). And this kind of economic regulation lies squarely "within the heartland" of the ICCTA's comprehensive regime. *Credit Suisse*, 551 U.S. at 285; *see Ex Parte No. 575*, 2007 WL 3170981, at *9 (holding that interchange commitments should be evaluated using the Rail Transportation Policy goals in 49 U.S.C. § 10101).

Last, there is "a serious conflict" between the antitrust laws and the regulatory regime. *Credit Suisse*, 551 U.S. at 285. For one, there is a "fine, complex, detailed line separat[ing]" interchange commitments that the STB permits or forbids. *Id.* at 279. In stopping short of finding that interchange commitments are "inherently anticompetitive" and thus prohibited "across the board," the STB held that interchange commitments should be reviewed on a "case-by-case basis." *Ex Parte No. 575*, 2007 WL 3170981, at *5, *9–10. This individualized review requires considering

11

"the particular facts, the competitive conditions before and after the interchange commitment, the nature of the commitment, and its actual or likely effects" as well as whether the interchange commitment comports with the "Rail Transportation Policy goals" in Section 10101. *Id.* at *9–10; *see also* 49 C.F.R. § 1150.43(h) (listing information that needs to be disclosed for evaluating interchange commitments). These factors could also change based on "the type of challenge brought before the Board" because affected parties have different ways to challenge interchange commitments under the ICCTA. *Ex Parte No. 575*, 2007 WL 3170981, at *9–10; *see infra* p. 13. To put all these pieces together requires railroad "expertise" and only the STB could decide these issues "with confidence." *Credit Suisse*, 551 U.S. at 281–82.

Antitrust laws and the ICCTA regulation of interchange commitments are "clearly incompatible" for another reason: Evidence tending to show an unreasonable restraint of trade under the Sherman Act "may overlap [with], or prove identical" to evidence tending to show a lawful interchange commitment. *Id.* at 281, 285. This is problematic. "[A]ntitrust plaintiffs may bring lawsuits . . . in dozens of different courts with different nonexpert judges and different nonexpert juries." *Id.* Given the "nuanced" and "fact-related nature" of the "evidentiary evaluations necessary to separate the permissible from the impermissible," there is "an unusually high risk" that courts and juries will neither "evaluate similar fact patterns consistently" nor "reach consistent results." *Id.*

On top of this, the "enforcement-related need for an antitrust lawsuit is unusually small" because the STB actively reviews interchange commitments, and the ICCTA provides adequate remedies for aggrieved parties. *Credit Suisse*, 551 U.S. at 283; *see also Trinko*, 540 U.S. at 412 (noting that "the additional benefit to competition provided by antitrust enforcement will tend to be small" when "the existence of a regulatory structure [is] designed to deter and remedy anticompetitive harm"); *Nat'l Gerimedical Hosp. & Gerontology Ctr. v. Blue Cross of Kansas City*, 452

12

U.S. 378, 389 (1981) (explaining that "when a regulatory agency has been empowered to authorize or require the type of conduct under antitrust challenge," implied antitrust immunity is "clearer"). To obtain relief from an "existing interchange commitment," the STB explained that an aggrieved party has several options: "[A] shipper may allege that a particular interchange commitment precludes, or would preclude, the provision of adequate, efficient through service at reasonable rates." *Ex Parte No. 575*, 2007 WL 3170981, at *10 (citing 49 U.S.C. §§ 10703, 10705, 10742, and 11101(a)). "Shippers may also move, under 49 U.S.C. 722(c), to reopen a proceeding authorizing a prior transaction or to partially revoke an exemption granted under 49 U.S.C. 10502."[5] *Ex Parte No. 575*, 2007 WL 3170981, at *10. And shippers can file a complaint with the STB "alleging that a carrier is violating a statutory obligation under the Interstate Commerce Act due to an interchange commitment." *Id.* at *11; *see* 49 U.S.C. §§ 11701, 11704(b). These remedies that the ICCTA provides for addressing unlawful interchange commitments "are exclusive and preempt the remedies provided under Federal . . . law." § 10501(b).

That the STB already considers competitive factors in regulating the railroad industry also "makes it somewhat less necessary to rely upon antitrust actions to address anticompetitive behavior." *Credit Suisse*, 551 U.S. at 283. In the STB's case-by-case review of interchange commitments, the Board considers "the fostering of sound economic conditions, the maintenance of reasonable rates in the absence of effective competition, and competition" as well as "the competitive conditions before and after the interchange commitment." *Ex Parte No. 575*, 2007 WL 3170981, at *9–10; *see* 49 U.S.C. §§ 10101(1), (4)–(6).

---

[5] Weskan has already availed itself of this remedy, originally filing a petition to reopen and partially revoke K&O's 2001 acquisition exemption to acquire the Lease from CKR based on Weskan's asserted concerns over the interchange commitment at issue here. Weskan Petition, *Kan. & Okla. R.R.—Acquisition Exemption—Cent. Kansas Ry., LLC*, STB No. FD 34030 (Nov. 27, 2024), Doc. ID 308948.

13

In sum, all four factors establish that the ICCTA is "clearly incompatible" with antitrust enforcement here. *Credit Suisse*, 551 U.S. at 285. The ICCTA thus precludes Plaintiffs' Sherman Act claims, and those claims should be dismissed.

**B.      The ICCTA preempts Plaintiffs' state-law antitrust claims (Counts V–VII).**

The ICCTA also preempts the Colorado and Kansas antitrust law claims. *See* Compl. ¶¶ 98–119. Congress can preempt state law under the Supremacy Clause, which makes federal law "the supreme Law of the Land." U.S. Const. art. VI; *see Emerson v. Kan. City S. Ry.*, 503 F.3d 1126, 1128 (10th Cir. 2007). "Any state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield." *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 108 (1992).

When a federal law has "an express preemption clause," courts "focus on the plain wording of the clause, which necessarily contains the best evidence of Congress's preemptive intent." *Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 594 (2011) (citation modified). "And when the statute's language is plain, [the Court's] inquiry into preemption both begins and ends with the language of the statute itself." *EagleMed LLC v. Cox*, 868 F.3d 893, 903 (10th Cir. 2017).

Congress passed the ICCTA "to establish an exclusive Federal scheme of economic regulation and deregulation for railroad transportation." *BNSF Ry. v. Hiett*, 22 F.4th 1190, 1193 (10th Cir. 2022) (citation modified). To this end, the ICCTA gives the STB "exclusive" jurisdiction to regulate "rail transportation" and expressly "preempt[s] the remedies provided under . . . State law." § 10501(b). This provision was meant "to reflect the direct and complete pre-emption of State economic regulation of railroads." H.R. Rep. No. 104-311, at 95 (1995).

Section 10501(b)'s preemption language is plain and explicit. *See Hiett*, 22 F.4th at 1194 ("The plain language [of Section 10501(b)] is clear."). "Every court that has examined the statutory language has concluded that the preemptive effect of section 10501(b) is broad and sweeping, and

14

that it blocks actions by states or localities that would impinge on the Board's jurisdiction or a railroad's ability to conduct its rail operations." *CSX Transp., Inc.—Petition for Declaratory Order*, STB No. FD 34662, 2005 WL 584026, at *6 (STB served Mar. 14, 2005) (collecting cases). Indeed, "it is difficult to imagine a broader statement of Congress's intent to preempt state regulatory authority over railroad operations." *BNSF Ry. v. Cal. Dep't of Tax & Fee Admin.*, 904 F.3d 755, 760 (9th Cir. 2018) (citation modified).

"[T]he STB's own understanding of its authority under the ICCTA supports [this] plain-language determination." *Hiett*, 22 F.4th at 1194. "As the agency authorized by Congress to administer the [ICCTA], the [STB] is uniquely qualified to determine whether state law should be preempted by the [ICCTA]." *Id.* (citation modified). And the STB has held that the ICCTA categorically preempts "matters directly regulated by [the STB]," including the "operation . . . of rail lines" and "railroad rates and service." *Emerson*, 503 F.3d at 1130 (quoting *CSX Transp., Inc.— Petition for Declaratory Order*, STB No. FD 34662, 2005 WL 1024490, at *2 (STB served May 3, 2005)).

The ICCTA preempts the state-law antitrust claims here. At "the core of ICCTA preemption" is a prohibition on state "economic regulation" of railroad activities, in favor of a uniform federal regime. *Fayus Enters. v. BNSF Ry.*, 602 F.3d 444, 451 (D.C. Cir. 2010) (citation modified). Balkanized state regulation is the antithesis of this congressional design and would be particularly damaging to railroads, which are inherently interstate and cannot relocate to avoid state regulation. *See Hiett*, 22 F.4th at 1194 n.2. ICCTA thus "eliminat[es] direct economic regulation of railroads by the states." *PCS Phosphate Co. v. Norfolk S. Corp.*, 559 F.3d 212, 219 (4th Cir. 2009).

State-law antitrust claims "obviously present a risk of balkanized legal norms." *Fayus Enters.*, 602 F.3d at 452 (finding that the ICCTA preempted indirect purchasers' state-law antitrust

15

claims). Plaintiffs' "claims are designed as a means of getting the district court to apply state law to assess the substantive fairness" of the Lease's interchange commitment. *Id.* (citation modified). But Congress already decided that the "remedies provided under [the ICCTA] with respect to regulation of rail transportation are exclusive and preempt the remedies provided under . . . State law." § 10501(b)(2). And in implementing the statute, the STB held that interchange commitments should be reviewed on a "case-by-case basis" considering the national "Rail Transportation Policy goals" in Section 10101. *Ex Parte No. 575*, 2007 WL 3170981, at \*9. Permitting states to conduct their own case-by-case analysis of interchange commitments under different antitrust laws would "create[] just the patchwork of railroad regulation that ICCTA sought to preempt." *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 593 F. Supp. 2d 29, 38 (D.D.C. 2008), *aff'd sub nom. Fayus Enters. v. BNSF Ry.*, 602 F.3d 444 (D.C. Cir. 2010); *accord In re Vehicle Carrier Servs. Antitrust Litig.*, 846 F.3d 71, 85 (3d Cir. 2017) (holding that the Shipping Act preempts state-law antitrust claims because allowing these claims would "interfere with Congress's goal of uniform regulation of common carriers' international maritime activity"). Plaintiffs' state-law antitrust claims are thus preempted by the ICCTA and those claims should be dismissed.

## II.   Plaintiffs fail to state claims under the Sherman Act § 1, the Colorado Antitrust Act (C.R.S. §§ 6-4-101 *et seq*.), and the Kansas Restraint of Trade Act (K.S.A. § 50-112) (Counts I–II & VI–VII).[6]

If the Court reaches the merits, it should dismiss Plaintiffs' claims under Rule 12(b)(6). Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or

---

[6] Courts analyze federal and Colorado antitrust claims together. *See, e.g.*, *Four Corners Nephrology Assocs. v. Mercy Med. Ctr. of Durango*, 582 F.3d 1216, 1220 n.1 (10th Cir. 2009); *Surgical Assistants*, 127 F.4th at 189; *Arapahoe Surgery Ctr., LLC v. Cigna Healthcare, Inc.*, 80 F. Supp. 3d 1257, 1262–63 (D. Colo. 2015); *see generally* C.R.S. § 6-4-119. And the KRTA is likewise construed in harmony with federal antitrust law. *See Reorganized FLI, Inc. v. Williams Companies, Inc.*, 410 F. Supp. 3d 1213, 1218 (D. Kan. 2019); *Smith v. Philip Morris Companies, Inc.*, 50 Kan. App. 2d 535, 544, 335 P.3d 644, 652 (2014); *see generally* K.S.A. § 50-163(b), (c).

otherwise, or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1. Plaintiffs' Section 1 claims fail at every step. They fail to plausibly allege the threshold issues for a rule-of-reason analysis, and they fail to state a plausible claim for price-fixing and market allocation. The claims should be dismissed.

### A.    The rule of reason applies to Plaintiffs' price-fixing claim.

For Section 1 claims, the rule of reason and the per se rule are the "two main analytical approaches for determining whether a defendant's conduct unreasonably restrains trade." *Buccaneer Energy (USA) Inc. v. Gunnison Energy Corp.*, 846 F.3d 1297, 1306 (10th Cir. 2017). Under the rule-of-reason analysis, "the fact-finder weighs all of the circumstances of the case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Schoenhofer v. McClaskey*, 861 F.3d 1170, 1176 (10th Cir. 2017) (quoting *Cont'l TV, Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 49 (1977)). "The rule of reason is the default approach, and there is a presumption in favor of its application." *Id.*; *see Campfield v. State Farm Mut. Auto. Ins.*, 532 F.3d 1111, 1119 (10th Cir. 2008) ("Most claims under § 1 are subject to the rule of reason[.]").

Per se liability, on the other hand, is reserved for "agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *Buccaneer Energy*, 846 F.3d at 1306 (quoting *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 289 (1985)). That is, "per se violations are restricted to those restraints that would always or almost always tend to restrict competition and decrease output," *Campfield*, 532 F.3d at 1119 (citation modified), and "only if courts can predict with confidence that it would be invalidated in all or almost all instances under the rule of reason," *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886–87 (2007).

17

The Court should analyze Plaintiffs' claims under the rule of reason because the relationship between K&O and Union Pacific is vertical. *See Ohio v. Am. Express Co.*, 585 U.S. 529, 541 (2018) (explaining that vertical restraints are analyzed under the rule of reason); *Cont'l TV*, 433 U.S. at 59 (same). K&O and Union Pacific have a vertical relationship because they are not "competitors"—firms that "operate at the same market level." *Campfield*, 532 F.3d at 1120 (collecting cases); *see Surgical Assistants*, 127 F.4th at 186 (explaining that "plaintiffs must allege a conspiracy *between competitors*" to plead a per se violation) (emphasis added). K&O, a short line railroad providing first- and last-mile service, and Union Pacific, a "multibillion dollar behemoth" operating "thousands of miles" of rail lines in the western and central United States, do not operate at the same market level. Compl. ¶¶ 1, 27–28. Indeed, the STB likened short line-Class I interchange commitments to vertical restraints because they are between railroads that "do not compete with each other." *Ex Parte No. 575*, 2007 WL 3170981, at *6. And consistent with other vertical restraints, the STB held that interchange commitments should be evaluated on an "individualized, case-by-case basis" rather than prohibited "across the board" because "no single rule of general applicability seems appropriate." *Id.* at *5, *10; *see Leegin*, 551 U.S. at 899 (describing the rule of reason as a "case-by-case adjudication"). That is a textbook rule-of-reason analysis.

**B.    Plaintiffs fail to allege a legally sufficient relevant market.**

One way the Tenth Circuit "insist[s] upon specificity in antitrust pleadings" is requiring plaintiffs to "defin[e] the relevant market." *Surgical Assistants*, 127 F.4th at 186. The rule of reason begins with identifying the relevant market because courts "cannot properly apply the rule of reason without an accurate definition" of the market in which the alleged restraint occurred. *Am. Express*, 585 U.S. at 543. For this reason, "[f]ailure to allege a legally sufficient market is cause for dismissal of the claim." *Campfield*, 532 F.3d at 1118; *see Surgical Assistants*, 127 F.4th at 189 (same).

18

The relevant market comprises two submarkets: (1) the product market and (2) the geographic market. *Surgical Assistants*, 127 F.4th at 187. Plaintiffs fail to plausibly allege both.

**Product Market**. The relevant product market "is composed of products that have reasonable interchangeability for the purposes for which they are produced." *Auraria Student Hous. at the Regency, LLC v. Campus Vill. Apartments, LLC*, 843 F.3d 1225, 1244–45 (10th Cir. 2016) (citation modified). To this end, the plaintiff must justify any proposed market "by defining it with reference to the rule of reasonable interchangeability and cross-elasticity of demand." *Buccaneer Energy*, 846 F.3d at 1313 (citation modified); *see Telecor Commc'ns, Inc. v. Sw. Bell Tel. Co.*, 305 F.3d 1124, 1131 (10th Cir. 2002) (noting that reasonable interchangeability and cross-elasticity of demand are "substantially synonymous"). "If two products share a high cross-elasticity of demand—in that an increase in the price of one product causes consumers to switch to the other, and vice versa—then those products likely are interchangeable and may properly be considered part of the same product market." *Buccaneer Energy*, 846 F.3d at 1313.

Plaintiffs define the relevant product market as "the westbound shipment of grain by train." Compl. ¶ 56. This outcome-driven litigation framing makes a hash out of defining the relevant market. At its core, Plaintiffs do not plausibly allege that shipping grain west by train for relatively short distances has no "reasonable [economic] substitutes." *Surgical Assistants*, 127 F.4th at 187.

Start with trucks. Plaintiffs admit that trucks *are* "a reasonable substitute" for shipping grain less than "200 miles" yet they exclude trucks from the product market anyway. Compl. ¶ 57. The Court need not go further in rejecting the proposed product market. No doubt, trucks may not be a "viable alternative" for "transport[ing] grain any significant distance." *Id.* ¶ 40. But Weskan need not opt to truck grain all the way to California—just as the Lease Track cannot take grain that far either. *See id.* ¶¶ 1, 35. Weskan need only truck grain to its Stockton Facility, using rail from

19

there. *See* Weskan's Reply to Petition for Exemption 3, *Kan. & Okla. R.R.*, STB No. FD 36849 (Apr. 16, 2025), Doc. ID 309474 ("The [Stockton] facility receives grain grown by Colorado and Kansas farmers that is presently delivered by truck and then loaded into railcars for outbound shipping.").[7] And every farmer in Lane, Scott, Wichita, and Greeley Counties in Kansas is well within 200 miles of Weskan's Stockton Facility. In fact, the farthest point in the proposed market is only about 105 miles away in Lane County.[8] *See* Exhibit A (Declaration of Daniel G. Solomon) ¶ 3; ECF Doc. 1-1 at 2.

Farmers in the relevant market can, and evidently do, also use trucks to access three alternative rail lines all well within 200 miles: BNSF's track south of the Lease Track, Union Pacific's track north of the Lease Track, and K&O's own track east of the Lease Track.[9] *See* ECF Doc. 1-1 at 1; *see* Compl. ¶ 58 (admitting that "a small number of parties in the Relevant Market have used trucks to ship grain to an alternative railroad"). Take Leoti, Kansas—home to L&E Farms, GP. *See* Compl. ¶ 17. A farmer in Leoti is located roughly 36 miles from Sharon Springs (Union Pacific), 44 miles from Garden City (BNSF), and 24 miles from Scott City (K&O). Solomon Decl. ¶ 3; *see* ECF Doc. 1-1 at 1–2; *The Competitive Advantage*, Weskan Grain, https://weskangrain.com/advantage/ (last visited Mar. 30, 2026) ("Prior to the construction of the Weskan facility, local farmers who needed operations / equipment capable of handling unit trains were required to send their trucks to Cheyenne Wells, [Colorado,] Sharon Springs, [Kansas,] or Coolidge[, Colorado].").

---

[7] The Court may take judicial notice of "[t]he contents of an administrative agency's publicly available files . . . ." *Winzler v. Toyota Motor Sales U.S., Inc.*, 681 F.3d 1208, 1213 (10th Cir. 2012).

[8] The Court may take judicial notice of distances calculated using Google Maps' distance measuring tool. *See Pahls v. Thomas*, 718 F.3d 1210, 1216 n.1 (10th Cir. 2013) (collecting sources); *see, e.g.*, *United States v. Orozco-Rivas*, 810 F. App'x 660, 668 (10th Cir. 2020) (taking judicial notice of "the distance as calculated using Google Maps").

[9] K&O need not pay the asset-use fee to Union Pacific for rail cars that originate on the track that K&O owns and interchange at the Towner Line. *See* Compl. ¶ 48; ECF Doc. 1-1 at 1 (depicted in black).

Common sense dictates that these are precisely the kinds of "short-haul shipments" that are not "cost-prohibitive." *Id*. ¶ 40; *see Ashcroft*, 556 U.S. at 664 (requiring courts to draw on "common sense" when evaluating plausibility of claims at pleading stage).

At any rate, Plaintiffs' conclusory assertions that trucks are not a "reasonable substitute[]" for short-haul shipments blinks reality. *Surgical Assistants*, 127 F.4th at 187. In deciding rate disputes, the STB must first find that the rail carrier "has market dominance over the transportation to which a particular rate applies." 49 U.S.C. § 10701(b), (c). Market dominance is defined as "an absence of effective competition from other rail carriers or modes of transportation." *Id.* § 10707(a). Although this analysis can be complex, a complainant can pursue a "streamlined market dominance approach" if the challenged movement "exceed[s] 500 highway miles between origin and destination," among other factors. 49 C.F.R. § 1111.12(a). The STB used this factor because "500 miles is a reasonable threshold for . . . determining competitiveness of rail transportation versus truck." *Mkt. Dominance Streamlined Approach*, STB No. EP 756, 2020 WL 4492435, at *10 (STB served July 31, 2020); *see also* Ass'n of Am. R.R., *Freight Rail: Economic Regulation*, available at bit.ly/4qSZAuA (last visited March 30, 2026) (explaining that "freight railroads face fierce competition," "most rail customers can also ship via trucks, barges and/or pipelines," and "trucks are freight rail's largest competitor") (citation modified). Put simply, the STB has determined that trucks effectively compete with railroads for movements under 500 miles. Excluding trucks from the product market is thus fatal to Plaintiffs' claims.

Worse still, Plaintiffs fail to plausibly allege that shipping grain *east* by rail is not "reasonably interchangeable" with shipping grain *west*. *Buccaneer Energy*, 846 F.3d at 1313. The closest they come is the unadorned assertion that farmers "must transport grain west" to access West Coast mills and ports "to remain competitive." Compl. ¶¶ 2, 35. But this conclusory allegation need not

21

be credited—especially when shipping grain west does not "correspond to the commercial realities' of the [grain] industry." *Am. Express*, 585 U.S. at 544 (citation modified).

As Weskan explains on its website, CXR is a "reverse exporter train."[10] Weskan Grain, https://weskangrain.com/ (last visited Mar. 30, 2026). In other words, CXR moves Weskan's grain *west—opposite* to the dominant eastward flow of grain in western Kansas. Western Kansas grain typically travels east because "Illinois, Iowa, Kansas, Nebraska, and Minnesota represent more than half of the country's total off-farm [grain storage] capacity." Gretchen Kuck, *A Look at Current U.S. Grain Storage Capacity*, Nat'l Corn Growers Ass'n, http://bit.ly/3ZR7vOj (Aug. 14, 2025). In fact, the largest grain elevator in the world is located just east of the Lease Track near Wichita. *See* OSHA, DeBruce Grain Elevator Explosion Report, ch. 2, available at bit.ly/4812wPk (last visited Mar. 30, 2026); *see* ECF Doc. 1-1 at 1. And for exports, most of the grain produced in the Midwest then makes its way down to the Port of New Orleans, which exports 60% of the nation's grain. *See* Michelle Rook, *Port of South Louisiana Top Export Port for U.S. Grain Even with Historic Drought*, AgWeb, bit.ly/4saZ50d (Nov. 23, 2023).

Viewed through the lens of commercial reality, Plaintiffs' unsupported assertion that they "must" ship grain from western Kansas to western markets cannot establish a lack of reasonable interchangeability with selling and shipping grain to mills located elsewhere. Compl. ¶¶ 2, 35. Weskan and the Farmer Plaintiffs must plead *facts* explaining why there is no cross-price elasticity of demand between shipping grain west and shipping it to closer locations with lower

---

[10] The Court may "consider[] [Weskan's] own website" to identify a "deficiency" in the relevant market definition. *Surgical Assistants*, 127 F.4th at 188.

22

transportation costs. *Surgical Assistants*, 127 F.4th at 187. Merely peppering the Complaint with "antitrust buzz-words" will not do.[11] *Tal*, 453 F.3d at 1261.

**Geographic Market.** "Geographic market refers to a product market's geographic scope, and is defined as the narrowest market which is wide enough so that products from adjacent areas cannot compete on substantial parity with those included in the market." *Surgical Assistants*, 127 F.4th at 189 (citation modified). Put another way, the geographic market is "the area of effective competition" for a product market. *Lantec, Inc. v. Novell, Inc.*, 306 F.3d 1003, 1026 (10th Cir. 2002). Plaintiffs define the geographic market as "Lane, Scott, Wichita, and Greeley Counties in Kansas and in Kiowa County, Colorado," which they allege "conforms to the economic realities of the grain shipping market." Compl. ¶¶ 1, 59; *see* ECF No. 1-1 at 2. Like the product market, the proposed geographic market is legally insufficient and requires dismissal. *See Campfield*, 532 F.3d at 1118; *Surgical Assistants*, 127 F.4th at 189.

To begin, Plaintiffs' "failure to establish a sufficient product market necessarily means [they] also failed to define a legally sufficient geographic market." *Surgical Assistants*, 127 F.4th at 190. But the geographic market fails on its own merits too. "A geographic market cannot be drawn simply to coincide with the market area of a specific company." *Garnica v. HomeTeam Pest Def., Inc.*, 230 F. Supp. 3d 1155, 1159 (N.D. Cal. 2017) (citation modified). Yet Plaintiffs do just that, limiting the proposed geographic market to these five counties solely because "the [Union

---

[11] For the same reason, Plaintiffs' barebones allegations about the effect of imposing a "small but significant non-transitory increase in price," Compl. ¶¶ 56–58, "do[] not pass the straight-face test," *In re German Auto. Manufacturers Antitrust Litig.*, 497 F. Supp. 3d 745, 758 (N.D. Cal. 2020), *aff'd*, 2021 WL 4958987 (9th Cir. Oct. 26, 2021) (rejecting product market when plaintiffs "did not conduct a legitimate SSNIP analysis" and relied on "'empirical evidence' of no value"). A SSNIP test is an empirical analysis conducted by an "*economist*." *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 975 (9th Cir. 2023) (emphasis added) (explaining how a SSNIP test works). No such test was conducted here.

Pacific] Lease Track runs through the middle of [them]."[12] Compl. ¶ 59. At most, Plaintiffs allege that "[m]ost farmers and shippers in the Relevant Market cannot turn to alternative rail lines located outside of the Relevant Market because it is too costly to ship their grain to those other rail lines." *Id.* That, however, is a hallmark conclusory allegation that need not be credited—an "assertion[] nominally cast in factual terms but so general and conclusory as to amount merely to an assertion that unspecified facts exist to conform to the legal blueprint." *Lavigne v. Great Salt Bay Cmty. Sch. Bd.*, 146 F.4th 115, 123 (1st Cir. 2025) (citation modified).

In truth, farmers throughout the proposed geographic market are well within trucking distance of other rail lines in adjacent counties, expanding the geographic market far beyond its defined borders. *See* Compl. ¶ 57 (setting "200 miles" as the outer limit for using trucks as a "reasonable substitute" to ship grain); *Mkt. Dominance Streamlined Approach*, 2020 WL 4492435, at *10. For example, Dighton (Lane County) to Garden City (Finney County) is about 42 miles, Scott City (Scott County) to Oakley (Logan County) is about 35 miles, and Leoti (Wichita County) to Sharon Springs (Wallace County) is about 36 miles. Solomon Decl. ¶ 3; *see* ECF Doc. 1-1 at 1–2. At bottom, Plaintiffs cannot establish a legally sufficient market by gerrymandering the geographic market around the Lease Track's footprint.

* * *

In the end, "a plaintiff cannot arbitrarily choose the product market relevant to its claims." *Buccaneer Energy*, 846 F.3d at 1313 (citation modified). Plaintiffs' proposed relevant market is based not on economic principles but on Weskan's preference to use its Stockton Facility and its affiliate railroad, CXR. Compl. ¶¶ 36–37. But courts consistently reject that the relevant market

---

[12] Plaintiffs plead no facts explaining why Kiowa County, *Colorado* should be included in the relevant market. Compl. ¶¶ 2, 55. Given the Stockton Facility's location in the far eastern part of Kiowa County, it is unclear why Weskan or any farmer would need or want to use the Lease Track to reach the Stockton Facility by truck or rail. *See* ECF Doc. 1-1 at 1.

24

should be defined by a plaintiff's preferences. *See, e.g.*, *City of New York v. Grp. Health Inc.*, 649 F.3d 151, 156 (2d Cir. 2011) (agreeing that the alleged relevant market "is legally insufficient because it is defined by the City's preferences"); *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1063 (9th Cir. 2001) (rejecting that plaintiff's "strictly personal preference" to play soccer at UCLA and stay in Los Angeles is relevant to defining the relevant market); *Oksanen v. Page Mem'l Hosp.*, 945 F.2d 696, 709 (4th Cir. 1991) ("Although Page Memorial [Hospital] may be where Oksanen prefers to practice, this preference alone does not justify excluding other hospitals and other doctors from the relevant market definition."). Preferences aside, Plaintiffs' proposed relevant market is "legally untenable" and "dooms" Plaintiffs' antitrust claims. *Surgical Assistants*, 127 F.4th at 189–90; *Campfield.*, 532 F.3d at 1118.

### C.    Plaintiffs fail to allege that K&O has market power in the relevant market.

Failing to establish the relevant market "is not [Plaintiffs'] only problem." *Surgical Assistants*, 127 F.4th at 190. Plaintiffs must also establish K&O's "market power"—"the power to control prices [or] the power to exclude competition." *Id.* "[M]arket share—i.e., percentage of the relevant market—is a focal point." *Buccaneer Energy*, 846 F.3d at 1315. But "market share alone is insufficient to establish market power." *Id.* (citation modified). Rather, assessing market power also requires examining "barriers to entry, the number of competitors in the market, market trends, and other relevant considerations." *Id.* at 1315.

For one, it is "impossible to assess" Defendants' market power because Plaintiffs "failed to plead a legally sufficient market." *Surgical Assistants*, 127 F.4th at 190. But even if they did, Plaintiffs' *three* paragraphs on market power are woefully short on facts. *See* Compl. ¶¶ 60–62. For example, Plaintiffs plead no facts about Defendants' market share. *See id.* To be fair, they allege that Defendants "control" all westbound rail shipments in the proposed market, *id.* ¶ 60, but that allegation is "both conclusory and contradicted by other allegations," *Doe v. Woodard*, 912

25

F.3d 1278, 1298 n.24 (10th Cir. 2019). Plaintiffs admit that a "small number" of parties use trucks to ship grain to "alternative rail lines" or to the Stockton Facility. Compl. ¶¶ 37, 58. How many? They don't say. But this number matters. That "consumers [can] shop around to find a rival offering a better deal" suggests that Defendants do not have as much "market power" as Plaintiffs let on. *SCFC ILC, Inc. v. Visa USA, Inc.*, 36 F.3d 958, 965 (10th Cir. 1994). Nor can the Court assess whether Plaintiffs plausibly alleged that Defendants have "not lost significant market share" despite the interchange commitment when Plaintiffs do not allege Defendants' market share to begin with. *Id.* ¶ 61. In brief, the Court need not credit Plaintiffs' "legal conclusion[s]" on market power "couched as . . . factual allegation[s]." *Iqbal*, 556 U.S. at 678.

### D.    Plaintiffs fail to plausibly allege price-fixing and market allocation claims.

Even setting aside these dispositive threshold issues, Plaintiffs fail to allege plausible price-fixing and market allocation claims.

#### 1.    Plaintiffs do not plausibly allege a price-fixing claim (Counts I & VI–VII).

To state a Section 1 claim, the plaintiff must allege facts showing that "the defendant entered a contract, combination or conspiracy that unreasonably restrains trade in the relevant market." *Full Draw Prods. v. Easton Sports, Inc.*, 182 F.3d 745, 756 (10th Cir. 1999). "The essence of a claim of violation of Section 1 of the Sherman Act is the agreement itself," *Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1082 (10th Cir. 2006), which must be "designed unreasonably to restrain trade," *Abraham v. Intermountain Health Care Inc.*, 461 F.3d 1249, 1257 (10th Cir. 2006). Whether a restraint of trade is unreasonable turns on "the facts peculiar to the business, the history of the restraint, and the reasons why it was imposed." *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 692 (1978). "An agreement or conspiracy under federal antitrust laws is said to exist when there is a unity of purpose, a common design and understanding, a meeting

of the minds, or a conscious commitment to a common scheme." *Suture Express, Inc. v. Cardinal Health 200, LLC*, 963 F. Supp. 2d 1212, 1223 (D. Kan. 2013) (citation modified); *accord Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 771 (1984).

To be sure, K&O's Lease has an interchange commitment from K&O to Union Pacific. But Plaintiffs do not plausibly allege that K&O and Union Pacific shared a unity of purpose or a conscious commitment to a common scheme to restrain trade. *See Loren Data Corp. v. GXS, Inc.*, 501 F. App'x 275, 280 (4th Cir. 2012) ("Merely pleading or pointing to an express contract is not enough to show that an actual conspiracy to restrain trade is afoot."). That's because "the alleged conspiracy does not make economic sense" to K&O. *Llacua v. W. Range Ass'n*, 930 F.3d 1161, 1181 (10th Cir. 2019); *see Adaptive Power Sols., LLC v. Hughes Missile Sys. Co.*, 141 F.3d 947, 952 (9th Cir. 1998) ("Antitrust claims must make economic sense.").

To start, Weskan has never been "forced to pay the Interchange Fee." Compl. ¶ 39; *see also id.* ¶¶ 37, 48. As Plaintiffs admit, no rail cars have interchanged at the Towner Line since it reopened in 2019, so there was nothing to pay. *Id.* ¶¶ 8, 52. But more to the point, Plaintiffs know that the interchange commitment requires *K&O* to pay an asset-use fee to Union Pacific.

Union Pacific owns the Lease Track and leases it to K&O. *Id.* ¶ 41. And Union Pacific expects to be compensated for K&O's use of the track. When a freight shipment originating on the Lease Track interchanges with Union Pacific, that is sufficient compensation. But when K&O uses the Lease Track to interchange traffic with *another* carrier, Union Pacific receives nothing. To this end, "[Union Pacific] . . . adopt[ed] the Interchange Fee" to penalize K&O financially when K&O uses the Lease Track in a way that deprives Union Pacific of a revenue opportunity. *Id.* ¶¶ 48, 88. That's what an interchange commitment does: It "serve[s] to induce a *party to the agreement* to interchange traffic with another party to the agreement, rather than with a third-party connecting

27

carrier, whether by outright prohibition, per-car penalty, adjustment in the purchase price or rental, positive economic inducement, or other means." 49 C.F.R. § 1114.30(d) (emphasis added). Although the type of interchange commitment was changed in 2019, its purpose was not: inducing *K&O* to interchange traffic with Union Pacific. *See id*. ¶ 48.

Weskan (and the other Plaintiffs) know all of this. In the STB proceeding, Weskan argued that "the proposed interchange commitment is intended to 'preserve [Union Pacific's] market power and to restrict competition,' by making it 'economically infeasible *for K&O*' to transport agricultural products originating in Kansas to points west of the CXR interchange at Towner." *Kan. & Okla. R.R.*, 2025 WL 1769306, at *1 (emphasis added; citation modified); *see id.* ("Weskan asserts that the amended interchange commitment was inserted into the Lease . . . for the purpose of 'economically prohibiting K&O from interchanging traffic with one railroad — CXR — and forcing all traffic to flow east to be interchanged with [Union Pacific].") (citation modified).

Indeed, in a press release published by the Soloviev Group (Weskan and CXR's parent company), Plaintiffs' counsel stated: "Union Pacific Railroad Company is preventing farmers and everyone else from obtaining lower prices." Press Release, The Soloviev Group, *Local Farmers, Weskan Grain, and Colorado Pacific Railroad File Antitrust Lawsuit Against Union Pacific Railroad and Kansas & Oklahoma Railroad*, PR Newswire (January 28, 2026), bit.ly/4s1FjUY; *see O'Toole*, 499 F.3d at 1225 (taking judicial notice of website). In short, as Weskan argued before the STB—but omits from the Complaint—the interchange commitment makes it economically infeasible for *K&O* to interchange with CXR because *K&O* would incur a significant penalty from Union Pacific.

What Weskan really complains about are the rates that K&O has quoted Weskan for westward traffic moving to CXR at the Towner Line. Because K&O owes Union Pacific a per-car

penalty of "at least $500" for each rail car originating on the Lease Track that interchanges with CXR at the Towner Line, K&O's quoted rates naturally reflect K&O's contractually bound costs to ship grain west on the Lease Track to Weskan's Stockton Facility. Compl. ¶¶ 8, 48, 52. These rates may be "cost-prohibitive" to Weskan but the reverse is true for K&O. *Id.* ¶ 52. It would be cost-prohibitive to K&O to quote rates that did not consider the asset-use fee that K&O must pay to Union Pacific under the Lease. *See Surgical Assistants*, 127 F.4th at 191 (asking whether "[v]alid business justifications explain" a defendant's conduct).

Had Weskan believed that K&O's rates were unreasonable—at any point since the Towner Line reopened in 2019—Weskan was not without recourse.[13] Compl. ¶¶ 5, 8. "Determining the reasonableness of challenged rail transportation rates is one of the [STB's] core functions." *Mkt. Dominance Streamlined Approach*, STB No. EP 756, 2019 WL 4383954, at *1 (STB served Sept. 11, 2019); *see* 49 U.S.C. §§ 10701, 10707. And "just as before the lease or sale [containing an interchange commitment], a shipper without effective transportation alternatives can challenge what it believes to be an unreasonable through rate and seek rate relief from the Board." *Ex Parte No. 575*, 2007 WL 3170981, at *9. Yet Weskan does not allege it filed (and indeed never filed) a rate dispute with the STB for traffic originating on the Lease Track and subject to the interchange commitment.

With the context clear, the Complaint does not support a plausible inference that *K&O* had a conscious commitment to restrain trade. *See Suture Express*, 963 F. Supp. 2d at 1223; *Iqbal*, 556 U.S. at 678. There are at least three ways to ship grain west out of the proposed relevant market. Grain can be shipped east on the Lease Track to connect with Union Pacific at Hutchinson—

---

[13] Whether Weskan knew that K&O was subject to an interchange commitment with Union Pacific or knew the interchange commitment's exact terms is immaterial. The *rates* that K&O quoted Weskan were "cost-prohibitive" to Weskan either way. Compl. ¶¶ 8, 47.

allegedly "an inefficient and costly process for westbound rail freight." Compl. ¶¶ 4, 42; *see* ECF Doc. 1-1 at 1. Grain can be trucked to an alternative railroad—another alleged "cost-prohibitive option." Compl. ¶¶ 53–54; *but see id.* ¶ 57 (admitting that trucks are "a reasonable substitute" for shipping grain less than "200 miles"). And grain can be trucked directly to Weskan's Stockton Facility—a third alleged "cost-prohibitive" option. *Id.* ¶¶ 37, 53; *but see The Competitive Advantage*, Weskan Grain, https://weskangrain.com/advantage/ (last visited Mar. 30, 2026) ("The Weskan Grain facility is the only trainloader within reasonable trucking distance of its tributary territory . . . .").

If K&O were not subject to the interchange commitment, however, Plaintiffs imply that *all* or most of the grain in the relevant market *would* use the Lease Track to access the Towner Line—benefitting K&O's "independent economic interest."[14] *See* Compl. ¶¶ 3, 6, 43–45. That no cars have moved west since the Towner Line reopened is not because K&O has and exercises market power over inefficient shipping routes but simply because it is "economically infeasible for K&O" to quote rates that Weskan considers acceptable. *Kan. & Okla. R.R.*, 2025 WL 1769306, at *1. This "obvious alternative explanation" for the lack of westward traffic "overwhelms" any plausible inference of liability against K&O. *Cavlovic v. J.C. Penney Corp.*, 2018 WL 2926433, at *4–5 (D. Kan. June 7, 2018); *see Surgical Assistants*, 127 F.4th at 191. Yet Plaintiffs plead no facts to "refute" much less acknowledge this economic reality. *Cavlovic*, 2018 WL 2926433, at *5; *see, e.g.*, *In re Overstock Sec. Litig.*, 119 F.4th 787, 806 (10th Cir. 2024) (finding that claim was not plausible

---

[14] To be sure, Plaintiffs conclusorily allege that K&O colluded with Union Pacific to reduce the flow of traffic via the Towner Line when K&O was the "exclusive operator" of that line from 2019 through 2021—even though K&O would have benefitted from the increased traffic. Compl. ¶ 45. But acting as the exclusive operator of the Towner Line did not relieve K&O of its interchange commitment to Union Pacific, so the lack of traffic is not evidence that K&O acted "against [its] apparent individual economic self-interest." *Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013).

when the plaintiff "ignore[d] the obvious alternative explanation for Defendants' actions") (citation modified). Plaintiffs thus fail to plausibly allege that K&O conspired to restrain trade under the Sherman Act § 1, the Colorado Antitrust Act, and the KRTA.

### 2. Plaintiffs do not allege a plausible market allocation claim (Count II).

Plaintiffs also fail to state a cognizable Section 1 claim for unlawful market allocation. *See* Compl. ¶¶ 82–85. A horizontal market allocation is "an agreement between competitors at the same level of the market structure to allocate territories in order to minimize competition." *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 608 (1972). The "essence" of this type of agreement is that "competitors apportion the market among themselves and cease competing in another's territory or for another's customers." *Midwest Underground Storage, Inc. v. Porter*, 717 F.2d 493, 497 n.2 (10th Cir. 1983). Coca-Cola, for example, may not strike this deal with Pepsi: "You take east of the Mississippi, and I'll take west."

Plaintiffs cannot square-peg-round-hole a market-allocation theory onto the facts because K&O and Union Pacific are not competitors. A market allocation claim makes no sense here because K&O and Union Pacific have a vertical, not horizontal, relationship. *See Cates v. Crystal Clear Techs., LLC*, 2016 WL 4379220, at *10 (M.D. Tenn. Aug. 17, 2016) (holding that "'market allocation' is not a recognized basis for unlawfulness" in vertical agreements). They neither compete for rail traffic nor operate at the same market level. *See supra* p. 18. K&O provides first- and last-mile services for shippers in western Kansas to access Union Pacific's rail network in the western and central United States. Put simply, there is no territory or customers to divide.

Given this relationship, Plaintiffs do not and could not plausibly allege that K&O and Union Pacific agreed to allocate the market for shipping grain west by territory or customers so as not to compete against each other. Rather, they plead only the conclusory allegation that the K&O-Union Pacific "agreement" had the "*effect* of allocating the market for the westward shipment of

31

grain from the Relevant Market between themselves and excluding competition." Compl. ¶ 82 (emphasis added). But allocating the entire market "*between themselves*" with no real division—at the "exclu[sion]" of other competitors—is not a market-*allocation* theory; it is a market-*monopolization* theory, which falls under Section 2 not Section 1. *Id.* (emphasis added); *see* 15 U.S.C. § 2; *see, e.g.*, *Midwest Underground*, 717 F.2d at 497 n.2 (rejecting unlawful market allocation claim when "defendants attempted to control [the plaintiff's] share of the market by excluding" the plaintiff rather than "divi[ding]" the market). In short, Plaintiffs' market-allocation theory is a dressed-up monopolization claim that is not cognizable under Section 1 and should be dismissed.

**III.    Plaintiffs fail to plausibly allege a conspiracy-to-monopolize claim under the Sherman Act § 2 and the KRTA (K.S.A. § 50-132) (Counts IV–V).[15]**

Plaintiffs' conspiracy-to-monopolize claim under the Sherman Act § 2 should also be dismissed. Section 2 makes it unlawful for any person to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce." 15 U.S.C. § 2. Plaintiffs fail to state a claim for three reasons.

*First*, Plaintiffs' legally insufficient relevant market is also fatal to claims under Section 2. *See Auraria Student Hous.*, 843 F.3d at 1230 (overruling prior panel precedent and holding that "plaintiffs must define the relevant market in every § 2 claim"); *see supra* pp. 18–25.

*Second*, a conspiracy to create a shared monopoly is not a cognizable claim under Section 2. "The very phrase 'shared monopoly' is paradoxical." *Oxbow Carbon & Mins. LLC v. Union Pac. R.R. Co.*, 926 F. Supp. 2d 36, 46 (D.D.C. 2013) (citation modified). "In enacting the prohibitions on monopolies, Congress was concerned about the complete domination of a market by a single economic entity, and therefore did not include shared monopolies or oligopolies within the

---

[15] The KRTA is construed in harmony with federal antitrust law. *See* K.S.A. § 50-163(b); *Reorganized FLI*, 410 F. Supp. 3d at 1218.

purview of Section 2." *Id.* (citation modified). With this in mind, "most courts have rejected shared or joint monopoly arguments when analyzing § 2 claims, finding that such claims contradict the basic concept that a monopoly is the domination of a market by a single firm." *Suture Express*, 963 F. Supp. 2d at 1227 (collecting cases); *see, e.g.*, *Bakay v. Apple Inc.*, 2024 WL 3381034, at *5 (N.D. Cal. July 11, 2024), *aff'd*, 2025 WL 3012822 (9th Cir. Oct. 28, 2025) ("Plaintiffs' Section 2 claim fails for the independent reason that a conspiracy jointly to monopolize trade is not cognizable under Section 2."); *Acad. of Allergy & Asthma in Primary Care v. Quest Diagnostics, Inc.*, 2022 WL 980791, at *9 (W.D. Tex. Mar. 31, 2022) (holding that a "consensus" of courts supports finding that "plaintiffs' shared-monopoly allegations do not plausibly state a § 2 claim") (collecting cases); *In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 382 (S.D.N.Y. 2016) (dismissing Section 2 conspiracy claim alleging that "defendants collectively sought to dominate the LME zinc warehousing services market") (collecting cases).

Plaintiffs allege the same conspiracy to create a shared monopoly that so many courts have rejected before. Plaintiffs allege that "Defendant UP, on the one hand, and Defendant K&O, on the other hand, have combined, conspired, and agreed *among themselves* to monopolize the Relevant Market . . . ." Compl. ¶ 92 (emphasis added). And Plaintiffs elaborate that—if their conclusory allegations can so be called—"Defendants conspired to monopolize the Relevant Market," "Defendants intended to monopolize the relevant market," and "Defendants maintained monopoly power." *Id.* ¶¶ 93–95. In other words, Plaintiffs allege that K&O and Union Pacific conspired to monopolize the grain shipment from western Kansas *together*. *See id.* ¶ 95 (alleging that the interchange commitment "ensured *Defendants* maintained complete control over the western shipment of grain from the Relevant Market") (emphasis added). This shared monopoly theory cannot proceed under Section 2.

33

*Third*, even if a shared monopoly theory were viable under Section 2, Plaintiffs fail to plausibly allege the elements of a conspiracy-to-monopolize claim: "conspiracy, specific intent to monopolize, and overt acts done in furtherance of the conspiracy." *Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 847 F.3d 1221, 1231 (10th Cir. 2017).

Plaintiffs do not plausibly allege a conspiracy between K&O and Union Pacific because the Complaint lacks facts supporting the inference that K&O had "a unity of purpose, a common design and understanding, a meeting of the minds, or a conscious commitment to a common scheme." *Suture Express*, 963 F. Supp. 2d at 1223; *see supra* pp. 26–30.

Plaintiffs also fail to plausibly allege that K&O had specific intent to monopolize the market for shipping grain west from western Kansas. "Specific intent to monopolize is the heart of a conspiracy charge." *Auraria Student Hous.*, 843 F.3d at 1234; *see also Perington Wholesale, Inc. v. Burger King Corp.*, 631 F.2d 1369, 1377 (10th Cir. 1979) (identifying "the gravamen" of a conspiracy-to-monopolize claim as "the intent to achieve the unlawful result"). "The specific intent necessary to establish a conspiracy to monopolize is the intent to enable or maintain a monopoly position in the relevant market." *In re Zinc Antitrust Litig.*, 155 F. Supp. 3d at 383; *see also* K.S.A. § 50-132 (prohibiting conspiring or combining "*for the purpose of* monopolizing any line of business") (emphasis added). "If one party's intent to monopolize is not shared by another party, there can be no conspiracy to monopolize." *Total Renal Care, Inc. v. W. Nephrology & Metabolic Bone Disease, P.C.*, 2009 WL 2596493, at *16 (D. Colo. Aug. 21, 2009) (citation modified).

Plaintiffs' lone conclusory allegation on this score does not cut it: "Defendants intended to monopolize the Relevant Market through their adoption of the Interchange Fee, as they set it high enough to eliminate the Towner Line as a competitive threat . . . ." Compl. ¶ 94; *but see id.* ¶ 88 ("[Union Pacific] . . . adopt[ed] the Interchange Fee."). For one, "claims as to the motivations or

actions of defendants as a general collective bloc . . . must . . . be set aside as impermissible group pleading." *In re Treasury Sec. Auction Antitrust Litig.*, 595 F. Supp. 3d 22, 32 (S.D.N.Y. 2022) (citation modified). But more than that, Plaintiffs plead no *facts* to infer that *K&O* had the "specific intent to destroy competition" at the Towner Line. *Times-Picayune Pub. Co. v. United States*, 345 U.S. 594, 626 (1953). To the contrary, K&O has an "independent economic interest" in traffic flowing west on the Lease Track to the Towner Line. Compl. ¶ 45. That no traffic originating on the Lease Track flows west is because the interchange commitment—in Weskan's words—makes it "economically infeasible for K&O" to quote rates that are economically reasonable to shippers— not because K&O had some nefarious intent to harm CXR. *Kan. & Okla. R.R.*, 2025 WL 1769306, at *1.

Plaintiffs also allege that the purpose of the interchange commitment was to force shippers to use Union Pacific tracks to ship grain west rather than give BNSF the chance to compete with Union Pacific for traffic west of NA Junction on the Towner Line. *See* Compl. ¶¶ 6, 43, 63; ECF Doc. 1-1 at 1; *see* Weskan's Reply to Petition for Exemption 9, *Kan. & Okla. R.R.*, STB No. FD 36849 (Apr. 16, 2025), Doc. ID 309474 (arguing same); *see Winzler*, 681 F.3d at 1213 (taking judicial notice of administrative agency's publicly available files). K&O, however, has no dog in this fight. Or to put it in antitrust terms—K&O has "no rational motive to create [a monopolistic] environment." *TV Commc'n Network, Inc. v. Turner Network TV, Inc.*, 964 F.2d 1022, 1026–27 (10th Cir. 1992). And when both parties do not share the intent to monopolize, a conspiracy-to-monopolize claim should be dismissed. *See, e.g.*, *Total Renal Care*, 2009 WL 2596493, at *16 (dismissing conspiracy-to-monopolize claim when plaintiff did not plead "that any of the collaborating entities shared [the other defendant's] specific intent to monopolize the market").

35

**IV.    Injunctive relief against common carriers is barred for federal antitrust violations.**

Last, Plaintiffs cannot seek injunctive relief under federal antitrust law. *See* Compl. ¶¶ 79, 85, 97. Private parties can seek injunctive relief for antitrust violations under the Clayton Act:

> Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties . . . provided that nothing herein contained shall be construed to entitle any person, firm, corporation, or association, except the United States, to bring suit for injunctive relief against any common carrier subject to the jurisdiction of the Surface Transportation Board under subtitle IV of Title 49.

15 U.S.C. § 26. The Clayton Act thus provides for "injunctive relief for a federal antitrust violation except when the defendant is a common carrier subject to the STB's jurisdiction." *CSX Transp., Inc. v. Norfolk S. Ry.*, 2023 WL 2552343, at *7 (E.D. Va. Jan. 27, 2023).

K&O is a common carrier. *See* Compl. ¶ 27 ("[K&O] is a Class III freight railroad company and a railroad common carrier."). So under the statute's plain language, injunctive relief for Sherman Act violations is not available to Plaintiffs. *See, e.g.*, *CSX Transp.*, 2023 WL 2552343, at *7 (dismissing federal antitrust injunctive relief claims against common carrier); *Truck-Rail Handling Inc. v. BNSF Ry.*, 2005 WL 8178364, at *4 (N.D. Cal. Mar. 8, 2005) (same).

## CONCLUSION

The Court should dismiss Plaintiffs' Complaint with prejudice.

Dated: April 2, 2026                              Respectfully submitted,

                                                  */s/ Jeffrey J. Simon*
                                                  Jeffrey J. Simon, KS 15231
                                                  Sara A. Fevurly, KS 27537
                                                  HUSCH BLACKWELL LLP
                                                  4801 Main Street, Suite 1000
                                                  Kansas City, MO 64112
                                                  T: 816.983.8000
                                                  F: 816.983.8080
                                                  jeff.simon@huschblackwell.com
                                                  sara.fevurly@huschblackwell.com

                                                  Daniel G. Solomon, *admitted pro hac vice*
                                                  HUSCH BLACKWELL LLP
                                                  1801 Pennsylvania Avenue, NW, Suite 1000
                                                  Washington, DC 20006
                                                  T: 202.378.2300
                                                  danny.solomon@huschblackwell.com

                                                  **ATTORNEYS FOR DEFENDANT**
                                                  **KANSAS & OKLAHOMA RAILROAD, LLC**

37

**CERTIFICATE OF SERVICE**

I hereby certify that on April 2, 2026, I filed the foregoing document via the Court's ECF system, which will cause a true and correct copy of the same to be served electronically on all ECF-registered counsel of record.

*/s/ Jeffrey J. Simon*
