**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

|  |  |
|---|---|
| WESKAN GRAIN LLC, *et al.*, | |
| *Plaintiffs*, | |
| v. | Case No. 2:26-cv-2053-JAR-GEB |
| KANSAS & OKLAHOMA RAILROAD, LLC, *et al.*, | Oral Argument Requested |
| *Defendants*. | |

**MEMORANDUM IN SUPPORT OF
DEFENDANT UNION PACIFIC RAILROAD COMPANY'S
<u>MOTION TO DISMISS OR STAY THE CASE</u>**

Pursuant to Federal Rule of Civil Procedure 12(b)(6) and Local Rule 7.1, Defendant Union

Pacific Railroad Company hereby submits this Memorandum in Support of its Motion to Dismiss

Plaintiffs' Complaint.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... ii

INTRODUCTION AND NATURE OF THE MATTER ................................................................ 1

BACKGROUND ....................................................................................................................... 2

LEGAL STANDARD................................................................................................................. 4

ARGUMENT ............................................................................................................................ 5

I.    Plaintiffs cannot use private antitrust claims to attack railroad interchange
      commitments or rates. .................................................................................................... 5

      A.    The STB's exclusive authority includes rates, leases, and interchange
            commitments. ...................................................................................................... 5

      B.    Implied antitrust preclusion forecloses these claims. ............................................ 7

      C.    The *Keogh* doctrine further bars Plaintiffs' claims attacking railroad rates. ........ 12

II.   Alternatively, primary jurisdiction warrants a stay until the STB acts............................. 14

CONCLUSION........................................................................................................................ 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
 556 U.S. 662 (2009)..................................................................................................................4

*Ass'n of Am. R.R. v. S. Coast Air Quality Mgmt. Dist.*,
 622 F.3d 1094 (9th Cir. 2010) .................................................................................................11

*BNSF Ry. v. Clark Cnty., Wash.*,
 11 F.4th 961 (9th Cir. 2021) ....................................................................................................14

*Byers v. Intuit, Inc.*,
 600 F.3d 286 (3d Cir. 2010)......................................................................................................4

*Carlin v. DairyAmerica, Inc.*,
 705 F.3d 856 (9th Cir. 2013) ...................................................................................................12

*Chi. & N. W. Transp. Co. v. Kalo Brick & Tile Co.*,
 450 U.S. 311 (1981)...................................................................................................................5

*Credit Suisse Sec. (USA) LLC v. Billing*,
 551 U.S. 264 (2007)..............................................................................................................7, 10

*Crocs, Inc. v. Joybees, Inc.*,
 No. 21-cv-2859, 2024 WL 3580779 (D. Colo. July 12, 2024)................................................13

*Digital Ally, Inc. v. Taser Int'l, Inc.*,
 No. 16-2032, 2017 WL 131595 (D. Kan. Jan. 12, 2017),
 *aff'd*, 720 F. App'x 1023 (Fed. Cir. 2018)..............................................................................13

*E. & J. Gallo Winery v. EnCana Corp.*,
 503 F.3d 1027 (9th Cir. 2007) .................................................................................................12

*Elec. Trading Grp., LLC v. Banc of Am. Sec. LLC*,
 588 F.3d 128 (2d Cir. 2009)..................................................................................................9, 10

*Emerson v. Kan. City S. Ry.*,
 503 F.3d 1126 (10th Cir. 2007) ...............................................................................................11

*Fayus Enters. v. BNSF Ry.*,
 602 F.3d 444 (D.C. Cir. 2010)..................................................................................................11

*Kurns v. R.R. Friction Prods. Corp.*,
 565 U.S. 625 (2012)..................................................................................................................11

*Mical Commc'ns, Inc. v. Sprint Telemedia, Inc.*,
   1 F.3d 1031 (10th Cir. 1993) .........................................................................................14

*Phillips Pipe Line Co. v. Diamond Shamrock Refin. & Mktg. Co.*,
   50 F.3d 864 (10th Cir. 1995) ..........................................................................................12

*Ryan v. Chemlawn Corp.*,
   935 F.2d 129 (7th Cir. 1991) ..........................................................................................15

*S. Utah Wilderness All. v. Bureau of Land Mgmt.*,
   425 F.3d 735 (10th Cir. 2005), *as amended on denial of reh'g* (Jan. 6, 2006)........................14

*Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*,
   476 U.S. 409 (1986)........................................................................................................13

*Tex. Com. Energy v. TXU Energy, Inc.*,
   413 F.3d 503 (5th Cir. 2005) ..........................................................................................12

*Town of Norwood v. New England Power Co.*,
   202 F.3d 408 (1st Cir. 2000)...........................................................................................12

*U.S. Futures Exch., LLC v. Bd. of Trade of City of Chi., Inc.*,
   953 F.3d 955 (7th Cir. 2020) .......................................................................................7, 10

*Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*,
   540 U.S. 398 (2004)..........................................................................................................7

**Administrative Decisions**

*Canadian Pac. Ry.—Control—Kan. City S.*,
   No. FD 36500, 2023 WL 2808454 (STB served Mar. 15, 2023) ...........................................9

*Disclosure of Rail Interchange Commitments*,
   No. EP 575 (Sub-No. 1), 2007 WL 3170981 (STB served Oct. 30, 2007) ...............3, 5, 6, 8, 9

*Kan. & Okla. R.R.—Acquisition Exemption—Cent. Kan. Ry.*,
   No. FD 34030, 2001 WL 648941 (STB served June 12, 2001) ..............................................2

*Kan. & Okla. R.R.—Acquisition Exemption—Cent. Kan. Ry.*,
   No. FD 34030, 2025 WL 627747 (STB served Feb. 25, 2025)............................................3, 8

*Kan. & Okla. R.R.—Lease & Operation Exemption with Interchange
   Commitment—Union Pac. R.R.*,
   No. FD 36849, 2025 WL 1769306 (STB served June 25, 2025) ........................................3, 4

*Kan. & Okla. R.R.—Lease & Operation Exemption with Interchange
   Commitment—Union Pac. R.R.*,
   No. FD 36849, 2026 WL 795881 (STB served Mar. 20, 2026) ......................................4, 7, 9

*Info. Required in Notices & Petitions Containing Interchange Commitments*,
No. EP 714, 2013 WL 4768009 (STB served Sept. 5, 2013) ......................................................7

*Review of Rail Access & Competition Issues*,
No. EP 575, 2007 WL 3170981 (STB served Oct. 30, 2007)......................................................1

*Union Elec. Co. d/b/a Ameren Missouri & Missouri Cent. R.R. v. Union Pac.
R.R.*,
No. NOR 42126, 2013 WL 769489 (STB served Feb. 27, 2013)..........................................8, 9

**Statutes and Regulations**

28 U.S.C. § 1367.............................................................................................................................13

49 U.S.C. § 10101...........................................................................................................................10

§ 10501 .............................................................................................................5, 10, 11, 12

§ 10502 ......................................................................................................................................5

§ 10701 ....................................................................................................................................12

§ 10901 ...........................................................................................................................5, 8, 10

§ 10902 ......................................................................................................................................5

§ 11101 ....................................................................................................................................13

§ 11323 ...............................................................................................................................5, 10

49 C.F.R. part 1111........................................................................................................13, 14

§ 1114.30..................................................................................................................................6

§ 1150.43...............................................................................................................................6, 8

§ 1180.4....................................................................................................................................6

part 1300.................................................................................................................................13

§ 1300.5..................................................................................................................................13

**Other Authorities**

H.R. Rep. No. 104-311 (1995)...................................................................................................5, 10

Rip Watson, *Lawsuit claims UP, short line blocked grain moves via alternate
route*, TRAINSPRO (Jan. 30, 2026)..............................................................................................1

## INTRODUCTION AND NATURE OF THE MATTER

The Court should dismiss this case, or at least stay it, because Plaintiffs' antitrust claims raise issues at the core of a federal agency's regulatory jurisdiction and expertise—issues that are pending before the agency now, in connection with this very dispute. Multiple doctrines foreclose Plaintiffs' effort to drag this Court into ongoing regulatory proceedings.

Plaintiffs, Weskan Grain, Colorado Pacific Railroad, and various Kansas and Colorado grain producers, brought this suit against Union Pacific and Kansas & Oklahoma Railroad (K&O). Their Complaint paints a picture—vivid in color, but riddled with holes—of small-time farmers battling a "behemoth" monopolist: They claim Union Pacific and K&O have conspired to block them from shipping grain by "secretly" adopting an "interchange commitment" in a lease under which K&O operates a Union Pacific-owned rail line.

The facts are quite different. Weskan and Colorado Pacific are both part of the Soloviev Group, a conglomerate owned by a New York billionaire who claims to be the fourteenth largest U.S. landowner.[1] This suit is part of Soloviev's effort to gain vertically integrated control over grain distribution in the area. And far from being tools of monopoly, interchange commitments—common provisions in rail leases that incentivize a railroad tenant to interchange traffic with its lessor—are often pro-competitive. They "have facilitated the creation and growth of short line railroads" like K&O, "which in turn has benefited the public" in various ways. *See Review of Rail Access & Competition Issues*, No. EP 575, 2007 WL 3170981, at *5 (STB served Oct. 30, 2007).

None of that, however, is this Court's problem. Congress gave the Surface Transportation Board (STB) exclusive jurisdiction to regulate rail transportation. The STB's jurisdiction includes

---

[1] Rip Watson, *Lawsuit claims UP, short line blocked grain moves via alternate route*, TRAINSPRO (Jan. 30, 2026), https://shorturl.at/284uM.

approving leases and interchange commitments like those at issue. In deciding these complex, fact-intensive issues, the agency considers competition principles derived from federal antitrust law. And, as the Complaint ignores, the STB will soon consider the very interchange commitment that Plaintiffs challenge in this case: The agency will decide (i) K&O's forthcoming second request to approve the interchange commitment, which Weskan has opposed as supposedly anticompetitive for the same reasons asserted in this action, and (ii) Weskan's alleged forthcoming challenge to K&O's rate for transporting grain, which the Complaint here likewise attacks.

This overlap forecloses Plaintiff's claims. But even if the STB weren't currently considering the very issues in this case, the Complaint would run afoul of both implied antitrust preclusion (because it raises issues that Congress entrusted to the regulatory agency) and the *Keogh* doctrine (because it challenges railroad rates, which the STB solely regulates). Indeed, by effectively asking the Court to dictate governing terms in a rail line lease, the Complaint clashes with the STB's exclusive grant of jurisdiction over such matters. For all these reasons, Plaintiffs' claims should be dismissed with prejudice.

Alternatively, the Court should at least stay the case until the STB has acted on the pending proceedings between these parties related to this dispute. At a minimum, the Court would benefit from having the agency's views on these issues before it decides whether Plaintiffs' claims are permissibly raised in this forum.

## BACKGROUND

Union Pacific owns rail lines across the country, including the rail line at issue, running between Towner, Colorado and Healy, Kansas. Compl. ¶ 3. Union Pacific has leased this line to a "short line" railroad for nearly 30 years. K&O has been the short line operator since 2001. *Kan. & Okla. R.R.—Acquisition Exemption—Cent. Kan. Ry.*, No. FD 34030, 2001 WL 648941, at *1 (STB served June 12, 2001); Compl. ¶ 41 & n.6.

2

Short lines are local or regional railroads.  As the STB has explained, short lines can "operate their lines at lower costs than could the larger carriers from which they acquired or leased their lines," they have "a more flexible workforce and lower crewing requirements," and they face "lower operating costs."  *Disclosure of Rail Interchange Commitments*, No. EP 575 (Sub-No. 1), 2007 WL 3170981, at *3 (STB served Oct. 30, 2007).  Many lease agreements between short line carriers and larger railroads include what is known as an interchange commitment—a contractual provision that governs the short line's incentive or ability to interchange traffic with other connecting carriers, typically tied to reduced rental payments owed by the short line.  *Id.*

When K&O took over the line in 2001, its lease agreement with Union Pacific contained an interchange commitment.  *Kan. & Okla. R.R.—Acquisition Exemption—Cent. Kan. Ry.*, No. FD 34030, 2025 WL 627747, at *3 (STB served Feb. 25, 2025).  That lease was authorized by the STB in 2001.  *Id.* at *1.  Nearly two decades later, in 2018 and 2019, the two railroads amended their lease to make various adjustments, including modifying the form of the interchange commitment.  *Id.* at *4.  At that point, K&O was responsible for securing STB approval of the amendments.  It failed to do so, apparently inadvertently.

The dispute over the interchange commitment was first raised with the STB in November 2024, when Weskan petitioned the agency to partially revoke the authority it granted in 2001.  *Id.* at *1; Compl. ¶ 48.  However, because the current interchange commitment was part of the 2018 and 2019 lease amendments, which had not yet been approved, the STB denied Weskan's petition as moot and ordered K&O to seek after-the-fact authority for the amendments.  *Kan. & Okla. R.R.*, 2025 WL 627747, at *4–5.

In March 2025, K&O did so, petitioning for authorization to amend and renew the lease.  *Kan. & Okla. R.R.—Lease & Operation Exemption with Interchange Commitment—Union Pac.*

3

*R.R.*, No. FD 36849, 2025 WL 1769306, at *1 (STB served June 25, 2025).  Weskan opposed the petition, arguing that the interchange commitment was designed to "preserve UP's market power and to restrict competition."  *Id.* (citation omitted).

In late March 2026, the STB denied K&O's petition without prejudice.  The agency found that the existing record was "not sufficient . . . to make an informed decision on the merits" regarding the interchange commitment's benefits in light of the governing policy goals.  *Kan. & Okla. R.R.—Lease & Operation Exemption with Interchange Commitment—Union Pac. R.R.*, No. FD 36849, 2026 WL 795881, at *8, *10 (STB served Mar. 20, 2026).  The STB thus directed K&O to file a "fully supported" petition by May 4, 2026.  *Id.* at *10.

As part of those proceedings, Weskan claimed that K&O had set unreasonably high rates for transportation of westbound grain.  Weskan Reply p. 11, *Kan. & Okla. R.R.*, No. FD 36849 (filed Jan. 5, 2026).  And while Weskan has not challenged rail traffic subject to the interchange commitment, it is familiar with the STB's rate-review procedures.  In fact, Weskan has submitted a pre-filing notice to the STB indicating its intent to file a complaint challenging the reasonableness of K&O's rate for transportation of grain commodities that Weskan ships from grain loading facilities in the vicinity of Scott City, Kansas and a grain elevator near Sheridan, Colorado.  *See* Pre-Filing Notice, *Weskan Grain LLC v. Kan. & Okla. R.R.*, No. NOR 42185 (STB filed Dec. 17, 2025).  Scott City is located along the line K&O leases from Union Pacific.  Compl. at 3.  As of this filing, Weskan has not yet filed a rate complaint.

## LEGAL STANDARD

To avoid dismissal under Rule 12(b)(6), a complaint must allege sufficient factual matter, accepted as true, to allow the court to reasonably infer that the defendant is liable under a cognizable legal theory.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Implied antitrust preclusion

may be decided on a Rule 12(b)(6) motion.  *E.g.*, *Byers v. Intuit, Inc.*, 600 F.3d 286, 298 (3d Cir. 2010).

## ARGUMENT

### I.    Plaintiffs cannot use private antitrust claims to attack railroad interchange commitments or rates.

The Complaint should be dismissed for failure to state a claim.  Plaintiffs challenge the interchange commitment in the Union Pacific–K&O lease and the transportation costs for westbound grain—both issues within the STB's exclusive authority.  Plaintiffs cannot use antitrust law to circumvent Congress's exclusive regulatory scheme.

#### A.    The STB's exclusive authority includes rates, leases, and interchange commitments.

Railroads have long been subject to one of "the most pervasive and comprehensive of federal regulatory schemes."  *Chi. & N. W. Transp. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 318 (1981).  Today, the law gives the STB "exclusive" jurisdiction over "transportation by rail carriers," "remedies . . . with respect to rates," and the "acquisition" and "operation" of rail lines. 49 U.S.C. § 10501(b)(1)–(2).  This "scheme of economic regulation and deregulation is intended to address and encompass all such regulation and to be completely exclusive."  H.R. Rep. No. 104-311, at 95–96 (1995).

This system includes exclusive responsibility to authorize the acquisition and operation of rail lines.  *See* 49 U.S.C. §§ 10901(a), 10902(a), 11323(a) (each providing that a railroad can acquire and operate a rail line "only" if the STB authorizes it).  The STB may do this through a formal application or its "exemption" authority under 49 U.S.C. § 10502(a).  Either way, only the STB may review and approve leases and other operating agreements for rail lines under its jurisdiction.  The STB also has authority to determine whether particular lease provisions—like

the interchange commitment at issue—preclude the provision of adequate, efficient service at reasonable rates. *Interchange Commitments*, 2007 WL 3170981, at \*10.

An interchange commitment is "a provision or agreement that may limit future interchange with a third-party connecting carrier, whether by outright prohibition, per-car penalty, adjustment in the purchase price or rental, positive economic inducement, or other means." 49 C.F.R. § 1180.4(g)(3)(i); Compl. ¶ 47. Interchange commitments are not inherently anticompetitive. In fact, the STB refused to adopt a rule disfavoring such provisions, recognizing that in many instances these provisions have led to "better service and/or better rates" and created or strengthened smaller ("short line") railroads, thereby "ultimately add[ing] to competition." *Interchange Commitments*, 2007 WL 3170981, at \*6. The STB instead reviews interchange commitments on a case-by-case basis, evaluating "the particular facts, the competitive conditions before and after the interchange commitment, the nature of the commitment, and its actual or likely effects." *Id.* at \*10. The agency also considers "the manner in which the interchange commitment discourages interchange with other carriers and the degree to which interchange is effectively foreclosed," with total interchange bans or perpetual limitations receiving "a higher level of scrutiny." *Id.*

To facilitate the agency's regulation of interchange commitments, and to "better equip shippers to challenge an agreement before it takes effect," procedures require the disclosure of interchange commitments in any proceeding where a party seeks STB authorization for a lease or acquisition containing such a provision. *Id.* at \*5. The filing party must disclose the existence, terms, and impact of any interchange commitment as well as provide a confidential, complete version to the agency. *See*, *e.g.*, 49 C.F.R. § 1150.43(h). A shipper or other affected party may also obtain access to the interchange commitment. *Id.* § 1114.30(d). These rules allow "the Board

6

and affected parties to determine at the outset whether a transaction that includes an interchange commitment is appropriate for the exemption process or raises competitive issues that require a more detailed examination." *Info. Required in Notices & Petitions Containing Interchange Commitments*, No. EP 714, 2013 WL 4768009, at \*2 (STB served Sept. 5, 2013).

Weskan is using these STB procedures to challenge the interchange commitment at issue here. In the proceeding where K&O sought authority for its interchange commitment, Weskan obtained the lease pursuant to the disclosure requirements and has argued to the STB that the commitment is anticompetitive and should be eliminated. *Kan. & Okla. R.R.*, 2026 WL 795881, at \*3 n.3. As noted, the STB ordered K&O to refile with additional evidence by May 4, 2026, after which Weskan will presumably renew its arguments. *Id.* at \*10.

However the STB resolves that proceeding, the Plaintiffs cannot use the antitrust laws to evade Congress's exclusive regulatory scheme.

### B.      Implied antitrust preclusion forecloses these claims.

When Congress enacts "a detailed regulatory scheme" to govern a particular industry, *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 406 (2004), courts "must determine" whether the regulatory statutes "implicitly preclude application of the antitrust laws." *Credit Suisse Sec. (USA) LLC v. Billing*, 551 U.S. 264, 271 (2007). A defendant may not be sued under federal antitrust laws if applying those laws is "clearly incompatible" with the industry-specific regulatory regime. *Id.* at 285.

Implied antitrust preclusion turns on four factors: "(1) the existence of clear and adequate regulatory authority to supervise the activity in question; (2) evidence that the responsible regulatory entities exercise that authority in an active and ongoing manner; (3) a resulting risk that the antitrust laws and those governing the challenged activity, if both applicable, would produce conflicting guidance, requirements, duties, privileges, or standards of conduct; and (4) whether the

7

questioned activity lies squarely within the heartland of the regulated area." *U.S. Futures Exch., LLC v. Bd. of Trade of City of Chi., Inc.*, 953 F.3d 955, 967 (7th Cir. 2020) (citing *Credit Suisse*, 551 U.S. at 275–77). Each factor is satisfied here.

*First*, a detailed regulatory scheme governs the lawfulness of interchange commitments in rail lease agreements. The STB must review and authorize every acquisition, lease, and operation of rail lines within its jurisdiction, including those by short line carriers like K&O. *See* 49 U.S.C. § 10902(a); *Kan. & Okla. R.R.*, 2025 WL 627747, at *5. In connection with these licensing proceedings, the STB requires the disclosure of the terms and impact of any interchange commitments. For example, in proceedings like *Kansas and Oklahoma Railroad*, No. FD 36849, the railroad is required to "certify" whether the lease involves an interchange commitment and to disclose a complete version of that agreement and provide other details. 49 C.F.R. § 1150.43(h)(1).

These disclosure requirements enable the STB to "monitor the[ ] us[e] and effect" of interchange commitments "over the short and long term" and to "better equip shippers to challenge an agreement before it takes effect." *Interchange Commitments*, 2007 WL 3170981, at *5. And shippers may separately address the impact of interchange commitments by invoking the STB's authority to review the reasonableness of rates, availability of interchange, and contractual commitments impacting a railroad's ability to provide service upon reasonable request. *Id.* at *10.

*Second*, the STB actively exercises its authority in this area. The agency has explained the criteria it will consider in evaluating the lawfulness of such provisions, including competitive effects, *id.* at *6, *9, and has adjudicated cases challenging these provisions. *See, e.g.*, *Union Elec. Co. d/b/a Ameren Missouri & Missouri Cent. R.R. v. Union Pac. R.R.*, No. NOR 42126, 2013 WL 769489, at *5 (STB served Feb. 27, 2013). In fact, the agency is actively exercising its authority with respect to the specific interchange commitment at issue. As noted, the Board recently denied

8

without prejudice K&O's petition because there was insufficient evidence to evaluate "the expressed concern about the potential competitive harm that the Lease could cause shippers, including . . . Weskan." *Kan. & Okla. R.R.*, 2026 WL 795881, at \*10. In so holding, the Board reiterated the factors it considers in evaluating interchange commitments and ordered K&O to refile a "fully supported" request by a date certain. *Id.* at \*9–10. Clearly, the STB's review of interchange commitments is no rubber stamp.

*Third*, allowing private antitrust suits to challenge railroad interchange commitments creates a strong risk of conflicting rules. Imposing antitrust liability based on allegedly anticompetitive interchange commitments "would inhibit permissible (and even beneficial) market behavior" that the STB monitors and regulates. *Elec. Trading Grp., LLC v. Banc of Am. Sec. LLC*, 588 F.3d 128, 136 (2d Cir. 2009). As the STB thoughtfully explained, interchange agreements played "an important role in the rebirth of the short line industry" and short lines have "benefitted the overall health of the rail industry." *Interchange Commitments*, 2007 WL 3170981, at \*3, \*7. Interchange commitments that create or strengthen short line railroads enable rail service to "expand into other markets, and thereby ultimately add to competition." *Id.* at \*6.

The risk of conflict is amplified given that the STB has authority to implement antitrust principles in the railroad industry by balancing competition and other public policy concerns. *See Canadian Pac. Ry.—Control—Kan. City S.*, No. FD 36500, 2023 WL 2808454, at \*17 (STB served Mar. 15, 2023); *Interchange Commitments*, 2007 WL 3170981, at \*6–7 (evaluating interchange commitments in the context of antitrust principles regarding vertical and horizontal restraints). Indeed, in rejecting efforts to curb or outright prohibit interchange commitments, the STB decided that "to assess the public interest, we must weigh the benefits of a particular interchange commitment against its potential for harm." *Interchange Commitments*, 2007 WL 3170981, at \*5.

The competitive impact of an interchange commitment is just one factor in that analysis and might be outweighed by other public interest considerations that courts cannot consider in applying the antitrust laws. *See* 49 U.S.C. § 10101 (listing policy goals the STB must consider). Where an agency pursues a course of regulation "*in spite of* potential anticompetitive effects," the agency's regulations must prevail because they are "'clearly incompatible' with the antitrust laws and their objectives." *U.S. Futures Exch.*, 953 F.3d at 967.

In sum, the prospect of antitrust liability together with treble damages will incentivize railroads to curb their permissible use of interchange commitments in rail agreements and thereby harm the vitality of short line railroads in contravention of the STB's policies. *See Elec. Trading Grp.*, 588 F.3d at 138. The "substantial risk of injury" to the rail industry and the "diminished need for antitrust enforcement to address anticompetitive conduct" because of the STB's ability to consider antitrust principles in evaluating interchange commitments "indicate a serious conflict" between application of federal antitrust law and the STB's exercise of its regulatory authority. *Credit Suisse*, 551 U.S. at 284.

*Fourth*, the underlying market activity that Plaintiffs target—interchange commitments in rail agreements—lies squarely within the heartland of the STB's statutory and regulatory authority. The STB has "exclusive" jurisdiction over the "acquisition" and "operation" of rail lines as well as the "rates" of and "interchange" between regulated railroads. 49 U.S.C. § 10501(b)(1)–(2); *see* H.R. Rep. No. 104-311, at 95–96 (1995). In particular, Congress requires the STB to approve a lease agreement permitting one railroad to "operate" another railroad's line. 49 U.S.C. § 10902(a); *see also id.* § 11323(a)(2). And, as explained above, the STB has a detailed regulatory scheme governing the disclosure and review of interchange commitments in rail agreements. These factors collectively warrant preclusion of Plaintiffs' antitrust claims.

10

If further support is needed, the ICC Termination Act, or ICCTA—which gives the STB the exclusive jurisdiction just discussed—expressly overrides conflicting federal laws. ICCTA's "remedies . . . with respect to regulation of rail transportation are exclusive *and preempt the remedies provided under Federal or State law*." 49 U.S.C. § 10501(b) (emphasis added). Allowing private plaintiffs to obtain treble damages under antitrust law for an interchange commitment in a rail lease is a regulation of rail transportation that intrudes on the Board's authority. *Emerson v. Kan. City S. Ry.*, 503 F.3d 1126, 1130 (10th Cir. 2007) (explaining that ICCTA preempts laws attempting to regulate "matters directly regulated by the Board" such as the "operation . . . of rail lines," "line acquisitions," and "railroad rates and service"); *Kurns v. R.R. Friction Prods. Corp.*, 565 U.S. 625, 637 (2012) (award of damages is regulation).

This does not mean ICCTA simply overrides *all* other federal laws touching on railroads. *See Fayus Enters. v. BNSF Ry.*, 602 F.3d 444, 453 (D.C. Cir. 2010) (noting that "some *subset* of state or federal antitrust claims might permissibly be brought against railroads"). "If an apparent conflict exists between ICCTA and a federal law, then the courts must strive to harmonize the two laws, giving effect to both laws if possible." *Ass'n of Am. R.R. v. S. Coast Air Quality Mgmt. Dist.*, 622 F.3d 1094, 1097 (9th Cir. 2010) (emphasis omitted). Here, it would plainly disrupt Congress's regulatory design if private parties like Plaintiff could influence the licensing of leases of rail lines and other agreements governing railroad operations by bringing Sherman Act claims for conduct (imposition of interchange commitments) the STB routinely regulates. The only harmonization to avoid this conflict, in the event the Court determined that the STB's regulatory authority does not *impliedly* preclude private antitrust liability, would be to hold that ICCTA's *express* preemption provision extends the doctrine of implied preclusion to block Plaintiffs' Sherman Act claims on these facts.

11

**C.   The *Keogh* doctrine further bars Plaintiffs' claims attacking railroad rates.**

Likewise, the *Keogh* doctrine bars Plaintiffs' antitrust claims to the extent they challenge K&O's rates for transporting westbound grain.

The *Keogh* doctrine bars private plaintiffs from wielding federal or state antitrust laws to seek damages for (or invalidate) rates regulated by an agency.  *See, e.g., E. & J. Gallo Winery v. EnCana Corp.*, 503 F.3d 1027, 1033–34 (9th Cir. 2007).   Historically, carriers in regulated industries like railroads were required to file a rate (or tariff) with the relevant federal agency. Once the agency accepted and published the rate, the regulated carrier could not "charge rates for its services other than those properly filed."  *Phillips Pipe Line Co. v. Diamond Shamrock Refin. & Mktg. Co.*, 50 F.3d 864, 867 (10th Cir. 1995) (citation omitted).

While the doctrine grew out of the rate-filing process, it also serves two other important interests: "the supremacy of federal law" and "deference to federal agency expertise."  *Carlin v. DairyAmerica, Inc.*, 705 F.3d 856, 868 (9th Cir. 2013).   For this reason, even if regulated entities no longer affirmatively file tariffs, the doctrine still applies so long as the relevant agency continues to exercise congressionally delegated authority to regulate rates.  *Gallo*, 503 F.3d at 1038–40; *Tex. Com. Energy v. TXU Energy, Inc.*, 413 F.3d 503, 510 (5th Cir. 2005) (state agency's "oversight over the market is sufficient to conclude that . . . energy rates are 'filed' within the meaning of the filed rate doctrine"); *Town of Norwood v. New England Power Co.*, 202 F.3d 408, 419 (1st Cir. 2000) (similar).

Congress has granted the STB jurisdiction over railroad rates, and the remedies available under ICCTA with respect to those rates "are exclusive and preempt the remedies provided under Federal or State law."  49 U.S.C. § 10501(b).  The STB has exclusive authority to review the reasonableness of transportation rates, *id.* § 10701, and exercises its statutory authority to review and regulate rates pursuant to a detailed rate-reasonableness methodology and complaint process.

12

*See* 49 C.F.R. part 1111.  Indeed, Weskan recently noticed its intent to file a complaint challenging the reasonableness of K&O's transportation rate for westbound grain commodities using these very procedures.  *Weskan Grain*, No. NOR 42185.

In addition, Congress requires a railroad to "publish, make available, and retain for public inspection its common carrier rates, schedules of rates, and other service terms, and any proposed and actual changes to such rates and service terms" for agricultural products, including grain. 49 U.S.C. § 11101(d).  The Board has prescribed procedures for compliance with this publication requirement, *see* 49 C.F.R. part 1300, and heightened disclosure requirements for grain shipment rates beyond what is required by statute, 49 C.F.R. § 1300.5.

Given the exclusive regulatory framework for rate review, "an award of treble damages is not an available remedy for a private shipper claiming" that a rail transportation rate "was the product of an antitrust violation."  *Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*, 476 U.S. 409, 422 (1986).  Hence, under the *Keogh* doctrine, the Complaint also fails to state a claim to the extent it challenges K&O's rates, which are inextricably intertwined with the interchange commitment.

*       *       *

Kansas and Colorado antitrust law are construed to follow federal antitrust law.  *See Digital Ally, Inc. v. Taser Int'l, Inc.*, No. 16-2032, 2017 WL 131595, at *2 (D. Kan. Jan. 12, 2017), *aff'd*, 720 F. App'x 1023 (Fed. Cir. 2018); *Crocs, Inc. v. Joybees, Inc.*, No. 21-cv-2859, 2024 WL 3580779, at *2 (D. Colo. July 12, 2024).  Plaintiffs' state law claims thus fail for the reasons already explained.  And even if some daylight existed, ICCTA preempts state law in this case, as discussed above.  Alternatively, because Plaintiffs' federal claims fail, the Court should decline to exercise supplemental jurisdiction over their state-law claims.  *See* 28 U.S.C. § 1367(c)(3).

13

## II.      Alternatively, primary jurisdiction warrants a stay until the STB acts.

If the Court does not dismiss the Complaint outright, it should at least stay the case under the primary-jurisdiction doctrine until the STB rules on Weskan's forthcoming requests for relief. Primary jurisdiction is a prudential doctrine that "allows the court to stay the judicial proceedings and direct the parties to seek a decision before the appropriate administrative agency" when Congress has placed an issue "within the special competence of [that] administrative body." *S. Utah Wilderness All. v. Bureau of Land Mgmt.*, 425 F.3d 735, 750–51 (10th Cir. 2005) (citation omitted), *as amended on denial of reh'g* (Jan. 6, 2006).  The doctrine promotes (1) "regulatory uniformity by preventing courts from interfering sporadically with a comprehensive regulatory scheme" and (2) "resort to agency expertise by allowing courts to consult agencies on 'issues of fact not within the conventional experience of judges.'" *Id.* at 751.  A court is empowered to refer issues or claims to the appropriate administrative agency if either ground applies.  *Id.*

The STB "retains primary jurisdiction" over "transportation by rail carriers," including "remedies . . .with respect to rates" as well as the "acquisition" and "operation" of rail lines.  *BNSF Ry. v. Clark Cnty., Wash.*, 11 F.4th 961, 963, 966 (9th Cir. 2021) (citation omitted).  The STB has developed comprehensive regulatory frameworks for evaluating the lawfulness of interchange commitments in rail agreements, *see supra* pp. 5–7, and challenges to the reasonableness of transportation rates quoted to shippers, *see* 49 C.F.R. part 1111.  The STB will consider the same issues raised in Complaint when K&O refiles its petition.  *Mical Commc'ns, Inc. v. Sprint Telemedia, Inc.*, 1 F.3d 1031, 1038–40 (10th Cir. 1993) (finding "the only prudent course" was to defer the district court's resolution of an issue under the primary jurisdiction doctrine when that issue is pending before an agency to avoid issuance of "conflicting decisions").

Deferring to the STB's primary jurisdiction is especially appropriate in a case, like this one, that raises complicated, fact-intensive questions that draw upon the agency's expertise and

14

that implicate broader issues of the nation's rail transportation policy.  Deferring resolution of Plaintiffs' antitrust claims until the STB concludes the above-described proceedings will avoid the risk of inconsistent outcomes.  Invoking the primary jurisdiction doctrine will also "serve[ ] judicial economy" and preserve party resources because the STB is already poised to resolve the issues raised in this case.  *Ryan v. Chemlawn Corp.*, 935 F.2d 129, 131 (7th Cir. 1991).

## CONCLUSION

The Court should dismiss the Complaint with prejudice for failure to state a claim.  In the alternative, the Court should stay the case pending final STB action.

April 3, 2026

Raymond A. Atkins (*pro hac vice*)
Allison C. Davis (*pro hac vice*)
Tobias S. Loss-Eaton (*pro hac vice*)
Stephen S. Laudone (*pro hac vice*)
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
Telephone: (202) 736-8000
Fax: (202) 736-8711
ratkins@sidley.com
allison.davis@sidley.com
tlosseaton@sidley.com
slaudone@sidley.com

Respectfully submitted,

 s/ *Melissa Hoag Sherman*
Melissa Hoag Sherman
SPENCER FANE LLP
6201 College Boulevard, Suite 500
Overland Park, KS 66211
Telephone: 913-327-5107
Fax: (913) 345-0736
msherman@spencerfane.com

*Attorneys for Defendant Union Pacific Railroad Company*

15

## CERTIFICATE OF SERVICE

I certify that on April 3, 2026, I caused the foregoing document to be filed through the CM/ECF system, which will serve notice on all registered counsel.

 *s/ Melissa Hoag Sherman*
Attorney for Defendant
Union Pacific Railroad Company