# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

|  |  |
|---|---|
| WESKAN GRAIN LLC; COLORADO PACIFIC RAILROAD, LLC.; D&L FARMS, GP; E&D FARMS, GP; D&C FARMS, GP; L&E FARMS, GP; NORTH FOUR FARMS, GP; MARIENTHAL GRAIN LLC; D&A FARMS, GP; HINEMAN LAND & CATTLE, INC.; HINEMAN RANCH, L.L.C.; CIRCLE C FARMS, INC.; STEVEN COMPTON; MARK SANDERS; and JLD PARTNERSHIP;<br><br>Plaintiffs,<br><br>v.<br><br>KANSAS & OKLAHOMA RAILROAD, LLC, and UNION PACIFIC RAILROAD COMPANY,<br><br>Defendants. | Civil Action No. 26-cv-02053-JAR-GEB |

## PLAINTIFFS' OMNIBUS RESPONSE IN OPPOSITION TO
## DEFENDANTS' MOTIONS TO DISMISS

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................... 1

FACTUAL BACKGROUND ............................................................................................. 3

I.       Background of Operations in the Relevant Market ............................................... 3

II.      Defendants Agreed and Conspired to Unreasonably Restrain Trade in the Relevant Market and Maintain their Monopoly. ............................................................................. 5

LEGAL STANDARD ........................................................................................................ 6

ARGUMENT ..................................................................................................................... 7

I.       The doctrine of implied antitrust immunity does not apply in this case. ............................ 7

II.      The ICCTA does not preempt Plaintiffs' state-law claims. ............................................ 11

         A.       Plaintiffs' state antitrust claims challenge unauthorized anticompetitive conduct, not rate reasonableness. ................................................................... 12

         B.       Plaintiffs' state-law claims are not preempted. ........................................... 13

                  1.       The ICCTA does not preempt *Illinois Brick* repealers. ........................... 14

                  2.       State antitrust laws provide remedies not available under federal law. ..... 14

                  3.       No balkanization concerns exist here. ..................................................... 15

         C.       Defendants cannot now invoke the protection of a regulatory framework they circumvented for years. ......................................................................... 16

III.     The filed rate doctrine does not apply to Plaintiffs' claims. .......................................... 17

IV.      The doctrine of primary jurisdiction is inapplicable. ................................................. 19

V.       The Court should retain supplemental jurisdiction over Plaintiffs' state-law claims. ...... 22

VI.      Plaintiffs properly plead claims under the Sherman Act § 1, the Colorado Antitrust Act, and the Kansas Restraint of Trade Act. .............................................................. 22

         A.       Plaintiffs Allege *Per Se* Violations of Section 1 of the Sherman Act. ............. 22

                  1.       Plaintiffs Allege a *Per Se* Unlawful Price Fixing Claim. ......................... 23

                  2.       Plaintiffs Allege a *Per Se* Unlawful Market Allocation Claim. ................. 28

         B.       Plaintiffs' Claims Succeed Under the Rule of Reason. ................................... 29

                  1.       Plaintiffs Plead a Facially Plausible Relevant Market. ............................ 30

                           a.       Plaintiffs Plead a Sufficient Product Market. ............................ 30

                           b.       Plaintiffs Plead a Legally Sufficient Geographic Market. ............. 33

                  2.       Plaintiffs Allege that Defendants Have Market Power. ............................ 34

VII.     Plaintiffs properly plead a conspiracy-to-monopolize claim under the Sherman Act § 2 and the KRTA. ......................................................................................................... 35

VIII.    Plaintiffs' pleas for injunctive relief are proper. ...................................................... 39

IX.      Plaintiffs request leave to amend their complaint. ..................................................... 40

CONCLUSION ............................................................................................................. 40

ii

**TABLE OF AUTHORITIES**

Page(s)

**Cases**

*Alliance Shippers, Inc. v. S. Pac. Transp. Co.*,
  858 F.2d 567 (9th Cir. 1988) ............................................................................... 17

*Arapahoe Surgery Ctr., LLC v. CIGNA Healthcare, Inc.*,
  80 F. Supp. 3d 1257 (D. Colo. 2015) ................................................................... 33

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) .............................................................................................. 14

*Ass'n of Surgical Assistants v. Nat'l Bd. of Surgical Tech. & Surgical Assisting*,
  127 F.4th 178 (10th Cir. 2025) ............................................................................. 30

*BAC Local Union 15 Welfare Fund v. Williams Restoration Co.*,
  2017 WL 3026117 (D. Kan. July 17, 2017) ......................................................... 39

*Beach v. Atlas Van Lines, Inc.*,
  2008 WL 8602539 (D.S.C. March 31, 2008) ....................................................... 25

*Benham v. Ozark Materials River Rock, LLC*,
  885 F.3d 1267 (10th Cir. 2018) ............................................................................ 26

*Black v. Occidental Petroleum Corp.*,
  2024 WL 1741085 (D. Wyo. Mar. 11, 2024) ...................................................... 41

*Black v. Occidental Petroleum Corp.*,
  69 F.4th 1161 (10th Cir. 2023) ............................................................................. 37

*BNSF Ry. Co. v. Albany & E. R.R. Co.*,
  741 F. Supp. 2d 1184 (D. Or. 2010) ..................................................................... 17

*BNSF Ry. Co. v. Hiett*,
  22 F.4th 1190 (10th Cir. 2022) ............................................................................. 19

*Brooks v. Mentor Worldwide LLC*,
  985 F.3d 1272 (10th Cir. 2021) ............................................................................ 13

*Brown v. City of Tulsa*,
  124 F.4th 1251 (10th Cir. 2025) ........................................................................... 14

*Buccaneer Energy (USA) Inc. v. Gunnison Energy Corp.*,
  846 F.3d 1297 (10th Cir. 2017) ...................................................................... 37, 40

*Budicak, Inc. v. Lansing Trade Grp., LLC*,
  452 F. Supp. 3d 1029 (D. Kan. 2020) ............................................................ 40, 41

*Butler v. Daimler Trucks N. Am. LLC*,
  433 F. Supp. 3d 1216 (D. Kan. 2020) ................................................................... 18

*California v. ARC Am. Corp.*,
  490 U.S. 93 (1989) ........................................................................................... 20, 21

*Colo. & Wyo. Ry. Co. v. Atchison, Topeka & Santa Fe Ry. Co.*,
  1974 WL 964 (D. Colo. Oct. 2, 1974) .................................................................. 18

*Credit Suisse Sec. (USA) LLC v. Billing*,
  551 U.S. 264 (2007) ................................................................................... 14, 15, 17

*CSX Transp., Inc. v. Norfolk S. Ry. Co.*
  2019 WL 4564564 (E.D. Va. Sept. 9, 2019) ............................................. 16, 17, 28

*CSX Transp., Inc. v. Norfolk S. Ry. Co.*,
  2021 WL 2908649 (E.D. Va. May 18, 2021) .................................................. 28, 29

*CSX Transp., Inc. v. Norfolk S. Ry. Co.*,
  2023 WL 2552343 (E.D. Va. Jan. 27, 2023) ............................................................. 46
*CSX Transp., Inc. v. Norfolk S. Ry. Co.*,
  648 F. Supp. 3d 679 (E.D. Va. 2023) ....................................................................... 29
*Eastman Kodak Co. v. Image Tech. Servs.*,
  504 U.S. 451 (1992) ................................................................................................ 40
*Emerson v. Kan. City S. Ry. Co.*,
  503 F.3d 1126 (10th Cir. 2007) ............................................................................... 19
*Fayus Enters. v. BNSF Ry. Co.*,
  602 F.3d 444 (D.C. Cir. 2010) ................................................................. 20, 21, 22, 23
*Fernandez v. Clean House, LLC*,
  883 F.3d 1296 (10th Cir. 2018) ............................................................................... 18
*Fineman v. Armstrong World Indus., Inc.*,
  980 F.2d 171 (3d Cir. 1992) .................................................................................... 45
*Four Corners Nephrology Assocs., P.C. v. Mercy Med. Ctr.*,
  2008 WL 622815 (D. Colo. Mar. 4, 2008) ............................................................... 40
*FTC v. Meta Platforms, Inc.*,
  775 F. Supp. 3d 16 (D.D.C. 2024) ........................................................................... 37
*FTC v. Penn State Hershey Med. Ctr.*,
  838 F.3d 327 (3d Cir. 2016) ............................................................................... 40, 41
*FTC v. Superior Court Trial Lawyers Ass'n*,
  493 U.S. 411 (1990) ....................................................................................... 30, 33, 41
*Full Draw Prods. v. Easton Sports, Inc.*,
  182 F.3d 745 (10th Cir. 1999) ................................................................................. 29
*Georgia v. Penn. R.R. Co.*,
  324 U.S. 439 (1945) ................................................................................................ 46
*In re Household Goods Movers Antitrust Litig.*,
  2009 WL 8234043 (D.S.C. Sept. 10, 2009) .............................................................. 25
*In re Ins. Brokerage Antitrust Litig.*,
  618 F.3d 300 (3d Cir. 2010) .................................................................................... 30
*In re Lower Lake Erie Iron Ore Antitrust Litig.*,
  998 F.2d 1144 (3d Cir. 1993) .................................................................................. 24
*In re Nurture Baby Food Litig.*,
  2025 WL 918927 (S.D.N.Y. Mar. 26, 2025) ............................................................. 26
*In re Pork Antitrust Litig.*,
  495 F. Supp. 3d 753 (D. Minn. 2020) ...................................................................... 45
*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
  593 F. Supp. 2d 29 (D.D.C. 2008) ...................................................................... 22, 46
*In re Surescripts Antitrust Litig.*,
  608 F. Supp. 3d 629 (N.D. Ill. 2022) ....................................................................... 45
*In re Transpacific Passenger Air Transp. Antitrust Litig.*,
  2011 WL 1753738 (N.D. Cal. May 9, 2011) ............................................................. 15
*In re Urethane Antitrust Litig.*,
  913 F. Supp. 2d 1145 (D. Kan. 2012) ...................................................................... 30
*Inst. for Fisheries Res. v. Cont'l Tire the Americas, LLC*,
  2024 WL 3381032 (N.D. Cal. July 10, 2024) ........................................................... 27

*Kan. & Okla. R.R.—Lease & Operation Exemption with Interchange Commitment—Union Pac. R.R.*,
  2026 WL 795881 (STB served Mar. 20, 2026) ......................................................................... 23

*KPH Healthcare Servs. v. Mylan N.V.*,
  2024 WL 5046325 (D. Kan. Dec. 9, 2024) ............................................................................... 14

*Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*,
  762 F.3d 1114 (10th Cir. 2014) ......................................................................................... 37, 45

*Loper Bright Enters. v. Raimondo*,
  603 U.S. 369 (2024) ................................................................................................................ 26

*Nat'l Inst. of First Assisting, Inc. v. Ass'n of Operating Room Nurses*,
  2020 WL 8189594 (D. Colo. Sept. 11, 2020) .......................................................................... 37

*Novell, Inc. v. Microsoft Corp.*,
  731 F.3d 1064 (10th Cir. 2013) ............................................................................................... 41

*Oxbow Carbon & Mins. LLC v. LLC v. Union Pac. R.R. Co.*,
  926 F. Supp. 2d 36 (D. D.C. 2013) .................................................................................... 43, 44

*Oxendine v. Kaplan*,
  241 F.3d 1272 (10th Cir. 2001) ......................................................................................... 34, 39

*Palmer v. BRG of Ga., Inc.*,
  498 U.S. 46 (1990) ............................................................................................................. 30, 35

*PCS Phosphate Co., Inc. v. Norfolk S. Corp.*,
  559 F.3d 212 (4th Cir. 2009) ............................................................................................. 17, 28

*Reazin v. Blue Cross & Blue Shield of Kan., Inc.*,
  899 F.2d 951 (10th Cir. 1990) ................................................................................................. 37

*Rev. of Rail Access & Competition Issues*,
  STB Ex Parte No. 575, 2007 WL 3170981 (STB served Oct. 30, 2007) .................................. 34

*Robbins v. Oklahoma*,
  519 F.3d 1242 (10th Cir. 2008) ............................................................................................... 13

*Rogers v. BNSF Ry. Co.*,
  2019 WL 5635180 (N.D. Ill. Oct. 31, 2019) ........................................................................... 23

*Schoenbaum v. E.I. Dupont De Nemours & Co.*,
  517 F. Supp. 2d 1125 (E.D. Mo. 2007) ................................................................................... 44

*Schwartz v. Celestial Seasonings, Inc.*,
  124 F.3d 1246 (10th Cir. 1997) ......................................................................................... 34, 39

*Spectators' Commc'n Network, Inc. v. Colonial Country Club*,
  253 F.3d 215 (5th Cir. 2001) ............................................................................................. 33, 45

*Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*,
  476 U.S. 409 (1986) ................................................................................................................ 24

*Suture Express, Inc. v. Cardinal Health 200, LLC*,
  963 F. Supp. 2d 1212 (D. Kan. 2013) ...................................................................................... 29

*Systemcare, Inc. v. Wang Labs. Corp.*,
  117 F.3d 1137 (10th Cir. 1997) ......................................................................................... 33, 45

*Taylor v. JBS Foods USA*,
  2025 WL 102450 (D.S.D. Jan. 15, 2025) ................................................................................ 27

*Telecor Commc'ns, Inc. v. Sw. Bell Tel. Co.*,
  305 F.3d 1124 (10th Cir. 2002) ......................................................................................... 36, 37

*Todd v. Exxon Corp.*,
   275 F.3d 191 (2d Cir. 2001) ............................................................................. 40
*Truck-Rail Handling Inc. v. BNSF Ry. Co.*,
   2005 WL 8178364 (N.D. Cal. Mar. 8, 2005) ................................................... 46
*U.S. ex rel. Schroeder v. Medtronic, Inc.*,
   2021 WL 4168140 (D. Kan. Sept. 14, 2021) ................................................... 47
*United States v. Bessemer & L. E. R.R. Co.*,
   717 F.2d 593 (D.C. Cir. 1983) ........................................................................ 26
*United States v. DaVita Inc.*,
   2022 WL 266759 (D. Colo. Jan. 28, 2022) ..................................................... 35
*United States v. Kemp & Assocs.*,
   907 F.3d 1264 (10th Cir. 2018) ...................................................................... 35
*W. Penn Allegheny Health Sys., Inc. v. UPMC*,
   627 F.3d 85 (3d Cir. 2010) ............................................................................. 14
*Wampler v. Sw. Bell Tel. Co.*,
   597 F.3d 741 (5th Cir. 2010) .......................................................................... 14
*Westman Comm'n Co. v. Hobart Int'l, Inc.*,
   796 F.2d 1216 (10th Cir. 1986) ...................................................................... 40
*Whitman v. Am. Trucking Ass'ns*,
   531 U.S. 457 (2001) ........................................................................................ 46
*Williams v. Duke Energy Int'l, Inc.*,
   681 F.3d 788 (6th Cir. 2012) .......................................................................... 24

**Statutes**

15 U.S.C. § 1 ............................................................................................. 29, 33, 35
28 U.S.C. § 1367(c)(3) ....................................................................................... 29
49 U.S.C. § 10501(b) ............................................................................... 16, 18, 19
49 U.S.C. § 10706 .............................................................................................. 17
49 U.S.C. § 10706(a)(2)(A) ............................................................................... 17
49 U.S.C. § 10706(a)(5)(A) ........................................................................... 17, 18
49 U.S.C. § 11323 .............................................................................................. 23
49 U.S.C. §§ 10101(4), (12) .............................................................................. 24
C.R.S. § 6-4-115(1) ........................................................................................... 22
K.S.A. § 50-161(b) ............................................................................................ 22

**Rules**

Fed. R. Civ. P. 12(b) ............................................................................................ 9
Fed. R. Civ. P. 12(b)(6) ..................................................................................... 13
Fed. R. Civ. P. 15(a)(2) ..................................................................................... 47

**Regulations**

49 C.F.R. Part 1180 ........................................................................................... 23

**Other Authorities**

1995 U.S.C.C.A.N. 850 ................................................................................................................... 46

H.R. Conf. Rep. 104-422 ............................................................................................................... 46

Plaintiffs file this omnibus response in opposition to the motions to dismiss filed by Defendants Kansas & Oklahoma Railroad, LLC (ECF Nos. 30 & 31) and Union Pacific Railroad Company (ECF Nos. 32 & 33).

**INTRODUCTION**

Since at least 2018, Defendants Kansas & Oklahoma Railroad, LLC ("K&O") and Union Pacific Railroad Company ("UP") (collectively, "Defendants") have conspired to force farmers and shippers to transport grain over a hundred miles eastward only to then turn around and go westward—rather than going westward in the first place—in order to reach destinations on the West Coast. Among other devices, Defendants imposed a secret paper barrier with anticompetitive rents. This inefficient scheme forces farmers and shippers to use UP's hub rather than a hub where UP would compete with BNSF. After Plaintiffs Weskan Grain LLC ("Weskan") and Colorado Pacific Railroad, LLC ("CXR") invested millions of dollars to offer a competitive shipping alternative to farmers in western Kansas and eastern Colorado, the scheme intensified. Defendants concealed their scheme from market participants and even hid it from the Surface Transportation Board ("STB"), despite being legally required to disclose and obtain regulatory approval for it. After more than five years, Defendants eventually disclosed the existence of the paper barrier but only after the STB ordered it disclosed once Weskan complained.

Defendants nevertheless argue that they have implied antitrust immunity and that only the STB has jurisdiction over their actions. In other words, having been caught hiding their scheme from the STB and others for years, they now claim their plot is both immune from judicial scrutiny and exclusively subject to STB jurisdiction. This is not only wholly fallacious, but it ignores that several parties here, including the Farmer Plaintiffs, are not even parties before the STB and cannot obtain redress there. Defendants also rely on caselaw inapplicable to railroads and ignore that the Supreme Court and other courts have allowed many antitrust actions to proceed against railroads

notwithstanding the regulatory structure. Defendants' arguments on primary jurisdiction ignore the Supreme Court's recent ruling in *Loper Bright* minimizing if not wholly eliminating the concept of deference to administrative agencies. Defendants' arguments on antitrust preemption and primary jurisdiction should be rejected.

Defendants also argue that Plaintiffs' state-law claims are preempted. But Defendants' preemption arguments rely on an overbroad interpretation of the text of the Interstate Commerce Commission Termination Act ("ICCTA") and misplaced concerns about state regulation and balkanized legal rules for railroads.

Separately, Defendant UP erroneously argues that the filed rate doctrine should be applied to Plaintiffs' claims to prevent them from recovering treble damages. But Plaintiffs' claims principally concern a secret surcharge agreement between two railroads that was never filed with or approved by the STB, not a rate to transport railcars. Nor are Plaintiffs objecting to a rate filed with and approved by the STB. Again, Defendants cannot avoid legal accountability by seeking refuge in a regulatory system they dodged for years.

Defendant K&O claims that Plaintiffs' federal and state antitrust claims fail to state a claim under Fed. R. Civ. P. 12(b). But Plaintiffs allege that Defendants are owners/operators of rail lines that agreed to fix or raise prices and allocate the westward shipment of grain from the Relevant Market between themselves. Defendants effectuated this scheme through their use of the secret surcharge and related vehicles, which caused Plaintiffs and other market participants to pay higher transportation costs. This is paradigmatic *per se* unlawful price fixing and market allocation under Section 1 of the Sherman Act. Plaintiffs also allege that Defendants entered into their agreement in response to competitive pressure from the Towner Line and to maintain their monopoly over

2

the westbound transport of grain from the Relevant Market. This constitutes conspiracy to monopolize under Section 2 of the Sherman Act and related state laws.

Defendants throw numerous arguments at the wall in the hope that one will stick and impermissibly pull facts from outside of the Complaint. But none stick and all should be rejected. For these reasons, as well as those discussed below, Defendants' motions to dismiss should be denied in their entirety.

FACTUAL BACKGROUND

## I.   Background of Operations in the Relevant Market

As defined in the Complaint, the Relevant Market is the market for the westbound shipment of grain by train from Lane, Scott, Wichita, and Greeley Counties in Kansas and from Kiowa County in Colorado. Compl. ¶ 55. UP owns and K&O operates a common carrier railroad line running through the Relevant Market (the "UP Lease Track"). *Id* at ¶ 3. UP leases the UP Lease Track to K&O under a 1997 lease agreement (the "1997 Lease").[1] *Id.* This line connects with the Towner Line in the west and the Great Bend Line in the east.[2] *Id.* Plaintiff CXR owns the Towner Line, and K&O owns the Great Bend Line. *Id.*

Farmer Plaintiffs[3] are grain farmers in the Relevant Market. *Id.* at ¶ 35. They ship much of their grain west to several large mills and export facilities on the West Coast. *Id.*

---

[1] UP originally leased the UP Lease Track to Central Kansas Railway, LLC ("CKR"). K&O inherited the lease in 2001 when it acquired the assets of CKR.

[2] The Great Bend Line runs from Scott City, Kansas, to Great Bend, Kansas.

[3] Farmer Plaintiffs consist of 13 entities and individuals: D&L Farms, GP; E&D Farms, GP; D&C Farms, GP; L&E Farms, GP; North Four Farms, GP; Marienthal Grain, LLC; D&A Farms, GP; Hineman Land & Cattle, Inc.; Hineman Ranch, L.L.C.; Circle C Farms, Inc.; Steven Compton;  Mark Sanders; and JLD Partnership.

3

Plaintiff Weskan is a grain elevator and marketing company. *Id.* at ¶ 12. It purchases, stores, sells, and ships grain for Farmer Plaintiffs. *Id.* at ¶ 36. It owns multiple grain storage facilities along or adjacent to the UP Lease Track and a state-of-the-art grain elevator complex along the Towner Line, approximately eight miles west of Towner, Colorado (the "Stockton Facility"). *Id.* Weskan is an affiliate of CXR. *Id*. at ¶ 12.

In a typical transaction between Weskan and Farmer Plaintiffs, Weskan purchases grain from Farmer Plaintiffs; temporarily stores it in its silos; coordinates transportation, including paying any costs to railroad owners and operators like Defendants; and loads the grain onto trains. *Id.* at. ¶ 38.

Trains must be used to transport grain long distances. *Id.* at. ¶ 40. Trucks can physically transport grain but are significantly more expensive per mile and are not always available, particularly during harvest season when demand for trucks is high. *Id.*

Before the reopening of the Towner Line, parties could not transport grain on the Towner Line due to its condition. All westbound freight shipped from the UP Lease Track had to first travel eastward to the Great Bend Line and then further east to Hutchinson, Kansas, on lines owned and operated by Defendants. *Id.* at. ¶ 42. Only then could that freight begin moving westward. *Id.* This east-to-west route was inefficient, costly, and ensured all westbound freight originating in the Relevant Market was shipped on Defendant-owned lines. *Id.*

CXR attempted to give shippers and farmers in the Relevant Market a more direct westbound alternative by purchasing the dilapidated Towner Line in 2018, rehabilitating it, and reopening it for rail freight service in 2019. *Id.* at ¶ 43. The Towner Line provides a direct route west for all freight from the Relevant Market. *Id.* It runs approximately 122 miles from Towner, Colorado, westward to NA Junction, Colorado. *Id.* At NA Junction, the Towner Line connects to

4

tracks owned and operated by both UP and BNSF Railway Company ("BNSF"), UP's main competitor in the Western United States. Thus, UP must compete with BNSF to ship this freight further west. *Id.* The Towner Line significantly reduces the costs and distances that westbound rail freight in the Relevant Market must travel to reach western mills and ports. *Id.* at. ¶ 44. Using the Towner Line to ship grain west reduces shipping costs by at least $500 per rail car. *Id.*

By rehabilitating the Towner Line, CXR introduced an efficient alternative for the westbound shipment of grain. But for Defendants' misconduct, this increase in competition for rail traffic would have benefitted Plaintiffs and other market participants through lower prices and higher quality services.

## II. Defendants Agreed and Conspired to Unreasonably Restrain Trade in the Relevant Market and Maintain their Monopoly.

Rather than compete with Plaintiff CXR and BNSF on the merits, Defendants responded to the reopening of the Towner Line by covertly agreeing to maintain their dominance over westbound grain shipments from the Relevant Market. *Id.* at ¶ 47. Notably, they secretly amended the 1997 Lease twice, including in 2019 (the "2019 Lease Amendment") to include a secret surcharge that, upon information and belief, Defendants refer to as an asset use fee (at times, "Interchange Fee"). *Id.* This secret surcharge, however, was not correctly categorized as an "asset use fee," interchange commitment, or any other fee commonly employed in the railroad industry. Rather, this fee was an exorbitant surcharge placed on any rail car that started in the Relevant Market on the UP Lease Track and traveled west over the Towner Line. This secret surcharge was specifically designed to prevent and set at a level that did prevent grain shipments from the Relevant Market from traveling from the UP Lease Track over the Towner Line by making such travel cost prohibitive. *Id.* at ¶ 8. Since the secret surcharge was adopted in 2019, not a single train

5

has started on the UP Lease Track and traveled west over the Towner Line despite the significant economic benefits and improved route options this route would produce. *Id.*

The price that Weskan pays Farmer Plaintiffs for grain is based, in part, on transportation rates that Weskan must pay to bring grain to market. *Id.* at ¶ 39. Thus, if forced to pay the secret surcharge, Weskan would pay higher transportation rates and thus Farmer Plaintiffs would receive a lower price for their grain. *Id.*

Defendants concealed the secret surcharge from the STB (despite a legal requirement to disclose it to the STB), CXR, Weskan, and several other interested parties (despite ongoing business relationships with them). *Id.* at ¶ 49. In fact, to this day, Defendants have not disclosed the 2019 Lease Amendment or the amount of the secret surcharge except when forced to do so through litigation, and even then the disclosure has not been to employees of any Plaintiff.[4] *Id.* at ¶ 51. Defendants have concealed not only the exact amount of the secret surcharge, but also the "assets" it refers to. Based on public information and other relevant factors, Plaintiffs can deduce that the secret surcharge exceeds $500 per rail car. *Id.* at ¶ 44.

## LEGAL STANDARD

When considering a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court must "take Plaintiffs' well-pleaded facts as true, view them in the light most favorable to Plaintiffs, and draw all reasonable inferences from the facts in favor of Plaintiffs." *Brooks v. Mentor Worldwide LLC*, 985 F.3d 1272, 1281 (10th Cir. 2021) (citation omitted). When viewing the facts in this manner, the Court need only find the allegations make it plausible to infer the defendants' liability. *Id.* Plausibility does not mean probability and a district court "may not dismiss on the ground that it appears unlikely the allegations can be proven." *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th

---

[4] On May 8, 2026, counsel for Plaintiffs requested a copy of the lease documents from counsel for K&O, but K&O refused to provide them.

Cir. 2008). Indeed, the Tenth Circuit "imposes a 'low bar for surviving a motion to dismiss,' and 'a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.'" *Brown v. City of Tulsa*, 124 F.4th 1251, 1264 (10th Cir. 2025) (quoting *Quintana v. Santa Fe Cnty. Bd. of Comm'rs*, 973 F.3d 1022, 1034 (10th Cir. 2020)).

These same principles apply to antitrust claims. As the Supreme Court and many circuit courts have made clear, there is no "heightened pleading standard" in antitrust cases. *Ashcroft v. Iqbal*, 556 U.S. 662, 664 (2009); *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 98 (3d Cir. 2010) (rejecting argument heightened pleading standard applies to antitrust cases); *Wampler v. Sw. Bell Tel. Co*., 597 F.3d 741, 744 (5th Cir. 2010) ("Antitrust cases are not subject to a heightened pleading standard."). Rather, the same Rule 8 standard applies to antitrust cases just as in "all civil actions." *Iqbal,* 556 U.S. at 664. Moreover, under Tenth Circuit precedent, courts must consider antitrust allegations in their totality "without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each." *KPH Healthcare Servs. v. Mylan N.V*., 2024 WL 5046325, at *8 (D. Kan. Dec. 9, 2024).

Therefore, requests for specificity should be rejected and Plaintiffs need only plead facts that, when accepted as true and viewed in a light most favorable to Plaintiffs, make it plausible for the Court to infer that Defendants broke the law as alleged in the Complaint.

**ARGUMENT**

### I. The doctrine of implied antitrust immunity does not apply in this case.

Defendants argue Plaintiffs' antitrust claims are subject to implied immunity. ECF No. 31 at 18–22; ECF No. 33 at 12–16. This argument fails. First, the Supreme Court created the implied immunity doctrine for securities cases. *See Credit Suisse Sec. (USA) LLC v. Billing*, 551 U.S. 264, 285 (2007). The underlying lawsuit in *Credit Suisse* concerned fees and commissions related to

7

initial public offerings, which are heavily regulated by the Securities and Exchange Commission (SEC), *id.* at 269–70, and the Supreme Court relied on other cases involving the intersection of antitrust and securities laws to formulate the test. *Id.* at 271. The case and its doctrine should not apply to Plaintiffs' claims against two railroads, and indeed, some federal courts have hesitated to apply the doctrine outside the securities context. *See, e.g., In re Transpacific Passenger Air Transp. Antitrust Litig.*, 2011 WL 1753738, at \*17 (N.D. Cal. May 9, 2011) (in an antitrust case involving airline baggage fees, court refused to apply the doctrine of implied immunity from *Credit Suisse*, stating that it was "unwilling to extend a doctrine so far beyond its original purpose") (citations omitted). Indeed, the cases Defendants cite for this doctrine concern other areas of the law and regulation, not railroads, and there does not appear to be a single case involving the railroad industry that applies *Credit Suisse*'s doctrine of implied antitrust immunity.

Second, Defendants cannot show implied antitrust immunity applies to Plaintiffs' claims. In order for it to apply, Defendants must satisfy the following four-part test articulated by the Supreme Court: (1) "the existence of regulatory authority . . . to supervise the activities in question; (2) evidence that the responsible regulatory entities exercise that authority;" (3) "a resulting risk that" the antitrust laws and the other potentially applicable area of the law, "if both applicable, would produce conflicting guidance, requirements, duties, privileges, or standards of conduct;" and (4) whether that conflict "affected practices that lie squarely within" the area to be regulated. *Credit Suisse*, 551 U.S. at 275–77.

Defendants cannot satisfy the second, third, and fourth prongs of the four-part test from *Credit Suisse*. First, by failing to comply with their legal obligations to disclose and obtain approval for their arrangement they can present no evidence of the exercise of regulatory authority in this instance, thereby failing the second prong. Second, this case does not pose a risk of

8

conflicting guidance or results. Plaintiffs do not contest rate reasonableness or ask the Court to determine what rates should be charged by Defendants in the Relevant Market. They complain about Defendants' anticompetitive behavior stemming from their secret lease agreement that has kept westbound rail traffic originating in Kansas from traversing CXR's Towner Line and whose secret surcharge has increased transportation costs for Farmer Plaintiffs, Weskan, and other shippers.

Likewise, the "conflict"—which does not exist—does not affect practices that lie "squarely within" the STB's orbit. This case may involve railroads, but Plaintiffs do not ask this Court to set rates or weigh in on railroad service or a transaction like a merger or a line sale, actions that are part of the STB's mandate. *See* 49 U.S.C. § 10501(b) (describing the STB's jurisdiction); STB's "About Us" page, www.stb.gov/about-stb/ (last visited May 15, 2026). Moreover, by arguing that the Court should invoke implied antitrust immunity due to the existence of the STB, Defendants are asking the Court to invoke a regulatory framework that they themselves avoided. Plaintiffs' claims stem from the 2019 Lease Amendment, which imposed a secret surcharge on rail traffic and shipping. Compl. ¶¶ 7–9, 47–50. Defendants were required to seek the STB's approval of the 2019 Lease Amendment and disclose the secret surcharge but failed to do so. They should not be allowed to avoid legal responsibility by invoking a regulatory system they avoided.

Many federal antitrust cases involving private agreements to which railroads are parties have rejected preemption or immunity arguments. For example, in *CSX Transp., Inc. v. Norfolk S. Ry. Co.*, the district court denied a motion to dismiss an antitrust suit brought by one railroad against another related to a private agreement involving access to a rail terminal. 2019 WL 4564564, at *8–9 (E.D. Va. Sept. 9, 2019). While the case concerned the ICCTA's preemption clause, 49 U.S.C. § 10501(b), the reasoning is instructive here. The Eastern District of Virginia

noted that the ICCTA and its preemption provision were concerned with the regulation of railroads, whereas the *CSX* case, like the case before this Court, concerned a private agreement. *Id*. at \*7–8.

In *BNSF Ry. Co. v. Albany & E. R.R. Co.*, the district court denied summary judgment on antitrust affirmative defenses and counterclaims in a case involving an interchange agreement between two railroads. 741 F. Supp. 2d 1184, 1197–98 (D. Or. 2010). The court found that the ICCTA did not preempt antitrust laws and cited several STB decisions that held that the ICCTA does not preempt other federal statutes. *Id*. at 1198. *See also PCS Phosphate Co., Inc. v. Norfolk S. Corp.*, 559 F.3d 212, 218 (4th Cir. 2009) (holding that voluntary agreements entered into by railroad companies "are not presumptively regulatory acts"). These cases demonstrate that there is no risk of conflicting guidance from a court adjudicating an antitrust matter involving a railroad or that "the possible conflict affected practice" lie within the zone of regulation. *See Credit Suisse*, 551 U.S. at 275–76. Moreover, multiple federal courts have stated that antitrust laws survived the deregulation of railroads that began in the 1970s, including the enactment of the ICCTA, the law that created the STB and the modern regulatory framework for U.S. railroads. *See, e.g., Alliance Shippers, Inc. v. S. Pac. Transp. Co.*, 858 F.2d 567, 570 (9th Cir. 1988) ("Antitrust remedies unquestionably survived deregulation.").

Tellingly, Defendants' Motions ignore the strict requirements of the ICCTA's antitrust carveout. 49 U.S.C. § 10706 exempts from the Sherman Act and the Clayton Act only agreements made between two rail carriers relating "to rates (including charges between rail carriers and compensation paid or received for the use of facilities and equipment), classifications, divisions, or rules related to them, or procedures for joint consideration, initiation, publication, or establishment of them" ***that are approved by the STB***. 49 U.S.C. § 10706(a)(2)(A); *see also* 49

10

U.S.C. § 10706(a)(5)(A). Defendants never sought STB approval for the 2019 Lease Amendment, so their agreement and its secret surcharge do not enjoy this explicit antitrust carveout.

Indeed, in an older, pre-ICCTA antitrust case from the District of Colorado between two railroad companies, the court disregarded the doctrine of implied antitrust immunity because the Reed-Bulwinkle Act (a precursor to the ICCTA) contained an antitrust carveout for transactions approved by the ICC. *See Colo. & Wyo. Ry. Co. v. Atchison, Topeka & Santa Fe Ry. Co.*, 1974 WL 964, at *4 (D. Colo. Oct. 2, 1974). In support, the court cited the legal maxim "*expressio unius est exclusion alterius*," or "the expression of one thing is the exclusion of another." *Id*. Thus, because the ICCTA and the pre-ICCTA laws regulating railroads contain an express antitrust carveout, implied antitrust immunity should not apply to cases involving railroads. Defendants failed to seek STB approval of their 2019 Lease Amendment and thus cannot avail themselves of this antitrust exemption.

For these reasons, the doctrine of implied antitrust immunity does not apply in this case.

## II.  The ICCTA does not preempt Plaintiffs' state-law claims.

Defendants erroneously argue that Plaintiffs' state-law claims are preempted by § 10501 of the ICCTA. That statute, however, is directed at state "remedies . . . with respect to regulation of rail transportation," 49 U.S.C. § 10501(b), not at the threshold question of who has standing to bring an antitrust claim. Moreover, preemption is an affirmative defense that the defendant bears the burden of proving. *Butler v. Daimler Trucks N. Am. LLC*, 433 F. Supp. 3d 1216, 1239 (D. Kan. 2020) (Robinson, C.J.). Because the parties are confined to the four corners of the complaint at the pleading stage, the defendant must prove an affirmative defense by showing "the complaint itself admits all the elements of the affirmative defense by alleging the factual basis for those elements." *Fernandez v. Clean House, LLC*, 883 F.3d 1296, 1299 (10th Cir. 2018) (citation omitted). Here, the Complaint does not allege all factual elements of any affirmative defense. Moreover, ICCTA

11

preemption is narrow and provides that "[e]xcept as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law." 49 U.S.C. § 10501(b). Thus, ICCTA preemption is limited to actions that would "have the effect of foreclosing or unduly restricting a railroad's ability to conduct its operations or otherwise unreasonably burden interstate commerce." *BNSF Ry. Co. v. Hiett*, 22 F.4th 1190, 1194 (10th Cir. 2022) (quoting *CSX Transp., Inc.*, 2005 WL 584026, at *7–8 (STB Mar. 14, 2005)).

Finally, in the Tenth Circuit and elsewhere, analyzing whether the ICCTA preempts a specific claim is fact-driven and ill-suited for resolution at the pleading stage. Indeed, courts should make "a factual assessment . . . as to whether requiring the Railroad to remedy the injury claimed by the [plaintiffs] would have the effect of preventing or unreasonably interfering with railroad transportation." *Emerson v. Kan. City S. Ry. Co.*, 503 F.3d 1126, 1133 (10th Cir. 2007).

### A. Plaintiffs' state antitrust claims challenge unauthorized anticompetitive conduct, not rate reasonableness.

Plaintiffs do not challenge the reasonableness of any rate or tariff. Nor do they ask this Court to determine what the Interchange Fee "should have been." Rather, Plaintiffs allege, *inter alia,* that Defendants covertly conspired to impose a secret surcharge designed to eliminate competition from the Towner Line and preserve Defendants' monopoly over westbound grain shipments. Compl. ¶¶ 1, 7–11, 46–53. This is a classic horizontal conspiracy to fix prices and allocate markets—*per se* violations of antitrust law—not a challenge to rate reasonableness. The Complaint alleges that the Interchange Fee is untethered to any reasonable asset use fee in that it increases cost by at least $500 per railcar, making it "cost-prohibitive for parties shipping grain west from the Relevant Market to use the Towner Line." *Id.* at ¶ 8. Plaintiffs believe discovery will reveal that Defendants' secret surcharge vastly exceeds any costs for K&O's use of the

phantom asset(s) and is among the highest such fee in the country. As a result, "no westbound railcar carrying any commodity has shipped from the Relevant Market and travelled over the Towner Line in the more than six years since the Interchange Fee was adopted." *Id*. This total foreclosure is strong evidence that the secret surcharge has effectively foreclosed interchange with the Towner Line. In short, Plaintiffs challenge an anticompetitive scheme, not rate reasonableness.

## B. Plaintiffs' state-law claims are not preempted.

Plaintiffs' state-law claims are not preempted by the *Illinois Brick* repealer statutes of Kansas and Colorado. While only direct purchasers can recover damages under federal antitrust law, states can allow indirect purchasers to recover damages under state antitrust law. *California v. ARC Am. Corp.*, 490 U.S. 93, 105–06 (1989) (holding that federal antitrust law does not preempt state *Illinois Brick* repealer statutes). Both Kansas and Colorado have done just that, meaning indirect purchaser Plaintiffs can bring their claims in this case.

Defendants rely on *Fayus Enters. v. BNSF Ry. Co.* to argue preemption, but that case is distinguishable. In *Fayus*, indirect purchasers of rail freight services brought state antitrust and consumer protection claims challenging the reasonableness of fuel surcharges imposed under private shipping contracts. 602 F.3d 444, 445–46 (D.C. Cir. 2010). The plaintiffs sought to "extend[] the remedies that the STB ordered for *regulated* freight to freight over which Congress deliberately stripped the STB—*and states*—of any regulatory authority." *Id.* at 453. Their claims were preempted because they were "designed as a means of getting the district court to apply state law to assess the substantive 'fairness' of the contracts the railroads entered into, including with reference to the manner in which the rates were computed." *Id.* at 452 (citation omitted).

But here no such patchwork of regulation would result. Plaintiffs challenge a covert conspiracy to impose a secret surcharge—conduct that was never authorized under the federal

13

regulatory scheme. Plaintiffs' state antitrust claims do not regulate rail operations, foreclose railroads' ability to operate, or unreasonably burden interstate commerce.

### 1. The ICCTA does not preempt *Illinois Brick* repealers.

The Supreme Court has squarely held that state *Illinois Brick* repealer statutes are not preempted by federal antitrust law. *ARC Am. Corp.*, 490 U.S. at 105–06. While *Fayus* expressed concern that applying state laws rejecting *Illinois Brick* "would jeopardize the federal interest in protecting railroad regulation from inefficient norms and balkanization," *Fayus*, 602 F.3d at 454, this concern was expressed in the context of claims seeking to extend STB rate-regulation remedies to private-contract freight through state law. Plaintiffs' claims do not present that concern. They challenge unauthorized anticompetitive conduct that falls outside the scope of ICCTA preemption for the reasons stated above.

The purpose of *Illinois Brick* repealer statutes is to ensure victims of anticompetitive conduct—which include the Farmer Plaintiffs who received depressed grain prices because of inflated transportation costs caused by Defendants' secret surcharge—are able to seek redress. Compl. ¶¶ 39, 64–67. The legislatures of Kansas and Colorado have determined that indirect purchasers have standing to enforce their antitrust laws.

### 2. State antitrust laws provide remedies not available under federal law.

Plaintiffs' state antitrust claims are not duplicative of their federal Sherman Act claims; they serve an independent remedial function. Farmer Plaintiffs are indirect purchasers of rail transportation, as they sell grain to Weskan, who then pays Defendants to ship the grain. *Id.* at ¶¶ 38–39. As indirect purchasers, Farmer Plaintiffs can recover damages only under state law. Dismissing their state claims would leave Farmer Plaintiffs with no remedy for their injuries.

The Complaint quantifies Farmer Plaintiffs' injuries in some detail. For example, during the week of December 1, 2025, farmers received 41 cents/bushel less for wheat shipped west from

14

the Scott City Facility (subject to the secret surcharge if shipped directly west) compared to the Stockton Facility (not subject to the secret surcharge)—a 66% reduction in revenue directly attributable to Defendants' secret surcharge. *Id.* at ¶¶ 65–66. Both the Kansas and Colorado antitrust statutes provide for treble damages for these injuries. K.S.A. § 50-161(b); C.R.S. § 6-4-115(1). Dismissing these claims would leave the Farmer Plaintiffs who bear a significant economic burden from Defendants' anticompetitive conduct with no avenue for recovery.

### 3. No balkanization concerns exist here.

There is no risk of balkanized legal norms in this case. Courts have warned of the risk of "balkanized legal norms" and a "patchwork of railroad regulation" when plaintiffs seek to subject national practices to state consumer and antitrust laws. *Fayus*, 602 F.3d at 452; *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 593 F. Supp. 2d 29, 38 (D.D.C. 2008). No such concern exists here. Plaintiffs' claims arise from a single secret agreement between two specific defendants to impose a punitive fee on interchange traffic that has the effect of foreclosing a specific carrier in a specific geographic market from competing, Compl. ¶¶ 1, 7–8, 55–59, and they involve the application of only two state antitrust statutes from Kansas and Colorado. *Id.* at ¶¶ 107–13, 114–19. These state antitrust statutes seek to address this particular anticompetitive conduct, not to impose ongoing regulatory requirements on interstate rail operations.

Indeed, the *Fayus* court itself recognized this critical distinction, expressly preserving claims like Plaintiffs' here:

> There is nothing in our reasoning inconsistent with the notion that some subset of state or federal antitrust claims might permissibly be brought against railroads, for price-fixing or other violations. The relevant question is not whether *all* potential antitrust suits are preempted, but rather whether this antitrust suit, as formulated by the plaintiffs, impermissibly infringes the federal deregulatory interests in the ICCTA.

15

602 F.3d at 453 (emphasis added). Other courts agree that if a state law claim has "nothing to do with regulating rail transportation" and involves a defendant that "happens to be a railroad company," then those claims are not preempted by the ICCTA. *See, e.g.*, *Rogers v. BNSF Ry. Co.*, 2019 WL 5635180, at *2–3 (N.D. Ill. Oct. 31, 2019). Thus, there is no risk that a judgment in this case would subject rail shipments crossing state lines to varying regulatory standards.

### C. Defendants cannot now invoke the protection of a regulatory framework they circumvented for years.

Defendants argue that Congress passed the ICCTA to establish an exclusive federal scheme of regulation, ECF No. 31 at 22, but this argument presupposes that Defendants are operating within that federal regulatory framework. *See Fayus*, 602 F.3d at 450 (describing the ICCTA as "a *de* regulatory move—not . . . an invitation to states to fill the regulatory void") (italics in original). Defendants, however, operated *outside* that framework.

Defendants were required to disclose the Lease Amendment to and seek approval for it from the STB. 49 U.S.C. § 11323; 49 C.F.R. Part 1180; Compl. ¶¶ 9, 49. Defendants failed to do so for six years, as the STB found.[5] Defendants also hid the Lease Amendment, including the secret surcharge, from Plaintiffs and other interested parties.

Allowing Defendants to use ICCTA preemption as a shield for conduct that was unauthorized by federal law and not approved by a federal agency would create a perverse incentive: railroads could escape both federal regulation (by not seeking approval) and state antitrust liability (by claiming preemption), rendering them unaccountable for their

---

[5] Earlier this year, the STB denied K&O's petition for exemption and ordered it to submit a new petition that addressed issues it failed to address in its initial petition, including the Interchange Fee. *See Kan. & Okla. R.R.—Lease & Operation Exemption with Interchange Commitment—Union Pac. R.R.*, No. FD 36849, 2026 WL 795881, at *8, *10 (STB served Mar. 20, 2026).

anticompetitive conduct. That result is contrary to the ICCTA's purpose and the Rail Transportation Policy's objectives of ensuring "effective competition among rail carriers" and "prohibit[ing] predatory pricing and practices, to avoid undue concentrations of market power." 49 U.S.C. §§ 10101(4), (12).

**III. The filed rate doctrine does not apply to Plaintiffs' claims.**

Defendant UP's argument that the filed rate doctrine bars Plaintiffs' claims is also unavailing. The filed rate doctrine holds that an award of treble damages is not available in an antitrust case based on rates filed and approved by a government agency. *See Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*, 476 U.S. 409, 422 (1986) (citing *Keogh v. Chicago & Nw. Ry. Co.*, 260 U.S. 156 (1922)). The rationale is that if a government agency approved a rate or tariff that applies to everyone, then it is presumed to be a competitive rate, and that awarding litigants damages would functionally give them a different rate and thus be unfair. *See In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1157 (3d Cir. 1993) (citing *Keogh*, 260 U.S. at 162–63).

Plaintiffs' claims are not based on a rate filed with the STB. Their claims stem entirely from the secret surcharge in the 2019 Lease Amendment, a private agreement negotiated between Defendants and intentionally concealed from the STB, contrary to the ICCTA. The Lease Amendment includes the secret surcharge that applies a $500+ fee on each rail car that starts in the Relevant Market and travels westbound on the UP Lease Track and interchanges with the Towner Line. Because Defendants never submitted the 2019 Lease Amendment to the STB, that agency has not determined whether the agreement is fair or valid, so the concerns animating the filed rate doctrine are inapplicable. *See generally Williams v. Duke Energy Int'l, Inc.*, 681 F.3d 788, 797 (6th Cir. 2012) (denying filed rate doctrine challenge because the case concerned side

17

agreements that were never filed with a regulatory agency) (quoting *Town of Norwood, Mass. v. New England Power Co.*, 202 F.3d 408, 419 (1st Cir. 2000)).

UP argues that even if regulated entities no longer affirmatively file tariffs, the filed rate doctrine still applies when an agency has oversight over the market. As authority UP cites cases involving FERC and the energy industry, which is subject to a different regulatory regime than railroads. Moreover, relevant caselaw shows the filed rate doctrine was abrogated by the ICCTA, which replaced the requirement that tariffs be filed with a system where they are instead published. *See In re Household Goods Movers Antitrust Litig.,* 2009 WL 8234043, at *8 (D.S.C. Sept. 10, 2009) (citing *Tempel Steel Corp. v. Landstar Inway, Inc.*, 211 F.3d 1029 (7th Cir. 2000)).[6] In *Beach*, the court had previously denied a motion to dismiss, finding that regardless of whether the ICCTA abrogated the filed rate doctrine, the doctrine still did not apply because the defendant never published any rates with the STB under the ICCTA and instead used unpublished software to hide their rates. *See Beach v. Atlas Van Lines, Inc.*, 2008 WL 8602539, at *3–4 (D.S.C. March 31, 2008) (upheld on summary judgment in *In re Household Goods*, 2009 WL 8234043, at *7–10). That is similar to what Defendants did here—they imposed an interchange commitment in a secret lease agreement that they failed to file with or disclose to the STB, contrary to law.

UP also cites the existence of a rate case with the STB filed by K&O in an attempt to show Plaintiffs' awareness and acceptance of STB procedures. But that case concerns a rate that K&O charges for traffic that originates on a different K&O line in Kansas and is not implicated by Plaintiffs' claims. It is thus wholly irrelevant. *See infra* Section IV.

---

[6] This case concerned motor carrier transport, which is also governed by the ICCTA, but the changes to the rail industry were similar.

Defendants failed to employ the proper regulatory procedures for putting the 2019 Lease Amendment into effect and instead implemented a secret surcharge to prevent competition. UP cannot now invoke regulatory procedures to avoid antitrust liability under the filed rate doctrine.

### IV. The doctrine of primary jurisdiction is inapplicable.

The Court should not apply the doctrine of primary jurisdiction, which is neither "primary" nor "jurisdictional" but rather a discretionary doctrine of deference to administrative agencies under limited circumstances. *See United States v. Bessemer & L. E. R.R. Co.*, 717 F.2d 593, 599 (D.C. Cir. 1983) ("The doctrine of primary jurisdiction, despite what the term may imply, does not speak to the jurisdictional power of the federal courts. It simply structures the proceedings as a matter of judicial discretion, so as to engender an orderly and sensible coordination of the work of agencies and courts." (cleaned up)); *see also Benham v. Ozark Materials River Rock, LLC*, 885 F.3d 1267, 1277 (10th Cir. 2018) (explaining primary jurisdiction is discretionary and "allows" courts to issue a stay under certain limited circumstances).[7]

First, the Supreme Court recently called into question the continued viability of the primary jurisdiction altogether. In *Loper Bright Enters. v. Raimondo,* 603 U.S. 369 (2024), the Supreme Court overruled judicial deference to administrative agencies, known as *Chevron* deference, because, *inter alia*, federal courts are the final arbiters of federal statutes and need not defer to federal agencies based on purported expertise. *See id.* at 412–13. Many federal courts have greatly discounted the continuing viability of primary jurisdiction after *Loper Bright*, since the doctrine is also based on deferring to federal agencies based on their purported expertise. *See In re Nurture Baby Food Litig.*, 2025 WL 918927, at *9 (S.D.N.Y. Mar. 26, 2025) ("The doctrine of primary

---

[7] "Primary jurisdiction" is a judicial doctrine, where "primary" refers to timing and "jurisdiction" refers to comity and the division of responsibility between courts and administrative agencies.

19

jurisdiction, which similarly allows courts to defer to agencies' expertise may be inconsistent with the reasoning of *Loper Bright*."); *Inst. for Fisheries Res. v. Cont'l Tire the Americas, LLC*, 2024 WL 3381032, at *3 (N.D. Cal. July 10, 2024) (declining to apply the primary jurisdiction doctrine and noting that "there will likely be a lot to fight about over [the EPA's pending rulemaking] in this case, especially in light of the overruling of *Chevron* deference to agency decisionmaking."); *Taylor v. JBS Foods USA*, 2025 WL 102450, at *20 (D.S.D. Jan. 15, 2025) ("This reluctance [to apply primary jurisdiction] could be even greater now in the wake of *Loper*.").

UP argues that the case should be stayed under this doctrine until the STB acts in two proceedings. ECF No. 33 at 19–20. The first proceeding is a "rate case" filed by Weskan against Defendant K&O. ECF No. 33 at 7. This rate case asks the STB to order K&O to establish reasonable rates and service terms for transportation of grain from Weskan's "Scott City East" facility in Scott City, Kansas, to its "Stockton Facility" in Sheridan Lake, Colorado. The Scott City East facility is located on a line that K&O owns, not the UP Lease Track, so the secret surcharge does not apply to this service. This antitrust case does not involve rail lines that K&O owns, and it does not involve whether these "line haul rates" are reasonable; it instead involves the bogus secret surcharge on railcars that travel to and from the Towner Line and the UP Lease Track. But the Towner Line and the secret surcharge are not at issue in the rate case. Thus, the outcome of this rate case before the STB will have no bearing on this antitrust case. Further, the rate case does not involve the Farmer Plaintiffs or Defendant UP.

The second STB proceeding is K&O's petition seeking an exemption for after-the-fact authority to renew and amend a lease agreement between K&O and UP. This lease agreement contains the secret surcharge at issue in this case. But the issues are different. The STB will decide whether the lease amendment including the secret surcharge is in the public interest or

anticompetitive. The STB will not decide Plaintiffs' antitrust, conspiracy, and other claims in this lawsuit, including claims made by the Farmer Plaintiffs and CXR, who are not parties to the STB proceedings. Thus, the outcome of the second STB case will have no bearing on this antitrust case.

Regardless, the STB lacks jurisdiction over secret agreements between railroads. In the context of preemption, courts have held that voluntary agreements entered into by private railroad companies "are not presumptively regulatory acts," and thus not preempted by statute. *PCS Phosphate Co. v. Norfolk S. Corp.*, 559 F.3d 212, 218–19 (4th Cir. 2009). Here, UP cannot overcome this presumption, that a voluntary agreement (here, the secret lease agreement) is not regulatory, by demonstrating that Plaintiff's various claims would affect the STB's exclusive jurisdiction over the regulation of railroads. *See CSX Transp., Inc. v. Norfolk S. Ry. Co.*, 2019 WL 4564564, at *8 (E.D. Va. 2019).

The *CSX Transp., Inc. v. Norfolk S. Ry. Co.* case is instructive. In that case, CSX brought antitrust claims against Norfolk Southern and others related to a switch rate charged to access a marine terminal, which was allegedly set too high in order to deter competition. 2019 WL 4564564, at *8. One defendant argued the lawsuit was preempted by ongoing proceedings before the STB. *Id*. at *7. The court found this argument "meritless." *Id*. The issue before the STB was whether to approve the increased rate, while the issue before the court was whether defendants had engaged in illegal conduct, including antitrust violations, "up to this point in time." *Id.* at *8 (emphasis in original). The court could award damages for CSX's previous losses or grant injunctive relief, but the STB's jurisdiction would not be affected because the STB could still approve or disapprove the pending rate increase "in the future." *Id.* (emphasis in original). Norfolk Southern later sought to refer the case to the STB on the same theory. 2021 WL 2908649, at *2–3 (E.D. Va. May 18, 2021). The court refused to do so because the STB setting a new reasonable switching rate "going

21

forward" would not resolve CSX's antitrust claims, which involved anticompetitive conduct "in the past." *Id*. at \*10 (emphasis in original).

The *CSX* court ultimately referred a single, narrow issue to the STB: whether the STB's approval of a merger in 1982 meant that the STB had authorized Norfolk Southern to "control" another entity, such that Norfolk Southern was immune from antitrust liability. *Id.* at \*11. After the STB answered that question in the negative, the case resumed in the district court. *See* 648 F. Supp. 3d 679 (E.D. Va. 2023), *aff'd* 114 F.4th 280 (4th Cir. 2024).

For these reasons, the Court should not apply the doctrine of primary jurisdiction.

## V. The Court should retain supplemental jurisdiction over Plaintiffs' state-law claims.

UP argues in conclusory fashion that the Court should decline supplemental jurisdiction over Counts V through VII under 28 U.S.C. § 1367(c)(3) because "Plaintiffs' federal claims fail." ECF No. 33 at 18 (citing 28 U.S.C. § 1367(c)(3)). This fallback argument is entirely derivative: it rises or falls with the federal claims. As discussed in Sections VI and VII, Plaintiffs have adequately stated claims under Sections 1 and 2 of the Sherman Act, so § 1367(c)(3) is never triggered. *See also Full Draw Prods. v. Easton Sports, Inc.*, 182 F.3d 745, 757 (10th Cir. 1999) (reversing district court's dismissal of pendent state antitrust claims and remanding for consideration on the merits alongside surviving federal antitrust claims). The Court should reject this argument in its entirety.

## VI. Plaintiffs properly plead claims under the Sherman Act § 1, the Colorado Antitrust Act, and the Kansas Restraint of Trade Act.

### A.  Plaintiffs Allege *Per Se* Violations of Section 1 of the Sherman Act.

Section 1 of the Sherman Act prohibits "every contract, combination . . . or conspiracy in restraint of trade or commerce . . . ." 15 U.S.C. § 1. The Sherman Act's prohibition generally precludes only restraints that are unreasonable. *Suture Express, Inc. v. Cardinal Health 200, LLC*,

22

963 F. Supp. 2d 1212, 1219 (D. Kan. 2013). There are two analytical approaches used to determine whether a defendant's conduct unreasonably restrains trade: the *per se* rule and the rule of reason. *FTC v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411, 433 (1990). The *per se* rule applies to restraints that always or almost always tend to restrict competition and decrease output, which include agreements to fix prices or allocate markets. *Id.*; *Palmer v. BRG of Ga., Inc.*, 498 U.S. 46, 49 (1990). If the *per se* rule applies, then the plaintiffs can prevail by showing the alleged contract or agreement exists; no further market analysis is required. *Id.*[8]

### 1.    Plaintiffs Allege a *Per Se* Unlawful Price Fixing Claim.

Agreements to fix or increase prices are the "[p]aradigmatic example" of practices deemed *per se* unlawful under the Sherman Act. *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 316 (3d Cir. 2010); *see also In re Urethane Antitrust Litig.*, 913 F. Supp. 2d 1145, 1150 (D. Kan. 2012). To assert a claim for *per se* unlawful price fixing, a plaintiff need not allege direct or explicit price fixing; rather, "under the Sherman Act, a combination formed for the purpose and the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce is illegal *per se*." *Palmer*, 498 U.S. at 48 (quoting *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 223 (1940)). Therefore, to plead a *per se* price fixing claim, a plaintiff must allege (i) an agreement (ii) between participants at the same level of the market (iii) to fix, raise, depress, stabilize, or peg prices. *Urethane*, 913 F. Supp. 2d at 1150.

Defendants entered into an agreement. In response to CXR's acquisition and rehabilitation of the Towner Line, Defendants agreed to eliminate the Towner Line as a competitive threat, which included secretly amending the 1997 Lease in 2019. Compl. ¶¶ 7, 47. This agreement included the

---

[8] Unlike claims under the rule of reason, *per se* violations do not require plaintiffs to define a relevant market or allege that defendants have market power. *Ass'n of Surgical Assistants v. Nat'l Bd. of Surgical Tech. & Surgical Assisting*, 127 F.4th 178, 186 (10th Cir. 2025)

Interchange Fee, which is the secret surcharge of more than $500 per rail car when a train travels west in the Relevant Market on the UP Lease Track and interchanges with the Towner Line. *Id.* at ¶¶ 8, 44, 52, 61. Defendants do not dispute that they entered into this agreement, that they kept it secret, that it contains the secret surcharge, or that the secret surcharge substantially increased transportation prices for the westbound shipment of grain from the Relevant Market.

Defendants operate at the same level of the market (i.e. at the same level of the supply chain) because they provide the same services to many of the same customers. As alleged in the Complaint, both K&O and UP are common carrier railroads that own and operate railroads in and around the Relevant Market. *Id.* at ¶¶ 3 (diagram), 27–28; Ex. A. These railroads include: (i) the UP Lease Track (owned by UP and operated by K&O); (ii) the Great Bend Line (owned by K&O), which connects to the UP Lease Track at its eastern terminus; (iii) the UP-owned line that runs north of and parallel to the UP Lease Track; and (iv) the UP-owned Hutchinson Line that connects to the K&O-owned Great Bend Line and runs parallel to the UP Lease Track to the south. *Id.* Defendants provide the same relevant services—transportation of grain by rail—to many of the same customers using these railroads. Thus, it is reasonable to infer Defendants operate at the same level of the market, which is all that is required at this stage.

K&O claims it does not operate at the same market level as UP because UP is designated by the STB as a Class I carrier and K&O is designated by the STB as a Class III carrier. ECF No. 31 at 26. But these class designations are based solely on annual operating revenue for rail lines. www.stb.gov/reports-data/economic-data/ (last visited on May 15, 2026). They are irrelevant to whether Defendants operate at the same market level. For example, Nike and Converse operate at the same level of the basketball shoe retail market, even though Nike generates significantly more revenue than Converse.

Second, K&O undercuts its own argument later in the brief by claiming Defendants' rail lines compete against each other. K&O states the UP Lease Track and the Great Bend Line (owned and operated by K&O) compete with the UP-owned and operated Hutchinson Line located south of these lines, and function as competitive restraints on each other. *See* ECF No. 31 at 32 (claiming the alternative lines should be included in the Geographic Market). This concession by K&O further shows it is at least reasonable to infer that Defendants operate at the same market level.

Defendants' agreements fixed and raised prices for the westward shipment of grain by rail from the Relevant Market. Through their agreements, including adopting the Interchange Fee in the 2019 Lease Amendment, Defendants prevented parties from shipping grain directly west from the Relevant Market over the Towner Line, which is a cheaper alternative. Compl. ¶¶ 63–69. Instead, farmers are forced to choose one of the following costlier options to ship grain west: (i) shipping grain east-to-west using Defendants' rail lines, which is longer and costlier; (ii) using trucks to ship grain to an alternative rail line located north or south of the Relevant Market, which is cost-prohibitive for most farmers in the Relevant Market and much less reliable than shipping by rail given the added dependence on trucks; or (iii) using trucks to ship grain to the Stockton Facility, which was not even an option until 2023, is still cost-prohibitive for most farmers since it also forces them to ship greater distances using costlier and less reliable trucks. *Id*. at ¶¶ 42–45, 52–54.

K&O argues it lacked a conscious commitment to the scheme because it lacked an independent economic interest in the conspiracy and, therefore, could not have entered into an agreement to unreasonably restrain trade. But this argument fails for several reasons. First, applying the *per se* rule to Plaintiffs' price fixing claim renders Defendants' agreements

25

unreasonable and unlawful *per se* without regard to economic motive. *Trial Lawyers Ass'n*, 493 U.S. at 433.

Second, Section 1 of the Sherman Act imposes liability on "*[e]very person* who shall make any contract or engage in any combination or conspiracy" that unreasonably restrains trade. 15 U.S.C. § 1 (emphasis added). The statute contains no exception based on degree of participation, economic interest, or any other factor. *Id.* This is why courts have repeatedly held plaintiffs need not prove every party to an antitrust conspiracy had an independent economic interest in the scheme, particularly at the pleading stage, and that plaintiffs need only allege that defendants "had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Arapahoe Surgery Ctr., LLC v. CIGNA Healthcare, Inc.*, 80 F. Supp. 3d 1257, 1263 (D. Colo. 2015) (quotations omitted). This is also why courts have found unlawful conspiracies or agreements involving unwitting or coerced participants. *See Systemcare, Inc. v. Wang Labs. Corp.*, 117 F.3d 1137, 1142–43 (10th Cir. 1997) (holding that "a contract between a buyer and seller satisfies the concerted action element of section 1 of the Sherman Act where the seller coerces a buyer's acquiescence in a tying arrangement imposed by the seller."). *See also Spectators' Commc'n Network, Inc. v. Colonial Country Club*, 253 F.3d 215, 222 (5th Cir. 2001) ("[T]here can be sufficient evidence of a combination or conspiracy when one conspirator lacks a direct interest in precluding competition, but is enticed or coerced into knowingly curtailing competition by another conspirator who has an anticompetitive motive.") (citing *Systemcare*).

Third, even if required, the Complaint alleges that K&O unambiguously had a conscious commitment to and an independent economic interest in effectuating the scheme. K&O chose to execute the 2019 Lease Amendment that contains the secret surcharge and enabled the conspiracy, and engaged in these actions, shortly after CXR acquired the Towner Line in 2018 and rehabilitated

26

it in 2019, making it reasonable to infer K&O entered into the agreement to thwart competition from the Towner Line. Compl. ¶¶ 7, 47. Likewise, K&O concealed the 2019 Lease Amendment and Interchange Fee despite a legal obligation to disclose them to the STB and requests for information about them from multiple parties, making it reasonable to infer that K&O understood the agreement was anticompetitive. *Id*. at ¶¶ 47–51. Finally, K&O profited from the scheme because it forced all rail traffic to first go east over K&O's Great Bend line even if it ultimately moved to western destinations. *Id*. at ¶ 3 (diagram) and Ex. A. Because K&O owned and operated the Great Bend Line, the scheme generated revenue for K&O it would not have received without the scheme, giving K&O an independent economic interest in effectuating the scheme. Accepting these allegations as true and making all reasonable inferences in favor of Plaintiffs, K&O had a conscious commitment to and profited from the alleged scheme.

K&O goes to great lengths to convince the Court that it pays the Interchange Fee–not Plaintiff Weskan. But this argument fails for multiple reasons. First, Defendants base this argument on purported facts pulled from their secret Lease Amendment with UP; it is black-letter law that such facts cannot be considered at this stage. *Oxendine v. Kaplan*, 241 F.3d 1272, 1275 (10th Cir. 2001); *Schwartz v. Celestial Seasonings, Inc*., 124 F.3d 1246, 1251 (10th Cir. 1997). Second, even if technically true, K&O admits this secret surcharge is passed on to and ultimately borne by Weskan. ECF No. 31 at 37 (explaining it would be "cost-prohibitive to K&O to quote rates to Weskan that did not consider" the Interchange Fee).

Finally, K&O's reliance on *Ex Parte No. 575* is misplaced. In *Ex Parte No. 575*, the STB simply rejected a request that *all* interchange commitments be subject to a rebuttable presumption that they are unreasonable and contrary to the public interest. *Rev. of Rail Access & Competition Issues*, STB Ex Parte No. 575, 2007 WL 3170981, at *1–3 (STB served Oct. 30, 2007). But

27

Plaintiffs are not arguing that all interchange commitments should be subject to this rebuttal presumption or the *per se* rule. Rather, Plaintiffs argue that the *per se* rule applies to this specific case because Defendants agreed to fix prices and allocate markets by eliminating the Towner Line as a competitive threat (paradigmatic examples to which the *per se* rule applies); that Defendants accomplished this by, among other things, secretly adopting the exorbitant Interchange Fee; and that this secret surcharge was intended to (and did) prevent freight traffic originating in the Relevant Market from interchanging with the Towner Line. ¶¶ 1, 7, 11, 47–54, 63. In this situation, the *per se* rule applies and *Ex Parte No. 575* does not hold otherwise.

For these reasons, Plaintiffs have pleaded a *per se* unlawful price fixing claim because they allege facts showing Defendants are at the same market level and entered into agreements to fix or increase the price of shipping grain west by rail from the Relevant Market.

### 2.   Plaintiffs Allege a *Per Se* Unlawful Market Allocation Claim.

Market allocation agreements are one of the "classic examples of a per se violation of § 1." *Palmer* 498 U.S. at 49; *United States v. Kemp & Assocs.*, 907 F.3d 1264, 1273 (10th Cir. 2018). To plead a *per se* market allocation claim, plaintiffs must allege that defendants operating at the same level of the market entered into an agreement to allocate markets to suppress competition. 15 U.S.C. § 1; *Kemp*, 907 F.3d at 1277; *United States v. DaVita Inc.*, 2022 WL 266759, at *5 (D. Colo. Jan. 28, 2022). The Complaint does just that. As explained above, Plaintiffs allege that Defendants operate at the same level of the market, as both are common carriers that own and operate rail lines in and around the Relevant Market and provide analogous rail services to many of the same customers. *See supra* at p. 24; Compl. ¶¶ 3 (diagram), 27–28.

Plaintiffs also allege Defendants executed the secret 2019 Lease Amendment and adopted the secret surcharge to suppress competition from the Towner Line and allocate the market for the

westbound shipment of grain in the Relevant Market between themselves. Compl. ¶¶ 7, 60–61, 82. Due to the secret surcharge, participants wanting to ship grain westbound from the Relevant Market must use the UP Lease Track (owned by UP and operated by K&O) to ship grain east to the Great Bend Line (owned and operated by K&O) and then continue east to Hutchinson, Kansas, at which point shippers can use either a BNSF-owned line or another UP-owned line. *Id*. at ¶ 3 (diagram) and Ex. A. The secret surcharge effectively prevents participants from shipping the grain directly west from the Relevant Market using the UP Lease Track and the Towner Line by increasing the cost to do so. *Id.* Defendants, therefore, have agreed to allocate the market for the westbound shipment of grain from the Relevant Market between themselves and eliminate competition from the Towner Line. This is a *per se* unlawful market allocation claim.

K&O argues Defendants do not actually allocate any market between themselves. But, as shown above, this argument ignores the well-pleaded allegations showing Defendants have allocated the market for the westbound shipment of grain from the Relevant Market among their rail lines until at least Hutchinson, Kansas. Compl. ¶ 3 (diagram) and Ex. A.

### B. Plaintiffs' Claims Succeed Under the Rule of Reason.

To state an antitrust claim under the rule of reason, plaintiffs must allege a plausible relevant market in which competition will be impaired and defendants have market power. *Telecor Commc'ns, Inc. v. Sw. Bell Tel. Co.*, 305 F.3d 1124, 1131 (10th Cir. 2002). As shown below, Plaintiffs specifically define the Relevant Market and explain why certain purported alternatives are excluded. Plaintiffs also allege facts showing Defendants have substantial market power in the Relevant Market. Nothing more is required at the pleading stage.

### 1. Plaintiffs Plead a Facially Plausible Relevant Market.

"It is well settled that defining the relevant market is an issue of fact." *Id.*; *see also Black v. Occidental Petroleum Corp.*, 69 F.4th 1161, 1177 (10th Cir. 2023) (explaining market definition is issue of fact); *Reazin v. Blue Cross & Blue Shield of Kan., Inc.*, 899 F.2d 951, 975 (10th Cir. 1990) ("Market definition is a question of fact."). Therefore, courts hesitate to dismiss claims based on market definition, and plaintiffs need only identify a relevant market that is facially plausible. *Nat'l Inst. of First Assisting, Inc. v. Ass'n of Operating Room Nurses*, 2020 WL 8189594, at *7 (D. Colo. Sept. 11, 2020). A relevant market has two components: (i) a product market that includes the product at issue and reasonably interchangeable products, and (ii) a geographic market that encompasses the area of effective competition. *Id.*

### a. Plaintiffs Plead a Sufficient Product Market.

The relevant product market "is composed of products that have reasonable interchangeability for the purposes for which they are produced—price, use and qualities considered." *Buccaneer Energy (USA) Inc. v. Gunnison Energy Corp.*, 846 F.3d 1297, 1313 (10th Cir. 2017). Defining a product market "is guided by the narrowest market principle," meaning the "circle must be drawn narrowly to exclude any other product to which, within reasonable variations in price, only a limited number of buyers will turn." *FTC v. Meta Platforms, Inc.*, 775 F. Supp. 3d 16, 36 (D.D.C. 2024) (quotations omitted). Thus, products that are interchangeable to some degree but lack significant cross-elasticity of demand (i.e., only a limited number of consumers turn to the alternative when faced with an increase in price) are not reasonably interchangeable and should be excluded from the product market. *Nat'l Inst.*, 2020 WL 8189594, at *7; *Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 762 F.3d 1114, 1117 (10th Cir. 2014).

30

Plaintiffs define the product market as the westbound shipment of grain by train from the Relevant Market. Compl. ¶ 56. Plaintiffs explain that alternative modes of transportation like trucks are not reasonably interchangeable because they are significantly more expensive and much less reliable than trains, particularly during harvest season. *Id*. at ¶¶ 56–58. Plaintiffs also explain that rail lines located outside of the Relevant Market are not reasonably interchangeable because farmers in the Relevant Market must use costly and less reliable trucks to transport the grain farther to reach the alternative rail lines. *Id.* Finally, Plaintiffs explain there is a low cross-elasticity of demand with these alternatives, as only a "small number of parties" in the Relevant Market have used trucks to access alternative rail lines despite the significant increase in transportation costs imposed by Defendants' secret surcharge. *Id*. at ¶¶ 37, 58. In sum, Plaintiffs have defined a relevant product market, clarified why certain options were excluded, and explained that the excluded options had a low cross-elasticity of demand with the product market.

K&O argues that trucks should be included in the relevant product market because Plaintiffs admit trucks are reasonably interchangeable for transporting grain under 200 miles. This argument fails for several reasons. First, the Complaint actually alleges that trucks "are ***not*** a reasonable substitute for shipping grain any distance over 200 miles." *Id*. at ¶ 57 (emphasis added). The Complaint also alleges that using trucks to transport grain to alternative rail lines is cost prohibitive for nearly all farmers in the Relevant Market and that using trucks (which typically requires thousands of truckloads per farm, per harvest) are far less reliable than using rail lines. *Id*. at ¶¶ 40, 52–53, 57. Given this, few farmers in the Relevant Market have used trucks to transport grain to alternative rail lines despite the exorbitant secret surcharge, demonstrating their low cross-elasticity of demand. *Id*.

31

Second, highlighting the fact-intensive nature of this inquiry, K&O relies on its own set of facts pulled from outside the Complaint to support its argument. These new facts include purported distances from unspecified locations within certain large counties and cities to certain loading facilities and rail lines. ECF No. 31 at 27–28. On a motion to dismiss under Rule 12(b)(6), however, Defendants are confined to the four corners of the complaint; any outside facts should be ignored.[9] *Oxendine*, 241 F.3d at 1275; *Schwartz,* 124 F.3d at 1251. While Defendants claim some of these facts are subject to judicial notice, Defendants are wrong. Without these outside facts, K&O's argument falls apart.

K&O next argues that alternative rail lines must be included in the product market because farmers in the Relevant Market can use trucks to ship grain to these alternative rail lines. But this argument fails for similar reasons. K&O again supports this argument with new facts from outside the Complaint that must be ignored. *See* ECF No. 31 at 27–28. This argument is also premised on the use of trucks to transport grain farther distances to the alternative rail lines, rendering this option cost-prohibitive and unreliable. Compl. ¶¶ 40, 52–53, 57.

Finally, K&O argues that eastward and westward shipments of grain from the Relevant Market are reasonably interchangeable because much of the grain shipped from the Relevant Market is allegedly shipped east to eastern and southern mills and ports. ECF No. 31 at 30–31. But this argument also fails. Whether a product is reasonably interchangeable turns on the product's

---

[9] Defendants' request for judicial notice of these facts should be rejected as they are neither adjudicative nor undisputed. *BAC Local Union 15 Welfare Fund v. Williams Restoration Co*., 2017 WL 3026117, at *2 (D. Kan. July 17, 2017) (explaining that courts can take judicial notice of adjudicative and undisputed facts at the pleading stage). The purported distances are between unspecified or irrelevant locations in cities and counties; it is unclear whether these distances were calculated using trucking routes or roads on which loaded trucks are permitted to use, as trucks are prohibited on certain roads due to weight and height restrictions; and Defendants ignore that a typical harvest for a single farm involves thousands of truck loads, so even a small increase in trucking distance results in thousands of additional trucking miles.

"price, use and qualities considered." *Buccaneer Energy*, 846 F.3d at 1313. The eastward shipment of grain involves different markets with different customers paying different prices for grain used in different mills for different purposes. Given these distinctions, the price, use, and qualities of the eastward shipment of grain are not interchangeable with those of the westward shipment of grain, particularly when all inferences are made in Plaintiffs' favor.

### b. Plaintiffs Plead a Legally Sufficient Geographic Market.

To plead a relevant market, plaintiffs must identify a relevant geographic market that consists of the "narrowest market which is wide enough so that products from adjacent areas cannot compete on substantial parity with those included in the market." *Budicak, Inc. v. Lansing Trade Grp., LLC*, 452 F. Supp. 3d 1029, 1056 (D. Kan. 2020). Determining the contours of a geographic market is also "highly fact sensitive" and "can be determined only after a factual inquiry into the commercial realities faced by consumers." *Four Corners Nephrology Assocs., P.C. v. Mercy Med. Ctr.*, 2008 WL 622815, at *9 (D. Colo. Mar. 4, 2008). *See also Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 453 (1992); *Westman Comm'n Co. v. Hobart Int'l, Inc.*, 796 F.2d 1216, 1220 (10th Cir. 1986) ("We recognize that market definition is a question of fact . . .."); *Todd v. Exxon Corp.*, 275 F.3d 191, 199 (2d Cir. 2001). Therefore, courts do not dismiss claims based on how a geographic market is defined, unless it is apparent from the face of the complaint that it has a fatal legal defect. *Budicak*, 452 F. Supp. 3d at 1056.

To determine whether a geographic market is properly defined, courts use the "hypothetical monopolist test," which asks whether a hypothetical monopolist in the proposed market could profitably impose a small but significant non-transitory increase in price (SSNIP). *FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 338 (3d Cir. 2016). If a material number of customers

33

would turn to alternatives outside the geographic market in response to a SSNIP, then the SSNIP would not be profitable and the market is defined too narrowly. *Id.*

Plaintiffs define the relevant geographic market as the five counties that the UP Lease Track dissects. Compl. ¶ 59. This is the "narrowest market which is wide enough so that products from adjacent areas cannot compete on substantial parity with those included in the market." *Budicak*, 452 F. Supp. 3d at 1056. Defendants can profitably impose a SSNIP in this market without losing a material number of customers. Proving this point by direct evidence, Defendants imposed the secret surcharge, which is far higher than a SSNIP, but only lost a small number of customers to alternative rail lines. Compl. ¶ 59. Accepting these allegations as true and making all reasonable inferences in their favor, Plaintiffs have pleaded a relevant geographic market.

### 2. Plaintiffs Allege that Defendants Have Market Power.

Market power is the ability to profitably raise prices or restrict output. *FTC v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411, 438 (1990); Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶ 5.01* (4th ed. 2017). Determining whether a defendant has market power is fact intensive and ill-suited for resolution at the pleading stage. *Black v. Occidental Petro. Corp.*, 2024 WL 1741085, at *5 (D. Wyo. Mar. 11, 2024). Plaintiffs can plead market power in two ways: (1) directly by showing a defendant increased prices above competitive levels without losing a significant number of customers; or (2) indirectly by alleging that defendants control a significant share of the relevant market (typically above 65%) and that the relevant market is subject to barriers to entry and expansion. *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1071 (10th Cir. 2013).

Here, Plaintiffs plead market power both directly and indirectly. Plaintiffs plead market power directly by alleging that Defendants substantially increased the price to ship grain

34

westbound by rail from the Relevant Market through the secret surcharge (i.e., they increased prices well above competitive levels), but only lost a small number of customers. Compl. ¶¶ 60–61. Plaintiffs plead market power indirectly by alleging that, as the owner and operator of the UP Lease Track, Defendants control all of the Relevant Market (i.e., have 100% market share) and that significant barriers to entry prevent a timely competitive response given the time and cost associated with constructing an alternative railroad.

K&O argues that Plaintiffs fail to plead market power because they do not identify a specific market share statistic for Defendants. ECF No. 31 at 33–34. But Plaintiffs plead market power directly, eliminating the need for a market share statistic. Compl. ¶¶ 60–61. Regardless, Plaintiffs allege in detail that Defendants control the entire Relevant Market given that they own and operate the only railroad located in the four counties in Kansas that are part of the Relevant Market and have imposed an exorbitant secret surcharge on the interchange located in Kiowa County, Colorado. *Id.* at ¶¶ 3 (diagram), 4, 60–61. Defendants, therefore, have a 100% market share over the westbound shipment of grain by train from the Relevant Market by definition.

For these reasons, Plaintiffs sufficiently plead a Relevant Market with properly defined product and geographic markets, and that Defendants have market power in the Relevant Market through both direct and indirect evidence.

## VII. Plaintiffs properly plead a conspiracy-to-monopolize claim under the Sherman Act § 2 and the KRTA.

K&O's arguments against Plaintiffs' conspiracy-to-monopolize-claim under Section 2 of the Sherman Act are contrary to the facts pleaded in the Complaint and inconsistent with K&O's previous arguments.

Plaintiffs' relevant market definition is legally sufficient under the Sherman Act § 2, contrary to K&O'S first argument. *See supra*, Section VI, pp. 22–35.

35

K&O also argues that "a conspiracy to create a shared monopoly is not a cognizable claim under Section 2," ECF No. 31 at 40, but this assertion contradicts its argument that Plaintiffs' price fixing claims require the Court to employ a rule of reason analysis rather than a *per se* analysis. K&O contends a rule of reason analysis is required because it and UP are not horizontal competitors. *See id*. at 25–26. But in opposing Plaintiffs' conspiracy-to-monopolize claim, K&O assumes that it and UP are horizontal competitors. *See id*. at 40. K&O cannot have it both ways and take inconsistent positions about its market position in this case to avoid legal accountability.

The cases K&O relies on are also distinguishable from the facts pled. K&O principally relies on *Oxbow Carbon & Mins. LLC v. Union Pac. R.R. Co.*, 926 F. Supp. 2d 36 (D. D.C. 2013), to argue that a "shared monopoly claim" is not possible under Sherman Act § 2. *See id*. at 40. The *Oxbow* plaintiffs were mining companies who accused UP and BNSF of engaging in a conspiracy to monopolize by collusively imposing fuel surcharges on their customers and allocating the market so they did not compete. The court noted that with the enactment of the Sherman Act, "Congress was concerned about 'the complete domination of a market by a single economic entity,' and therefore did not include 'shared monopolies' or oligopolies within the purview of Section 2." *Oxbow*, 926 F. Supp. 2d at 46 (citations omitted). "To the extent that plaintiffs have alleged a market structure in which UP and BNSF each possess and seek to protect market power within the same markets, their monopoly claims based on an alleged agreement to monopolize must fail." *Id*.

Plaintiffs' conspiracy-to-monopolize claims do not involve a "shared monopoly." Instead, Plaintiffs allege that (1) Defendants entered into a secret agreement for a railroad track owned by UP and operated by K&O; (2) the agreement contains a secret surcharge that imposes a per car surcharge or phantom secret surcharge that makes it prohibitively expensive for railcars to

36

interchange onto railroad tracks not owned by either UP or K&O; and (3) this fee forces railcars operating in the Relevant Market to use only UP tracks to get their goods to the west coast. The UP Lease Track is effectively the "single economic entity" necessary for a monopoly as described by the court in *Oxbow*.

Plaintiffs have also plausibly alleged a conspiracy between UP and K&O to monopolize, and K&O's arguments to the contrary should be rejected. As discussed above in Section VI, pp. 22–35, the Complaint alleges facts supporting an inference that K&O had "a unity of purpose, a common design and understanding, a meeting of the minds, or a conscious commitment to a common scheme." ECF No. 31 at 42.

Plaintiffs' Complaint also contains facts that plausibly allege that K&O had a specific intent to monopolize the Relevant Market. Plaintiffs' claims center on the secret agreement Defendants executed after CXR acquired and rehabilitated the Towner Line. This agreement contains the exorbitant secret surcharge that prevents rail traffic from traveling westbound from the UP Lease Track to the Towner Line and then to points west. Defendants never sought STB approval of the secret agreement, contrary to law, and continue to refuse to disclose this information to Plaintiffs. Weskan even went to the STB to force K&O to disclose it, but K&O and UP have still not shared it. K&O knowingly and willingly amended their agreement with UP to make it anticompetitive, continues to operate the UP Lease Track under this agreement, and continues to conceal the agreement from Plaintiffs. Plaintiffs' Complaint mentions these facts multiple times. *See, e.g.,* Compl. ¶¶ 7, 9–11, 45, 47–50, and 70; *see also Schoenbaum v. E.I. Dupont De Nemours & Co.*, 517 F. Supp. 2d 1125, 1145–46 (E.D. Mo. 2007) (denying motion to dismiss on a conspiracy to monopolize claim, citing pleading of secret agreement among two competitors as alleging requisite intent to monopolize the seed market) (vacated on other grounds);

*see generally Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 762 F.3d 1114, 1130 (10th Cir. 2014) ("Specific intent need not be proven by direct evidence, but can be inferred from the defendant's anticompetitive practices or other proof of unlawful conduct.") (citations omitted).

Finally, as discussed above in Section VI, pp. 22–35, antitrust law does not require that a party to an unlawful agreement have an independent economic interest in the scheme. *See Systemcare, Inc.*, 117 F.3d at 1142–43; *Spectators' Commc'n Network, Inc.*, 253 F. 3d at 221; *Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 212 (3d Cir. 1992) (in considering an antirust conspiracy, "the emphasis is upon the participant's 'commitment to [the] scheme [which is] designed to achieve an unlawful purpose' which is crucial. A rational factfinder could infer agreement with the objective from knowledge of the objective and action calculated to achieve the objective despite differing motives.") (citations omitted). K&O's argument about its motives invites fact-finding into why K&O signed the secret agreement despite its contention that it had "no rational motive" to create a monopolistic environment. Such questions cannot be resolved at the pleading stage. *See generally In re Surescripts Antitrust Litig.*, 608 F. Supp. 3d 629, 651 (N.D. Ill. 2022) ("Courts are wary to dismiss antitrust cases on intent solely on the pleadings because evidence of intent is often in the control of the defendants.") (citations omitted); *In re Pork Antitrust Litig.*, 495 F. Supp. 3d 753, 767 (D. Minn. 2020) ("in antitrust cases, where the proof is largely in the hands of the alleged conspirators, dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly") (quoting *Hosp. Bldg. Co. v. Trs. of Rex Hosp.*, 425 U.S. 738, 746 (1976)).

Even if antitrust law did require a participant in an anticompetitive scheme to have an independent economic interest in the scheme, such an interest can be inferred in this case. As discussed above in Section VI.A.1, K&O knowingly and willingly entered into the secret

38

agreement with UP and was presumably represented by able counsel during the process. If K&O had no independent economic interest to enter into the 2019 Lease Amendment, then why did K&O do so? By asserting that it lacked such an interest, K&O is really arguing that it should not have entered into the secret agreement at all. Yet it did. An independent economic interest can thus be inferred.

For these reasons, the Court should deny K&O's motion to dismiss Plaintiffs' conspiracy-to-monopolize claims.

### VIII.   Plaintiffs' pleas for injunctive relief are proper.

Defendant K&O argues that injunctive relief against common carriers is barred for federal antitrust violations. ECF No. 31, § IV at 44. But courts have long held that injunctive relief is proper to remedy federal antitrust violations by common carriers, as long as it does not encroach on "a matter subject to the jurisdiction" of a regulatory agency. *See, e.g., Georgia v. Penn. R.R. Co.*, 324 U.S. 439, 455 (1945). The enactment of the ICCTA in 1995 did not change this, as the ICCTA made only "conforming amendments" (i.e., non-substantive changes) to the Clayton Act. *See* H.R. Conf. Rep. 104-422, 237, 1995 U.S.C.C.A.N. 850, 922. The unpublished cases relied on by K&O either ignore or fail to heed this undisputed legislative history. *Truck-Rail Handling Inc. v. BNSF Ry. Co.*, 2005 WL 8178364 (N.D. Cal. Mar. 8, 2005); *CSX Transp., Inc. v. Norfolk S. Ry. Co.*, 2023 WL 2552343 (E.D. Va. Jan. 27, 2023). If the ICCTA had indeed eliminated the ability of private plaintiffs to seek injunctive relief for antitrust violations, the legislative history would not be silent on such a sweeping change in the law. As the Supreme Court has explained, "Congress [does not] hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). Indeed, since the ICCTA was enacted, courts have continued to hear requests from private plaintiffs for antitrust injunctive relief against common carrier railroad defendants. *See, e.g., In re*

*Rail Freight Fuel Surcharge Antitrust Litig.*, 593 F. Supp. 2d 29, 36, 41–43 (D.D.C. 2008) (declining to dismiss indirect purchaser plaintiffs' federal antitrust claim for injunctive relief).

### IX. Plaintiffs request leave to amend their complaint.

If the Court finds that Plaintiffs did not sufficiently plead any of their claims, they move for leave to amend their complaint. Fed. R. Civ. P. 15(a)(2) directs courts to "freely give leave [to amend] when justice so requires." *U.S. ex rel. Schroeder v. Medtronic, Inc.*, 2021 WL 4168140, at *20 (D. Kan. Sept. 14, 2021). "[R]efusing to grant leave to amend 'is generally only justified upon a showing of undue delay, unique prejudice to the opposing party, bad faith or dilatory motive, failure to cure deficiencies by amendments previously allowed, or futility of amendment.'" *Id.* (quoting *Frank v. U.S. W., Inc.*, 3 F.3d 1357, 1365 (10th Cir. 1993)). None of the reasons are present here. Moreover, this would be "the first ruling by the Court on the sufficiency of the allegations," so the Court should "grant [Plaintiffs] one additional opportunity to attempt to state cognizable claims." *Id.* at *21.

### CONCLUSION

For these reasons, Defendants' motions to dismiss should be denied.

Dated: May 15, 2026.

Respectfully submitted,

/s/ Rex A. Sharp
Rex A. Sharp, KS #12350
Isaac L. Diel, KS #14376
Hammons P. Hepner, KS #29138
SHARP LAW LLP
4820 W. 75th Street
Prairie Village, KS  66208
Telephone: (913) 901-0505
rsharp@midwest-law.com
idiel@midwest-law.com
hhepner@midwest-law.com

—and—

Thomas R. Ajamie*
John S. "Jack" Edwards, Jr.*
Courtney D. Scobie*
AJAMIE LLP
Pennzoil Place - South Tower
711 Louisiana, Suite 1600
Houston, TX  77002
Telephone: (713) 860-1600
Facsimile: (713) 860-1699
tajamie@ajamie.com
jedwards@ajamie.com
cscobie@ajamie.com

*Counsel for Plaintiffs*

\*Admitted *pro hac vice*

41

**CERTIFICATE OF SERVICE**

I hereby certify that on May 15, 2026, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

SHARP LAW LLP

*/s/ Rex A. Sharp*

42