**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| WESKAN GRAIN LLC; COLORADO PACIFIC RAILROAD, L.L.C.; D&L FARMS, GP; E&D FARMS, GP; D&C FARMS, GP; L&E FARMS, GP; NORTH FOUR FARMS, GP; MARIENTHAL GRAIN LLC; D&A FARMS, GP; HINEMAN LAND & CATTLE, INC.; HINEMAN RANCH, L.L.C.; CIRCLE C FARMS, INC.; STEVEN COMPTON; MARK SANDERS; and JLD PARTNERSHIP; | ) ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 2:26-cv-02053 |
| v. | ) ) | |
| KANSAS & OKLAHOMA RAILROAD, LLC, and UNION PACIFIC RAILROAD COMPANY, | ) ) ) | |
| Defendants. | ) | |

**DEFENDANT KANSAS & OKLAHOMA RAILROAD, LLC'S**
**REPLY IN SUPPORT OF ITS MOTION TO DISMISS**

Defendant Kansas & Oklahoma Railroad, LLC submits this reply in support of its Motion

to Dismiss Plaintiffs' Complaint under Fed. R. Civ. P. 12(b)(6).

## TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................................1

ARGUMENT........................................................................................................................1

I.   Plaintiffs' antitrust claims are incompatible with the ICCTA's regulatory scheme ............ 1

    A.   K&O has implied antitrust immunity from Plaintiffs' federal antitrust claims ..................................................................................................................... 1

    B.   The ICCTA preempts Plaintiffs' state-law antitrust claims.................................... 3

II.  Plaintiffs fail to state claims under the Sherman Act § 1, the Colorado Antitrust Act and the Kansas Restraint of Trade Act ......................................................................... 5

    A.   The per se rule does not apply to Plaintiffs' Section 1 claims ................................ 8

    B.   Plaintiffs fail to allege a legally sufficient relevant market .................................. 12

    C.   Plaintiffs fail to plausibly allege market power ...................................................... 14

    D.   Plaintiffs fail to plausibly allege price-fixing and market allocation claims ........ 15

        1.   Plaintiffs do not plausibly allege a price-fixing claim ............................. 15

        2.   Plaintiffs fail to state a plausible market allocation claim ........................ 16

III. Plaintiffs fail to plausibly allege a Section 2 conspiracy-to-monopolize claim................ 16

IV.  Plaintiffs cannot seek injunctive relief against K&O for their federal antitrust claims ..................................................................................................................................... 17

V.   Plaintiffs' request for leave to amend the Complaint should be denied............................ 18

CONCLUSION..................................................................................................................18

## TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Association of Surgical Assistants v. Nat'l Bd. of Surgical Tech. & Surgical Assisting*,
127 F.4th 178 (10th Cir. 2025) ................................................................................. 12, 14

*Bauchman for Bauchman v. W. High Sch.*, 132 F.3d 542 (10th Cir. 1997).................................. 18

*BNSF Ry. Co. v. Hiett*, 22 F.4th 1190 (10th Cir. 2022) .................................................................. 4

*Brooks v. Mentor Worldwide LLC*, 985 F.3d 1272 (10th Cir. 2021)............................................ 15

*Brown v. Pro Football, Inc.*, 518 U.S. 231 (1996) ......................................................................... 1

*Budicak, Inc. v. Lansing Trade Grp., LLC*, 452 F. Supp. 3d 1029 (D. Kan. 2020)............ 9, 11, 12

*Campfield v. State Farm Mut. Auto. Ins.*, 532 F.3d 1111 (10th Cir. 2008) ................................. 12

*Caplinger v. Medtronic, Inc.*, 784 F.3d 1335 (10th Cir. 2015).................................................. 3, 4

*Chase Mfg., Inc. v. Johns Manville Corp.*, 84 F.4th 1157 (10th Cir. 2023) ............................... 10

*Columbian Fin. Corp. v. Bowman*, 314 F. Supp. 3d 1113 (D. Kan. 2018).................................... 5

*Credit Suisse Sec. (USA) LLC v. Billing*, 551 U.S. 264 (2007) ............................................. 1, 2, 3

*CSX Transp., Inc. v. Norfolk S. Ry. Co.*, 2023 WL 2552343 (E.D. Va. Jan. 27, 2023).......... 17, 18

*Edgar v. Teva Pharm. Indus., Ltd.*, 2024 WL 1282436 (D. Kan. Mar. 26, 2024)....................... 18

*Elliott Indus. Ltd. P'ship v. BP Am. Prod. Co.*, 407 F.3d 1091 (10th Cir. 2005) ................... 10, 11

*Emerson v. Kan. City S. Ry. Co.*, 503 F.3d 1126 (10th Cir. 2007) ................................................ 4

*Eravi v. City of Lawrence*, 2024 WL 3360447 (D. Kan. July 9, 2024) ....................................... 18

*Fayus Enters. v. BNSF Ry. Co.*, 602 F.3d 444 (D.C. Cir. 2010)................................................... 4

*Friberg v. Kan. City S. Ry. Co.*, 267 F.3d 439 (5th Cir. 2001)...................................................... 4

*Gaddy v. Corporation of the President of the Church of Jesus Christ of Latter-Day Saints*,
148 F.4th 1202 (10th Cir. 2025) ................................................................................... 14

*Garman v. Campbell Cnty. Sch. Dist. No. 1*, 630 F.3d 977 (10th Cir. 2010) .............................. 18

*Georgia v. Pa. R.R. Co.*, 324 U.S. 439 (1945)............................................................................. 17

*Hastey on behalf of YRC Worldwide, Inc. v. Welch*, 449 F. Supp. 3d 1053 (D. Kan. 2020).......... 5

*Hodgson v. Farmington City*, 675 F. App'x 838 (10th Cir. 2017) ................................................ 5

*Hooper v. City of Tulsa*, 71 F.4th 1270 (10th Cir. 2023)............................................................... 5

*In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*,
44 F.4th 959 (10th Cir. 2022) ......................................................................................... 8

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877 (2007) .................................... 8

*Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 847 F.3d 1221 (10th Cir. 2017)................ 17

*Llacua v. W. Range Ass'n*, 930 F.3d 1161 (10th Cir. 2019) ........................................................ 15

*Mathews v. Denv. Newspaper Agency LLP*, 649 F.3d 1199 (10th Cir. 2011) ................................ 5

*Matney v. Barrick Gold of N. Am.*, 80 F.4th 1136 (10th Cir. 2023) ............................................... 6

*Midwest Underground Storage, Inc. v. Porter*, 717 F.2d 493 (10th Cir. 1983) ........................... 16

*Mohamad v. Palestinian Auth.*, 566 U.S. 449 (2012) .................................................................... 18

*Navajo Nation v. Dalley*, 896 F.3d 1196 (10th Cir. 2018) ............................................................ 18

*Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064 (10th Cir. 2013) ................................................. 15

*O'Toole v. Northrop Grumman Corp.*, 499 F.3d 1218 (10th Cir. 2007) ...................................... 10

*Sanchez v. U.S. Dep't of Energy*, 870 F.3d 1185 (10th Cir. 2017) .................................................. 9

*State Oil Co. v. Khan*, 522 U.S. 3 (1997) ........................................................................................ 8

*Suture Express, Inc. v. Cardinal Health 200, LLC*,
   963 F. Supp. 2d 1212 (D. Kan. 2013) .......................................................................... 15, 16, 17

*Systemcare, Inc. v. Wang Laboratories Corp.*, 117 F.3d 1137 (10th Cir. 1997) ......................... 15

*Tal v. Hogan*, 453 F.3d 1244 (10th Cir. 2006) ......................................................................... 5, 14

*Total Renal Care, Inc. v. W. Nephrology & Metabolic Bone Disease, P.C.*,
   2009 WL 2596493 (D. Colo. Aug. 21, 2009) ............................................................................ 17

*U.S. Futures Exch., LLC v. Bd. of Trade of the City of Chi., Inc.*,
   953 F.3d 955 (7th Cir. 2020) ...................................................................................................... 1

*Union Pac. R.R. Co. v. Chi. Transit Auth.*, 647 F.3d 675 (7th Cir. 2011) ...................................... 4

*Union Pac. R.R. Co. v. Reg'l Transp. Auth.*, 74 F.4th 884 (7th Cir. 2023) ................................. 12

*United States v. Brewbaker*, 87 F.4th 563 (4th Cir. 2023) .............................................................. 9

*Wyo-Ben Inc. v. Haaland*, 63 F.4th 857 (10th Cir. 2023) ............................................................... 5

**Statutes:**

15 U.S.C.
   § 1 .............................................................................................................................................. 5
   § 2 ....................................................................................................................................... 16, 17
   § 26 ..................................................................................................................................... 17, 18

49 U.S.C.
   § 10101 ..................................................................................................................................... 12
   § 10501(b) .................................................................................................................................. 2
   § 10501(b)(1) ............................................................................................................................. 2
   § 10501(b)(2) ......................................................................................................................... 2, 4
   § 10706 ....................................................................................................................................... 3
   § 10901(a) .................................................................................................................................. 2
   § 10902(a) .................................................................................................................................. 2
   § 11101(b) .................................................................................................................................. 6
   § 11323(a) .................................................................................................................................. 2

ii

§ 11701(b) .................................................................................................................... 5
§ 11704(b) .................................................................................................................... 5

**Administrative Decisions:**

*Kan. & Okla. R.R.—Acquisition Exemption—Cent. Kansas Ry., LLC*,
  STB No. FD 34030, 2025 WL 627747 (STB served Feb. 25, 2025) ............................... 7, 8, 10

*Kan. & Okla. R.R.—Acquisition Exemption—Cent. Kansas Ry., LLC*,
  STB No. FD 34030, 2026 WL 795881 (STB served Mar. 20, 2026)........................................ 3

*Kan. & Okla. R.R.—Lease and Operation Exemption with Interchange Commitment—*
  *Union Pac. R.R.*, STB No. FD 36849
  (STB served Apr. 8, 2025), Decision ID No. 52540.....................................................................7

*Kan. & Okla. R.R.—Lease and Operation Exemption with Interchange Commitment—*
  *Union Pac. R.R.*, STB No. FD 36849 (Sub-No. 1)
  (STB served May 26, 2026), Decision ID No. 53075 ...........................................................6, 7

*Kan. & Okla. R.R.—Lease and Operation Exemption with Interchange Commitment—*
  *Union Pac. R.R.*, STB No. FD 36849,
  2025 WL 1769306 (STB served June 25, 2025)....................................................................12

*Rev. of Rail Access & Competition Issues*,
  STB Ex Parte No. 575, 2007 WL 3170981 (STB served Oct. 29, 2007) ..................... 2, 8, 9, 11

**Rules:**

D. Kan. Rule 15.1(a)(2) ................................................................................................. 18

**Regulations:**

49 C.F.R.
  § 1114.30(d)............................................................................................................. 6, 7
  § 1121.3(d)(2) .............................................................................................................. 7
  § 1150.33(h)................................................................................................................. 7
  § 1150.43(h)................................................................................................................. 2
  § 1150.43(h)(1) ............................................................................................................ 7

**Other Authorities:**

Rip Watson, *Lawsuit claims UP, short line blocked grain moves via alternate route*,
  TRAINSPRO (Jan. 30, 2026), https://shorturl.at/284uM .........................................................10

William A. Mullins and Michaela Mastroianni, *Regulatory Authority for Lease*
  *Renewals and Amendments? C'mon Man!*, 92 J. Transp. L. Logist. & Pol'y 81 (2025)...........8

## INTRODUCTION

Rather than resolve this matter at the Surface Transportation Board where it belongs, Plaintiffs have repackaged their grievance against K&O as an antitrust conspiracy before this Court. To do so, Plaintiffs construct a self-serving narrative built on vague, conclusory allegations. Yet Plaintiffs' alleged plot is divorced from Weskan's story as told to the STB and from industry reality.

No matter, Plaintiffs' Opposition spotlights the Complaint's shortcomings: Plaintiffs plead conclusory allegations insufficient to state antitrust claims. They do little more than restate the antitrust elements as facts and ask the Court to adopt them as such. But these are precisely the kind of allegations that are not entitled to a presumption of truth. And when the Court applies the proper pleading standard, the Complaint cannot survive.

## ARGUMENT

**I.     Plaintiffs' antitrust claims are incompatible with the ICCTA's regulatory scheme.**

**A.     K&O has implied antitrust immunity from Plaintiffs' federal antitrust claims.**

Implied antitrust immunity bars Plaintiffs' Sherman Act claims. To begin, "[i]mplied immunity is neither a securities doctrine nor a commodities doctrine. It is an antitrust doctrine. . . . The regulatory setting—securities, commodities, or something else—simply provides the backdrop against which the template is applied." *U.S. Futures Exch., LLC v. Bd. of Trade of the City of Chi., Inc.*, 953 F.3d 955, 968 (7th Cir. 2020); *see, e.g.*, *Brown v. Pro Football, Inc.*, 518 U.S. 231, 235–36, 242 (1996) (finding that certain collective bargaining activity enjoyed implied antitrust immunity). "[N]othing in [*Credit Suisse Sec. (USA) LLC v. Billing*, 551 U.S. 264 (2007)] points to the contrary." *U.S. Futures Exch.*, 953 F.3d at 968.

Plaintiffs challenge only *Credit Suisse*'s second, third, and fourth prongs. ECF No. 36 at 8. On the second prong, that K&O did not "comply with its legal obligations" to seek approval for the lease amendments is irrelevant to the analysis. *Id*. *Credit Suisse* asks whether the STB's

1

exercise of its authority over interchange commitments is "active and ongoing" in general, 551 U.S. at 285—not "in this instance," ECF No. 36 at 8; *see* ECF No. 31 at 11.

Next, although Plaintiffs do not challenge that the STB has the "regulatory authority . . . to supervise the activities in question," *Credit Suisse*, 551 U.S. at 285, they argue that regulating interchange commitments does not "lie 'squarely within' the STB's orbit." ECF No. 36 at 8–9. To thread that needle, they invoke 49 U.S.C. § 10501(b) as evidence that regulating interchange commitments is *not* "part of the STB's mandate." ECF No. 36 at 9. Yet Section 10501(b) compels the opposite: The STB has "exclusive" jurisdiction over "transportation by rail carriers," "remedies . . . with respect to rates," and the "acquisition" and "operation" of rail lines, including "*interchange*" between regulated railroads. 49 U.S.C. § 10501(b)(1)–(2) (emphasis added). Regulating short line transactions involving interchange commitments is thus "within the heartland" of the ICCTA's comprehensive regime. *Credit Suisse*, 551 U.S. at 285; *see* 49 U.S.C. §§ 10901(a), 10902(a), 11323(a); 49 C.F.R. § 1150.43(h); *see Rev. of Rail Access & Competition Issues*, STB Ex Parte No. 575, 2007 WL 3170981, at *9 (STB served Oct. 29, 2007) ("*Ex Parte No. 575*").

At the core of the implied immunity analysis, Plaintiffs do not meaningfully address whether there is a "serious conflict between the antitrust and regulatory regimes." *Credit Suisse*, 551 U.S. at 285. They address none of the concerns K&O raised—"the difficulty of drawing a complex, sinuous line separating" procompetitive and anticompetitive interchange commitments, "the need for [railroad]-related expertise to draw that line, the likelihood that litigating parties will depend upon the same evidence yet expect courts to draw different inferences from it, and the serious risk that antitrust courts will produce inconsistent results that, in turn, will overly deter" interchange commitments that have improved the railroad industry. *Id.*; *see Ex Parte No. 575*, 2007 WL 3170981, at *5–9 (describing the procompetitive benefits of interchange commitments); ECF

2

No. 31 at 11–13. To this end, the Court need not find that implied immunity applies to every "antitrust matter involving a railroad"—just the regulation of interchange commitments. ECF No. 36 at 10. *Credit Suisse* held only that implied immunity precluded "the application of the antitrust laws to the [securities] conduct alleged *in this case*." 551 U.S. at 267–68 (emphasis added); *see id.* at 285 (concluding "that the securities laws are 'clearly incompatible' with the application of the antitrust laws *in this context*") (emphasis added). And here, the ICCTA's regulation of interchange commitments is "clearly incompatible" with antitrust enforcement. *Id.* at 285.

Plaintiffs' erroneous, scattershot arguments do not change this conclusion. First, implied antitrust immunity is not a preemption doctrine. *See* ECF No. 36 at 9–10. *Credit Suisse* did not ask whether the securities law preempted the Sherman Act, and this Court need not ask it either. *See Credit Suisse*, 551 U.S. at 267–68 ("interpret[ing] the securities laws as implicitly precluding the application of the antitrust laws to the conduct alleged").

Plaintiffs are also wrong that the Lease is a "private agreement" outside STB jurisdiction. ECF No. 36 at 10. The STB directed K&O to file a "petition for exemption or application to obtain authority to renew the Lease" *because* the STB regulates short line transactions with interchange commitments. *Kan. & Okla. R.R.—Acquisition Exemption—Cent. Kansas Ry., LLC*, STB No. FD 34030, 2026 WL 795881, at *10 (STB served Mar. 20, 2026). Nor is the Lease regulated under 49 U.S.C. § 10706, which provides an antitrust exemption for certain approved "rate agreements." *See* ECF No. 36 at 10–11. At bottom, implied antitrust immunity precludes Plaintiffs' Sherman Act claims, and those claims should be dismissed.

### B.      The ICCTA preempts Plaintiffs' state-law antitrust claims.

Plaintiffs' arguments against ICCTA preemption of their state-law antitrust claims are similarly unavailing. As a procedural matter, the Court can grant a motion to dismiss "on the basis of an affirmative defense like preemption when the law compels that result." *Caplinger v. Medtronic,*

3

*Inc.*, 784 F.3d 1335, 1341 (10th Cir. 2015). On the merits, the question is not whether Plaintiffs have "standing to bring an antitrust claim," whether Plaintiffs' state-law claims are preempted by "federal antitrust law" or "*Illinois Brick* repealer statutes," or whether state-law antitrust claims are "duplicative" of the Sherman Act. ECF No. 36 at 11, 13–14. It is whether Plaintiffs can bring state-law antitrust claims that serve "an independent remedial function" (*id.* at 14), when Congress decided that "the *remedies* provided under [the ICCTA] with respect to regulation of rail transportation are exclusive and preempt the remedies provided under . . . State law." 49 U.S.C. § 10501(b)(2) (emphasis added). The answer is no.

Plaintiffs argue that this "preemption is narrow." ECF No. 36 at 11–12. Courts have held otherwise. *See Union Pac. R.R. Co. v. Chi. Transit Auth.*, 647 F.3d 675, 678 & n.1 (7th Cir. 2011) ("Congress's intent in the Act to preempt state and local regulation of railroad transportation has been recognized as broad and sweeping."); ECF No. 31 at 14–15. To be sure, "the scope of ICCTA preemption is broader than just direct economic regulation of railroads," *BNSF Ry. Co. v. Hiett*, 22 F.4th 1190, 1194 (10th Cir. 2022), but "the core of ICCTA preemption is economic regulation," *Fayus Enters. v. BNSF Ry. Co.*, 602 F.3d 444, 451 (D.C. Cir. 2010). And exposing railroads to state-law antitrust liability for railroad lease terms regulated by the STB would "have the effect of preventing or unreasonably interfering with railroad transportation" nationwide. *Emerson v. Kan. City S. Ry. Co.*, 503 F.3d 1126, 1133 (10th Cir. 2007); *see Friberg v. Kan. City S. Ry. Co.*, 267 F.3d 439, 444 (5th Cir. 2001) (holding that "liability aris[ing] from a railroad's economic decisions" falls squarely within "the all-encompassing language of the ICCTA's preemption clause").

Plaintiffs also claim that preemption would leave Farmer Plaintiffs "with no remedy for their [indirect] injuries" and leave K&O and Union Pacific "unaccountable for their anticompetitive conduct." ECF No. 36 at 14, 16–17. But that is not true either. Under the ICCTA, "[a] person

4

. . . may file with the Board a complaint about a violation of this part by a rail carrier providing transportation or service," and the STB "may not dismiss a complaint . . . because of the absence of direct damage to the complainant." 49 U.S.C. § 11701(b); *see* 49 U.S.C. § 11704(b) (authorizing damages). The ICCTA thus preempts Plaintiffs' state-law antitrust claims.

**II.    Plaintiffs fail to state claims under the Sherman Act § 1, the Colorado Antitrust Act and the Kansas Restraint of Trade Act.**

To evaluate antitrust claims, courts must understand the relevant industry and the relationship between the parties. Plaintiffs urge the Court to ignore the administrative record in the parallel STB proceedings, which clarifies these facts and dismantles the Complaint's narrative. These facts, however, are properly considered here. In reviewing a motion to dismiss, the Court can take judicial notice of certain "facts," *Tal v. Hogan*, 453 F.3d 1244, 1265 n.24 (10th Cir. 2006), and "public records," *Hooper v. City of Tulsa*, 71 F.4th 1270, 1280 n.8 (10th Cir. 2023). The STB decisions and Weskan's *own* representations before the STB are "matters of public record not subject to reasonable dispute" and thus may be considered.[1] *Hastey on behalf of YRC Worldwide, Inc. v. Welch*, 449 F. Supp. 3d 1053, 1060 (D. Kan. 2020); *see, e.g.*, *Wyo-Ben Inc. v. Haaland*, 63 F.4th 857, 872 n.10 (10th Cir. 2023) ("[D]istrict courts may take judicial notice of, and consider, documents in the administrative record on a Rule 12(b)(6) motion to dismiss."); *Hodgson v. Farmington City*, 675 F. App'x 838, 840–41 (10th Cir. 2017) (finding no error "in taking judicial notice of public records from the parties' administrative and judicial proceedings"); *Columbian Fin. Corp. v. Bowman*, 314 F. Supp. 3d 1113, 1119 (D. Kan. 2018), *aff'd*, 768 F. App'x 847 (10th Cir. 2019) (taking judicial notice of "the existence and content of the orders and pleadings submitted and

---

[1] To "protect[] the integrity of the judicial system," Weskan should also be judicially estopped "from deliberately changing positions according to the exigencies of the moment." *Mathews v. Denv. Newspaper Agency LLP*, 649 F.3d 1199, 1209 (10th Cir. 2011) (citation modified).

publicly filed" in administrative proceeding, including "the content of what was argued and what was decided").

*First*, Weskan does not pay the asset-use fee—or "secret surcharge" as Plaintiffs now re-peatedly call it. ECF No. 36 at 5; *see* 49 C.F.R. § 1114.30(d) (defining interchange commitment). As Weskan told the STB—while *quoting the Lease*—the asset-use fee is an "additional charge **to K&O** [that] effectively precludes the rail movement of any grain originating at the facilities of Weskan . . . on the Leased Premises westward over the Towner Line by making such movements cost prohibitive." Weskan Reply to Pet. for Exemption 6, *Kan. & Okla. R.R.—Lease and Operation Exemption with Interchange Commitment—Union Pac. R.R.*, STB No. FD 36849 (STB filed April 16, 2025), Doc. 309474 (emphasis added); *see also* Weskan Pet. 7, *Kan. & Okla. R.R.—Acquisition Exemption—Cent. Kansas Ry., LLC*, STB No. FD 34030 (STB filed Nov. 27, 2024), Doc. ID 308948 (describing the interchange commitment as "imposing an extremely high, if not punitive cost or charge **on K&O**") (emphasis added); *see generally Matney v. Barrick Gold of N. Am.*, 80 F.4th 1136, 1144–45 (10th Cir. 2023) ("Factual allegations that contradict a properly considered document are not well-pleaded facts that the court must accept as true.") (citation modified). Even so, Plaintiffs *still* urge the Court to reject K&O's argument that "it pays the Interchange Fee–not Plaintiff Weskan." ECF No. 36 at 27.

*Second*, Plaintiffs say this is not about rates. *See* ECF No. 36 at 12–13. Yet Weskan told the STB the opposite: Because of the interchange commitment, "K&O steadfastly refused to entertain providing rates and terms that would make rail transportation feasible over the use of trucks to move grain to the Stockton facility." Weskan Pet. 8, *Kan. & Okla. R.R.*, STB No. FD 34030; *see id.* at 8–10 (recounting Weskan's efforts to "obtain rates and terms that would make K&O service . . . to the CXR interchange feasible"); *see* 49 U.S.C. § 11101(b) (requiring a railroad to provide

6

rates on request). The dispute must, in fact, be about rates because Weskan does not pay the asset-use fee. Indeed, Weskan told the STB in its rate reasonableness case against K&O that "[t]he parties' disagreements have centered on the inability of Weskan to receive reasonable rates and service terms from K&O for the transportation of grain commodities . . . ." Weskan Pet. for Waiver 2, *Weskan Grain LLC v. Kan. & Okla. R.R.*, STB No. NOR 42185 (STB filed April 17, 2025), Doc. ID 311144.

*Third*, the interchange commitment is not as "secret" as Plaintiffs would have it appear. ECF No. 36 at 5. As Weskan (again) told the STB, Weskan and CXR have known about the interchange commitment for years:

> [I]n Weskan's . . . and CXR's discussions with K&O and UP about potential scenarios for transportation rates and service over the Lease Tracks ***dating back seven years***, both railroads have confirmed the existence of provisions in the Lease that are intended to restrict the ability of K&O to freely interchange grain cars originating from shippers located on the Lease Tracks with CXR at Towner . . . .

Weskan Pet. 8, *Kan. & Okla. R.R.*, STB No. FD 34030 (emphasis added). And although Plaintiffs lament that K&O has refused to provide a copy of the Lease, *see, e.g.*, ECF No. 36 at 6 n.4, 37, they cite no legal basis requiring K&O to do so outside the context of an STB proceeding—where this dispute belongs.[2] *See* 49 C.F.R. §§ 1121.3(d)(2), 1114.30(d), 1150.33(h), 1150.43(h)(1).

True enough, K&O did not seek authorization for the lease amendments. But this was not the nefarious agency run-around that Plaintiffs want it to be. *See, e.g.*, ECF No. 36 at 37. Rather, before the STB's decision in *Kan. & Okla. R.R.—Acquisition Exemption—Cent. Kansas Ry., LLC*,

---

[2] Plaintiffs also claim that "Weskan even went to the STB to force K&O to disclose it, but K&O and UP have still not shared it." ECF No. 36 at 37. In truth, the STB required K&O to disclose the Lease to only Weskan's STB counsel and that has been done—*twice. See Kan. & Okla. R.R.—Lease and Operation Exemption with Interchange Commitment—Union Pac. R.R.*, STB No. FD 36849 (STB served Apr. 8, 2025), Decision ID No. 52540; *Kan. & Okla. R.R.—Lease and Operation Exemption with Interchange Commitment—Union Pac. R.R.*, STB No. FD 36849 (Sub-No. 1) (STB served May 26, 2026), Decision ID No. 53075.

7

STB No. FD 34030, 2025 WL 627747 (STB served Feb. 25, 2025), "there had been significant confusion and conflicting precedent as to when a lease amendment needed to be submitted to the STB for approval." William A. Mullins and Michaela Mastroianni, *Regulatory Authority for Lease Renewals and Amendments? C'mon Man!*, 92 J. Transp. L. Logist. & Pol'y 81, 81 (2025). And in "holding that all lease amendments must be submitted for approval"—including K&O's—STB practitioners immediately criticized the STB for "overstepp[ing] the statutory purpose and act[ing] outside the scope of the current regulatory scheme." *Id.*

### A.    The per se rule does not apply to Plaintiffs' Section 1 claims.

Plaintiffs try to excuse their failure to plead the rule of reason threshold requirements by advocating for per se treatment of their Section 1 claims. "The per se rule is appropriate only after courts have had considerable experience with the type of restraint at issue, and only if courts can predict with confidence that it would be invalidated in all or almost all instances under the rule of reason." *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886–87 (2007) (citation modified); *see State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997) (explaining that the per se rule is inappropriate when "the economic impact of certain practices is not immediately obvious").

Neither is true here. Plaintiffs cite no examples of courts finding interchange commitments to be anticompetitive, and interchange commitments do not have "manifestly anticompetitive effects" in any event. *Leegin*, 551 U.S. at 886 (citation modified). Just the opposite: Interchange commitments are often procompetitive. They "have facilitated the creation and growth of short line railroads" like K&O, "which in turn has benefited the public" in various ways. *Ex Parte No. 575*, 2007 WL 3170981, at *5; *see id.*, at *6–9 (discussing the procompetitive benefits of interchange commitments). That a business arrangement "may be procompetitive or competitively neutral . . . necessarily means a per se rule is inappropriate." *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, 44 F.4th 959, 1003 n.22 (10th Cir. 2022).

8

To skirt the per se rule's categorical application, Plaintiffs suggest that the Court need not find that "all interchange commitments" are per se anticompetitive; it need only apply the per se rule "to this specific case." ECF No. 36 at 28. Yet that makes the point. Courts apply per se treatment only when the alleged conduct "appears on its face to be the sort of conduct that would *nearly always* have anticompetitive effects." *Budicak, Inc. v. Lansing Trade Grp., LLC*, 452 F. Supp. 3d 1029, 1053 (D. Kan. 2020) (emphasis added). Again, that is not the case with interchange commitments, which do not always cause "more harm than good," and thus cannot be governed by a "single rule of general applicability." *Ex Parte No. 575*, 2007 WL 3170981, at *5; *see id.*, at *9 (refusing to make "broad, sweeping generalizations about the lack of social utility of interchange commitments").

Slapping the conclusory label "price-fixing" on K&O's conduct, moreover, does not make it so. *See Sanchez v. U.S. Dep't of Energy*, 870 F.3d 1185, 1199 (10th Cir. 2017) (refusing "to accept mere labels and legal conclusions as true"). "Rather than look only at the label attached to the restraint, such as 'price fixing' or 'market allocation,' courts must consider the restraint in context . . . before applying the per se rule." *United States v. Brewbaker*, 87 F.4th 563, 574 (4th Cir. 2023). And in context, "Plaintiffs' Sherman Act claim does not fall within the standard scope of 'price-fixing' claims." *Budicak*, 452 F. Supp. 3d at 1054.

K&O did not "fix" any prices. The interchange commitment may have affected K&O's ability to offer rates acceptable to Weskan—but Weskan never paid these rates. No railcars have interchanged at the Towner Line since it reopened in 2019. *Contrast* ECF No. 36 at 27 (arguing that even if K&O's explanation of the interchange commitment is "technically true, . . . this secret surcharge is passed on to and ultimately borne by Weskan"), *with* Compl. ¶¶ 8, 52, *and* Weskan Pet. for Waiver 2, *Weskan Grain*, STB No. NOR 42185 ("K&O has never shipped any grain from

Kansas to the Stockton Facility since it became operational in 2023."). And when trucks take grain from western Kansas to Weskan's Stockton Facility—which occurs much more often than Plaintiffs let on[3]—*Weskan* or the *Farmer Plaintiffs* allegedly incur increased transportation costs, but K&O does not make a penny. *See Kan. & Okla. R.R.*, 2025 WL 627747, at *1 ("Weskan states that . . . its recently constructed grain elevator complex near Sheridan, Colo. (Stockton Facility) . . . currently receives grain by truck.").

At best, Plaintiffs suggest that the alleged scheme "generated revenue" that K&O "would not have received without the scheme." ECF No. 36 at 35. Yet Plaintiffs do not allege that K&O charged "prices above competitive levels" for eastbound rail traffic. *Chase Mfg., Inc. v. Johns Manville Corp.*, 84 F.4th 1157, 1177 n.24 (10th Cir. 2023); *see Elliott Indus. Ltd. P'ship v. BP Am. Prod. Co.*, 407 F.3d 1091, 1124 n.29 (10th Cir. 2005) (defining price-fixing as "raising, depressing, fixing, pegging, or stabilizing the price of a commodity"). Nor do Plaintiffs allege that this extra revenue is *more* than K&O would receive if—as Plaintiffs allege would happen—rail traffic could travel west on the Lease Track. *See* Compl. ¶¶ 3, 6, 43–45; ECF No. 31 at 30.

Not only that, but Plaintiffs concede that K&O's interchange commitment to Union Pacific does not apply to traffic originating on K&O's owned rail line. ECF No. 36 at 20. This means that Weskan's two Scott City facilities never need to send grain east to Hutchinson (or even by truck

---

[3] Plaintiffs allege that only "a small number of farmers in the westernmost part of the Relevant Market can ship their grain by truck." Compl. ¶ 37. But this allegation is belied by Weskan and CXR's owner's claim—while touting this lawsuit, no less—that "the ability to move traffic directly via [CXR] would eliminate 25,000 moves currently made by truck to get grain from Scott City to where [CXR] can handle it." *See* Rip Watson, *Lawsuit claims UP, short line blocked grain moves via alternate route*, TRAINSPRO (Jan. 30, 2026), https://shorturl.at/284uM; *see O'Toole v. Northrop Grumman Corp.*, 499 F.3d 1218 (10th Cir. 2007) (taking judicial notice of information on the internet). Scott City, however, is in the *eastern* part of the proposed relevant market. ECF No. 1-1 at 2.

to Stockton).[4] *See* Compl. ¶¶ 65–67; ECF No. 1-1 at 1–2; Weskan Reply 10, *Kan. & Okla. R.R.—Lease and Operation Exemption with Interchange Commitment—Union Pac. R.R.*, STB No. FD 36849 (STB filed Jan. 5, 2026), Doc. ID 310647 ("K&O and UP confirm that the Asset Use Fee does not apply to grain loaded at Weskan's Scott City East and Scott City Kirk facilities.").

The per se rule does not apply for the added reason that K&O and Union Pacific "do not compete with each other, but rather provide services at different points in a distribution chain."[5] *Ex Parte No. 575*, 2007 WL 3170981, at *6; *see Elliott Indus.*, 407 F.3d at 1124 n.29 (describing horizontal price-fixing as an agreement "among actual competitors (i.e., at the same level of distribution)"); *Budicak*, 452 F. Supp. 3d at 1054 ("Plaintiffs provide no cases, and the Court has uncovered none, where a court afforded per se analysis to a price-fixing conspiracy between non-competitors."). K&O does not compete with Class I railroads, like Union Pacific, for shipping grain to the west coast; the Lease Track ends just over the Colorado border. ECF No. 1-1 at 1. Rather, K&O feeds local traffic to the Class I network, in which Union Pacific competes with BNSF for westbound traffic. *See* Compl. ¶¶ 6, 43, 63; ECF No. 1-1 at 1. If K&O and Union Pacific were, in fact, competitors, Union Pacific would not lease its railroad track to K&O. Union Pacific could simply operate the track itself and exclude K&O from the market.

Including Union Pacific's and BNSF's rail lines north and south of the proposed relevant market in the geographic market as part of the area of effective competition does not "undercut" this point. ECF No. 36 at 25. Plaintiffs allege that the interchange commitment's purpose was to

---

[4] Weskan alleges that it shipped grain east to Hutchinson via K&O's owned line only once in December 2025—as Plaintiffs were gearing up for this lawsuit. Compl. ¶¶ 65–67. Otherwise, Plaintiffs allege only that traffic had to go east on the Lease Track *before* the Towner Line became operational. *See id.* ¶¶ 4, 42.

[5] Even if the Court finds that K&O and Union Pacific are competitors, the per se rule is still inapplicable for the reasons stated already.

11

force shippers to use Union Pacific tracks to ship grain west rather than give BNSF the chance to compete with Union Pacific for traffic west of NA Junction on the Towner Line. *See* Compl. ¶¶ 6, 43, 63; ECF No. 1-1 at 1; *see Kan. & Okla. R.R.—Lease and Operation Exemption with Interchange Commitment—Union Pac. R.R.*, STB No. FD 36849, 2025 WL 1769306, *1 (STB served June 25, 2025) ("Weskan argues that competition between BNSF and UP to serve the Stockton Facility is therefore foreclosed . . . ."). K&O pointed out, in response, that the Union Pacific and BNSF rail lines just outside the proposed relevant market are well within reasonable trucking distance, thus creating competition between *Union Pacific and BNSF* for westbound traffic even if the interchange commitment prevents the two railroads from competing for westbound traffic on the Towner Line. *See* ECF No. 31 at 24; ECF No. 1-1 at 1–2.

In short, the rule of reason applies to "most claims," and Plaintiffs' claims are no exception. *Campfield v. State Farm Mut. Auto. Ins.*, 532 F.3d 1111, 1119 (10th Cir. 2008).

**B.      Plaintiffs fail to allege a legally sufficient relevant market.**

Plaintiffs' legally insufficient relevant market allegations are "cause for dismissal." *Campfield*, 532 F.3d at 1118; *see Association of Surgical Assistants v. Nat'l Bd. of Surgical Tech. & Surgical Assisting*, 127 F.4th 178, 189 (10th Cir. 2025) (same); *Budicak*, 452 F. Supp. 3d at 1054.

**Product Market**. Plaintiffs cannot credibly argue that trucks and rail are not "reasonable substitutes" for short-haul shipments. *Surgical Assistants*, 127 F.4th at 187. The STB has determined that trucks compete with rail. ECF No. 31 at 21; *see also Union Pac. R.R. Co. v. Reg'l Transp. Auth.*, 74 F.4th 884, 887 (7th Cir. 2023) (noting that "one goal of the 1995 amendments was to deregulate rail transportation, so that it could better compete with . . . truck transportation"). And Weskan told the STB that the interchange commitment violates Congress's rail transportation policy goals in 49 U.S.C. § 10101 because "it would discourage CXR's development of the Towner Line to effectively compete with commercial trucking of grain in western Kansas and Colorado"

and it does not "ensure effective competition between CXR and commercial trucking of grain to Weskan's facility." Weskan Reply 8, *Kan. & Okla. R.R.*, STB No. FD 36849 (citation modified); *see also* Weskan Pet. 9, *Kan. & Okla. R.R.*, STB No. FD 34030 (describing rate negotiations with K&O that would have "enable[d] K&O's service to compete with trucking service"); ECF No. 36 at 4 (admitting "demand for trucks is high" at harvest time); Watson, *supra* n.4.

Alternative rail lines should also be included in the product market. Although Plaintiffs allege that "the UP Lease Track is the only railroad in the Relevant Market," Compl. ¶ 58, that's not true. Plaintiffs now concede that the interchange commitment does not apply to traffic originating on K&O's owned rail line in Scott and Lane County, so K&O can carry traffic west from Weskan's two Scott City facilities without owing Union Pacific the asset-use fee. ECF No. 36 at 20; ECF No. 1-1 at 1–2; *see supra* p. 10–11. As for alternative rail lines outside the proposed relevant market, to show the interchange commitment's anticompetitive effects, Plaintiffs allege that Union Pacific's Oakley, KS rail line and BNSF's Garden City, KS rail line are "comparable markets" for grain prices. *See* Compl. ¶ 67; ECF No. 1-1 at 1–2. Because plaintiffs rely on these locations as "price comparison" points for grain shipped from within the relevant market, these locations must also, by definition, be accessible to farmers in the relevant market. Compl. ¶ 67.

Last, Plaintiffs contend that shipping grain east is not interchangeable with shipping grain west because of "price, use, and qualities." ECF No. 36 at 33. Yet Plaintiffs point to no facts anywhere, much less in the Complaint, to support this conclusory assertion. *See* Compl. ¶¶ 2, 35.

**Geographic Market.** The Tenth Circuit has not endorsed the hypothetical monopolist test to analyze the relevant market on a motion to dismiss, so the Court need not consider it. *See* ECF No. 36 at 33–34. But either way, the Court has no basis to evaluate it here. Plaintiffs do no more than restate the test and declare that it applies with no underlying factual support. Compl. ¶ 59; *see*

13

*Gaddy v. Corporation of the President of the Church of Jesus Christ of Latter-Day Saints*, 148 F.4th 1202, 1210 (10th Cir. 2025) ("We need not accept as true a complaint's conclusory allegations, unwarranted inferences, or legal conclusions.") (citation modified). Far from "direct evidence" of K&O using its monopoly power to impose a small or large price increase, no railcars have used the Lease Track to interchange with CXR at the Towner Line, so K&O has no customers to lose. ECF No. 36 at 34; *see* Compl. ¶¶ 8, 52.

The bottom line is that the proposed geographic market is defined too narrowly because customers can turn to alternative rail lines. If Weskan can truck grain all the way from Scott City to its Stockton Facility, *see* Watson, *supra* n.4; ECF No. 1-1 at 1–2, then the alternative rail lines are also well within reasonable trucking distance. *See* Compl. ¶¶ 57, 67; ECF No. 31-1 ¶ 3.

### C.    Plaintiffs fail to plausibly allege market power.

Pleading market power is also a "prerequisite" for Plaintiffs' Section 1 claims, and the deficient relevant market definition makes it "impossible to assess" whether K&O and Union Pacific have market power. *Surgical Assistants*, 127 F.4th at 190. Plaintiffs cannot plausibly allege, for example, that Defendants have a "100% market share over the westbound shipment of grain by *train* from the Relevant Market" when the product market is limited neither to trains nor to the Lease Track. ECF No. 36 at 35 (emphasis added).

But even if Plaintiffs allege a plausible relevant market, Plaintiffs' market power allegations "suffer[] from [a] lack of factual support." *Tal*, 453 F.3d at 1261. Plaintiffs' direct and indirect allegations are no more than affirmative restatements of their burden to allege market power. ECF No. 36 at 34. Take Plaintiffs' claim that the Complaint alleges that K&O "substantially increased the price to ship grain westbound by rail . . . but only lost a small number of customers." *Id.* at 34–35 (citing Compl. ¶¶ 60–61). That allegation simply restates how to allege market power directly: that a defendant "raised prices substantially above a competitive level without sacrificing

14

business." *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1071 (10th Cir. 2013). It states, in other words, "an inference . . . devoid of any factual enhancement" that the Court need not accept as true.[6] *Brooks v. Mentor Worldwide LLC*, 985 F.3d 1272, 1281 (10th Cir. 2021) (citation modified). This allegation also ignores that K&O has no customers to lose: No railcars have interchanged at the Towner Line since it reopened in 2019. Compl. ¶¶ 8, 52.

### D.     Plaintiffs fail to plausibly allege price-fixing and market allocation claims.

Threshold deficiencies aside, Plaintiffs fail to allege plausible Section 1 claims.

### 1.     Plaintiffs do not plausibly allege a price-fixing claim.

Under the rule of reason too, Plaintiffs fail to plausibly allege a price-fixing claim. Union Pacific leased K&O railroad track. Plaintiffs allege that *one* provision in the entire Lease—the interchange commitment—is an unreasonable restraint of trade. In doing so, Plaintiffs try to contort the interchange commitment, a common lease term with recognized procompetitive benefits, into a price-fixing claim and assign anticompetitive motives to K&O, the lessee. *See* Compl. ¶¶ 75–77. Yet, as explained, the interchange commitment has not had the effect of price-fixing—as that term is defined—and K&O would be better off without the interchange commitment. *See supra* p. 9–10; ECF No. 31 at 26–31. Put another way, K&O had no "unity of purpose" with Union Pacific on its effects.[7] *Suture Express, Inc. v. Cardinal Health 200, LLC*, 963 F. Supp. 2d 1212, 1223 (D. Kan. 2013). The Court should thus heed the advice to "look carefully at antitrust cases where the defendants had no rational economic motive to conspire." *Llacua v. W. Range Ass'n*, 930 F.3d 1161, 1181 (10th Cir. 2019) (citation modified).

---

[6] Plaintiffs' indirect market power allegations fare no better. *Compare* Compl. ¶¶ 60, 62, *with Novell*, 731 F.3d at 1071.

[7] This case is therefore nothing like *Systemcare, Inc. v. Wang Laboratories Corp.*, in which the buyer reluctantly agreed to a tying arrangement that was, by its nature, anticompetitive. 117 F.3d 1137, 1143–44 (10th Cir. 1997).

### 2.    Plaintiffs fail to state a plausible market allocation claim.

Plaintiffs also fail to save their market allocation claim. Plaintiffs concede that their market allocation claim survives only if the Court finds that Plaintiffs allege a horizontal market allocation claim between competitors. ECF No. 36 at 28. Because K&O and Union Pacific are not competitors, this claim fails. *See supra* p. 11–12. But even if K&O and Union Pacific are competitors, Plaintiffs still do not allege the "essence of a market allocation violation"—that K&O and Union Pacific "apportion[ed] the market among themselves and *cease[d] competing* in another's territory or for another's customers." *Midwest Underground Storage, Inc. v. Porter*, 717 F.2d 493, 497 n.2 (10th Cir. 1983) (emphasis added); Compl. ¶¶ 82–85. Either way, the claim should be dismissed.

## III.    Plaintiffs fail to plausibly allege a Section 2 conspiracy-to-monopolize claim.

Plaintiffs' conspiracy-to-monopolize claim under the Sherman Act § 2 should likewise be dismissed. K&O's argument does not rely on an "inconsistent" assumption that K&O and Union Pacific are "horizontal competitors." ECF No. 36 at 36. It relies on the Complaint: Plaintiffs ask the Court to find "that Defendants violated Section 2 of the Sherman Act by conspiring to maintain *their* monopoly in the Relevant Market." Compl. at Prayer for Relief (C) (emphasis added); *see id.* ¶ 11 (alleging that Defendants "preserved *their* monopoly") (emphasis added); *id.* ¶¶ 92–95 (alleging K&O and Union Pacific's collective efforts to monopolize the market together). This shared monopoly theory "contradict[s] the basic concept that a monopoly is the domination of a market by a single firm" and requires dismissal. *Suture Express*, 963 F. Supp. 2d at 1227.

If Plaintiffs, as they insist, do not allege a deficient shared monopoly theory, then Plaintiffs' conspiracy-to-monopolize claim must rest on the theory that Union Pacific is the single entity seeking to monopolize the market.[8] *See* Compl. at Prayer for Relief (B) (asking the Court to find

---

[8] Plaintiffs offer that the "UP Lease Track"—is "effectively the 'single economic entity' necessary for a monopoly." ECF No. 36 at 37. But that makes no sense. The Sherman Act imposes liability

"that [Union Pacific] violated Section 2 of the Sherman Act by unlawfully maintaining its monopoly"); *see id.* ¶¶ 86–90 (alleging monopoly maintenance claim against Union Pacific). A monopoly, after all, requires "the domination of a market by a single firm." *Suture Express*, 963 F. Supp. 2d at 1227; *see Kan. & Okla. R.R.*, 2025 WL 1769306, at *1 ("Weskan contends that the proposed interchange commitment is intended to preserve [Union Pacific's] market power . . . .") (citation modified). Yet Plaintiffs plead no facts to infer that *K&O* had the "specific intent" to help *Union Pacific* achieve a monopoly. *Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 847 F.3d 1221, 1231 (10th Cir. 2017). That's because Plaintiffs allege that K&O would carry more traffic if it were not subject to Union Pacific's interchange commitment. *See* ECF No. 31 at 30, 35; *see* Watson, *supra* n.4. And "if one party's intent to monopolize is not shared by another party, there can be no conspiracy to monopolize." *Total Renal Care, Inc. v. W. Nephrology & Metabolic Bone Disease, P.C.*, 2009 WL 2596493, at *16 (D. Colo. Aug. 21, 2009) (citation modified).

## IV.      Plaintiffs cannot seek injunctive relief against K&O for their federal antitrust claims.

Plaintiffs are not entitled to injunctive relief under federal antitrust law. Plaintiffs argue that under the Clayton Act, they can seek injunctive relief against a common carrier "as long as it does not encroach on 'a matter subject to the jurisdiction' of a regulatory agency." ECF No. 36 at 39 (citing *Georgia v. Pa. R.R. Co.*, 324 U.S. 439, 455 (1945)). Yet their reliance on *Georgia* is "misplaced." *CSX Transp., Inc. v. Norfolk S. Ry. Co.*, 2023 WL 2552343, at *7 (E.D. Va. Jan. 27, 2023). The Supreme Court in *Georgia* analyzed a pre-ICCTA version of the Clayton Act that limited seeking injunctive relief "in respect of any matter subject to the regulation, supervision, or other jurisdiction of the [ICC]." 15 U.S.C. § 26 (amended 1995). The current statutory text, however,

---

on "every person" who conspires "with any other person" to monopolize a part of trade or commerce. 15 U.S.C. § 2. The Sherman Act does not impose liability on inanimate objects.

17

deleted this language and thus "no longer limits the bar on private actions to matters that are subject to the jurisdiction of the STB." *CSX Transp.*, 2023 WL 2552343, at \*8.

The ICCTA's legislative history changes nothing. *Compare* ECF No. 36 at 40, *with CSX Transp.*, 2023 WL 2552343, at \*8–10 (analyzing why plaintiff's legislative history arguments "are unavailing even if considered substantively"). Courts consider legislative history only if the statute is ambiguous. *See Mohamad v. Palestinian Auth.*, 566 U.S. 449, 458 (2012); *Navajo Nation v. Dalley*, 896 F.3d 1196, 1211 (10th Cir. 2018). And Section 26 is anything but: No person can "bring suit for injunctive relief against any common carrier subject to the jurisdiction of the [STB]."

## V.     Plaintiffs' request for leave to amend the Complaint should be denied.

"A request for leave to amend included in a brief in opposition to a motion to dismiss is improper; rather, leave to amend must be sought by a written motion." *Edgar v. Teva Pharm. Indus., Ltd.*, 2024 WL 1282436, at \*36 (D. Kan. Mar. 26, 2024) (citation modified); *see Garman v. Campbell Cnty. Sch. Dist. No. 1*, 630 F.3d 977, 986 (10th Cir. 2010) (calling this procedural shortcut "insufficient"). Plaintiffs neither filed a motion nor "attach[ed] the proposed pleading." D. Kan. Rule 15.1(a)(2). This "failure to comply with Local Rule 15.1 is alone sufficient to deny leave to amend." *Eravi v. City of Lawrence*, 2024 WL 3360447, at \*5 (D. Kan. July 9, 2024). Plaintiffs' request for leave to amend their complaint should be denied. *See* ECF No. 36 at 40.

At any rate, amendment would be futile. *See Bauchman for Bauchman v. W. High Sch.*, 132 F.3d 542, 562 (10th Cir. 1997) ("A court properly may deny a motion for leave to amend as futile when the proposed amended complaint would be subject to dismissal for any reason." (citation modified)). When the relevant market is properly defined and when Weskan pleads facts consistent with its representations at the STB, Plaintiffs cannot state plausible antitrust claims.

## CONCLUSION

The Court should dismiss Plaintiffs' Complaint with prejudice.

18

Dated: June 5, 2026

Respectfully submitted,

*/s/ Sara A. Fevurly*
Jeffrey J. Simon, KS 15231
Sara A. Fevurly, KS 27537
HUSCH BLACKWELL LLP
4801 Main Street, Suite 1000
Kansas City, MO 64112
T: 816.983.8000
F: 816.983.8080
jeff.simon@huschblackwell.com
sara.fevurly@huschblackwell.com

Daniel G. Solomon, *admitted pro hac vice*
HUSCH BLACKWELL LLP
1801 Pennsylvania Avenue, NW, Suite 1000
Washington, DC 20006
T: 202.378.2300
danny.solomon@huschblackwell.com

**ATTORNEYS FOR DEFENDANT
KANSAS & OKLAHOMA RAILROAD, LLC**

19

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 5, 2026, I filed this document via the Court's ECF system, which will cause a true and correct copy of the same to be served electronically on all ECF-registered counsel of record.

*/s/ Sara A. Fevurly*

20